Marlene A. Fong SBN 111560
Marc Alan Fong SBN 80049
FONG & FONG APC
2161 Harbor Bay Parkway
Alameda, CA 94502
Tel. 510-748-6800 x110
Email: marlene.fong@fonglaw.com
Email: mfong@fonglaw.com
Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SARAH-JANE PARKER, DEBTOR | ) CASE NO.: 14-44083 CN13 |
| | ) |
| VS. | ) MEMORANDUM OF POINTS AND |
| | ) AUTHORITIES IN SUPPORT OF MOTION |
| LAURENCE JENNINGS; RAJ PATEL; | ) FOR SANCTIONS FOR VIOLATION OF |
| JUSTIN HU; LAWRENCE DROUIN; | ) AUTOMATIC STAY AND FOR CONTEMPT |
| BAYSIDE COURT OWNERS | ) UNDER 11 USC 362(a), (k) AND 11 USC |
| ASSOCIATION; SCOTT JORDAN, ESQ; | ) 105(a) |
| ANDREW CANTOR, ESQ., | ) |
| | ) Date: December 4, 2015 |
| RESPONDENTS | ) Time: 11:00 a.m. |
| | ) Courtroom: 215 |
| | ) Location: United States Bankruptcy Court, |
| | ) 1300 Clay Street, Second Floor, Oakland, CA |
| | ) Judge: Hon. Charles Novack |

# TABLE OF AUTHORITIES

## Cases

*BMW of North America v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589;
134 L.Ed.2d. 809 (1996) ………………………………………………40, 42

*Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343 (1940) ……………………………. 22

*State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408;
123 S.Ct. 1513, 1519-20; 155 L.Ed.2d 585 (2003)…………….…... 40

*In re Avon Townhomes Venture*, 433 B.R. 269
(Bankr.N.D.Calif. 2010) …………....…15, 16, 19, 20, 30, 32, 33, 37, 51

*In re Bloom*, 875 F.2d 224 (9th Cir. 1989) …………………………..………………. 39

*In re Bulson*, 117 B.R. 537, 539 (9th Cir. B.A.P. 1990) …………………………………...14

*In re Butz*, 444 B.R. 301 (Bankr.M.D.Penn. 2011) ………………………………. 9, 13, 14

*Campbell v. Countrywide Home Loans, Inc*., 545 F.3d 348 (5th Cir. 2008) ………………...34

*In re Cassell*, 254 B.R. 687 (6th Cir. B.A.P. 2000) ……………………………………… 34

*In re Chaussee*, 399 B.R. 225 (9th Cir. B.A.P. 2008) …………………………………….34

*In re Dawson*, 390 F.3d 1139 (9th Cir. 2004) …………………………...…………….37, 38, 39

*In re Diamond*, 286 BR 476 (D.N.H. 2002) ………………………….………………. 14, 23

*In re Draper*, 237 BR 502 (Bankr.M.D.Fla. 1999) ……………………………………… 13

*Eskanos & Adler P.C. v. Leetien* (*In re Eskanos*), 309 F.3d 1210 (9th Cir. 2002) …………. 35

*Matter of Excello Press Inc*., 967 F.2d 1109 (7th Cir. 1992) ……………………………….34

*Fink v. Nourse*, 239 F.3d 989 (9th Cir. 2001) …………………………………...…………….. 15

*Frantz v. United States Powerlifting Federation*, 836 F.2d 1063 (7th Cir. 1987) …………. 34

*Griffin v. Wardrobe* (*In re Wardrobe*) 559 F.3d 932 (9th Cir. 2009) ………………………... 22

*In re Granados Communications Inc*, 503 B.R. 726 (9th Cir. B.A.P. 2013) …..………... 36, 37

*In re Gordon Properties LLC,* 460 BR 681 (Bankr.E.D.Va 2011) 16, 17, 18, 21, 29, 32, 39, 51

*In re Jamo*, 283 F.3d 392 (1st Cir. 2002) ………………………………………………….... 23

*In re Karsh Travel*, 102 B.R. 778 (N.D. Calif. 1989) ……………….……………………… 9

*In re Kaufman*, 315 B.R. 858 (Bankr.N.D.Calif. 2004) …..………… 16, 40, 41, 42, 49, 53-55

*In re Klotz*, 239 B.R. 706 (Bankr.N.D.Ohio 2002) …………………….……………. 39, 40

*In re Khan*, 504 B.R. 409 (Bankr.D.Md. 2014) …………………………….…………. 31

*Knupfer v. Lindblade* (*In re Dyer*) 322 F.3d 1178 (9th Cir. 2003) ……………..……...…9, 15, 35

*In re Lopez*, 405 BR 24 (1st Cir. B.A.P 2009) …………………………………..……… 36

*In re Payless Cashways, Inc.*, 287 B.R. 482 (Bankr.W.D.Mo. 2002) …………………….21

*In re Pavon*, 192 F.3d 902 (9th Cir. 1999) ……………………………………..……… 39

*In re Peralta*, 317 BR 381 (9th Cir. B.A.P. 2004) ……………………………....…. 14, 22, 23

*In re Perl*, 513 B.R. 566 (9th Cir. B.A.P. 2014) ………………………………………… 22

*Professional Seminar Consultants v. Sino American Tech. Exchange Council Inc.*

                  727 F.2d 1470 (9th Cir. 1984) …………………………….……… 40

*In re Ray*, 355 BR 253 (Bankr.D.Oregon 2006) …………………………………..…… 14

*River Garden Farms v. Superior Court*, (1972) 26 Cal.App.3d 986 …………….……... 46

*In re Reynard*, 250 B.R. 241 (Bankr.E.D.Va. 2000) …………………………..………… 14, 31

*In re Rogers*, 391 B.R. 317 (Bankr.M.D.La. 2008) ……………………………………… 34

*In re Schwartz*, 954 F.2d 569 (9th Cir. 1992) …………………………………………… 20, 22

*In re Sedgwick*, 266 B.R. 185 (Bankr.N.D.Calif.2001) …………………..……………… 20, 31

*In re Snowden*, 769 F.3d 651 (9th Cir. 2014) ……………………….…......…….36, 37, 38, 39

*In re Spencer*, 457 B.R. 601 (E.D.Mich.2011) …………………………………..……… 51

*In re St. Vincent's Catholic Med. Centers*, 440 B.R. 587 (Bankr.S.D.N.Y. 2010) ………….21

*In re Stanton*, 139 BR 232 (9th Cir. B.A.P. 1992) ………………………………………… 36

*Sternberg v. Johnson*, 595 F.3d 937 (9th Cir. 2010) ……………………………………… 35

*United States v. Harchar*, 371 B.R. 254 (N.D.Ohio 2007) ………………………………… 14, 31

*Wash. St. Corp. v. Lusardi*, 329 F.3d 1076 (9th Cir. 2003) …………………...………… 22

*In re Zumbrum*, 88 B.R. 250 (9th Cir. B.A.P. 1988) ………..……….………..…..…… 9

## **Statutes**

11 U.S.C. 101(5) ……………………………………......………..…………… 9, 30

11 U.S.C. 105(a) ……………………………………… 8, 9, 15, 22, 26-28, 31-33, 37

11 U.S.C. 362(a) …………………………….......… 9, 13-17, 20, 21, 25, 27, 31, 33, 35, 51

11 U.S.C. 362(k) ……………….……………….....……… 9, 15, 16, 25, 27, 29, 36-38, 39

11 U.S.C. 501 …………………………………………………………………….33

11 U.S.C. 501 …………………………………………………………………….33

11 U.S.C. 1306(a) ………………………………………………………………… 31

11 U.S.C. 1327(c) ………………………………………………………………… 31

Cal. Civil Code Sec.  4285(c) ……………………...…………………,…..…………… 17

Cal. Civil Code Sec. 4290(a) ……………………………………………,…………… 17

Cal. Civil Code Sec. 4295 …………………………………………..……………… 17

Cal. Civil Code Sec. 5605(b) …………………………………………..….. 18, 47

Cal. Civil Code Sec. 5655(a) …………………………………………..……… 31

Cal. Civil Code Sec. 5675 …………………………………………………… 34

Cal. Civil Code Sec. 5700 …………………………………………………… 34

Cal. Civil Code Sec. 5725(b) …………………………………………………… 35

Cal. Civil Code Sec. 4070 …………………………………………..……….… 18

Cal. Civil Code Sec. 1366(b) [former] …………………………...…………… 18, 47

FRBP 9011(b) …………………………………………………..…………….34, 35

# TABLE OF CONTENTS

1. Introduction and Factual Background …………………………….……………..….. 8

2. Jurisdiction …………………………………………………………… 9

3. Identity and status of respondents……………………………….…………… 9

4. The board member respondents are highly sophisticated in real estate, business, and finance …………………………………………………………..……10


PART ONE: SUMMARY OF STAY VIOLATIONS …………………………… 10


PART TWO: APPLICABLE LAW ……………………………………………… 13

A.  The automatic stay is extremely broad and prohibits any act to collect a pre-petition claim, whether direct or indirect. ……………………………………………… 13

B.  The automatic stay prevents any act against property of the estate or property from the estate…………………………………………………………… 14

C.  The court has broad power under section 105(a) and its inherent power to curb and sanction abusive litigation practices………………………………………………… 15

D.  A condominium association cannot use coercion and subterfuge to force payment of pre-petition claims. …………………………………………………… 16

E.  A recorded condominium plan cannot be altered or amended without the consent of the record owner and all mortgage holders on a notarized instrument. ………….…………… 17


PART THREE: THE ASSESSMENT INCREASES ARE UNLAWFUL UNDER CALIFORNIA SUBSTANTIVE LAW AND THE ASSOCIATION'S CC&RS. UNLAWFUL ASSESSMENT INCREASES ARE PER SE OPPRESSIVE, VEXATIOUS BAD FAITH LITIGATION TACTICS AND ALSO STAY VIOLATIONS ………………………….………… 18


PART FOUR: RESPONDENTS HAVE COMMITTED MULTIPLE AND SUBSTANTIAL VIOLATIONS OF THE AUTOMATIC STAY AND CONTEMPTS…………..……… 20

A.  The post-petition demands for payment of pre-petition assessments and other claims

violate the automatic stay. ………………………………………….…….… 20

B. Acceleration of the 2015 assessment violates the stay …………………………21

C. The October 29, 2014 post-petition settlement demand is harassing and coercive and violates the automatic stay. …………………………………….……… 22

D. The purported seizure of parking spaces attached to debtor's condominium unit violates the automatic stay. …………………………………………….……… 23

E. Seizure of the exclusive parking area harms the interests of secured creditors, clouds the title and makes the condominium unsellable.. ……..…………………….… 26

F. Imposition of "retro assessments" for prior years violates the automatic stay and is void. ………………………………………………..……………… 26

G. Imposition of fines for supposed rules violations is part of a scheme of harassment and coercion and violates the automatic stay. The fines are void and unenforceable in addition to being a stay violation. ……………………………………..………… 27

H. Renting out debtor's residence while she still holds legal title is an attempt to collect a pre-petition debt, an act to obtain possession of property of the estate, and a contemptuous bad faith litigation tactic. ……………………………………………..……….. 30

I. Amending the governing documents to "allow" seizure of debtor's deeded and mapped exclusive parking area, seizure of debtor's condominium unit itself, and seizure of the income from renting debtor's condominium are violations of the automatic stay and a contempt .. 32

J. Submitting a false claim and filing a motion for relief from stay based on a false claim are violations of the automatic stay and contempts……………………….…....… 33

K. Failure to dismiss civil suit violates the automatic stay. ……………….…….…… 35


PART FIVE: DAMAGES FOR VIOLATIONS OF AUTOMATIC STAY AND FOR CONTEMPT ……………………………………………………… 36

A. Attorneys' Fees Incurred In Bringing Motion and Ending Violations ………………. 36

B. Damages for Emotional Distress ………………………………………………… 37

C. Damages for Financial Losses ………………………………………………… 39

D. Punitive Damages …………………………..……………………………… 39

**The Kaufman case** …………………………………………..……… 40

**Application of *Kaufman* principles to this case** ………………………….…………… 42

**1. Defendants' Acts** …………………………………………………………… 42

(a) Unlawful assessment claims set stage for bankruptcy. ………………………… 42

(b) Jennings/Bayside vow to "play ultimate hardball without pause." …………………… 45

(c) Jennings/Bayside make it impossible to sell Debtor's Unit 990 and interfere

in the pending sale agreement……………………………………………..……..47

(d) Jennings/Bayside demands become even more outlandish in 2014,

driving Ms. Parker to file bankruptcy. …………………………………...…………… 49

(e) Jennings/Bayside have done this before and know how to drive an owner

into bankruptcy and take his condominium …………………………………………… 49

(f) The Association has hit on a strategy of keeping Ms. Parker on title to her unit and

continuing to assess "post-petition" assessments and impose fines, while refusing

to take the deed offered in October 2014 or foreclose on the unit. ……………………… 50

(g) Jennings has inflicted this harm on Ms. Parker for personal financial gain. ………… 52

**2. Defendants' Wealth** ……………………………………………………… 53

**3. Relation to Actual Damages** …………………………………………….. 54

**4. Appropriate Punitive Damages Award** …………………………………… 54

CONCLUSION ……………………………………………………………… 55

## 1. INTRODUCTION AND FACTUAL BACKGROUND

Debtor Sara-jane Parker filed this case on October 8, 2014 after her homeowners association, Bayside Court Owners Association, ran up $163,000 in claims against her in the space of only two years, based on grossly unlawful assessment claims and other charges. This figure includes assessment increases not allowed by law, "retroactive" assessment increases for the years 2009 through 2013 inclusive, trumped up and illegal "fines," and acceleration of future-years' annual assessments. [1] The lawful annual assessment on Ms. Parker's condominium was about $8,000 per year at the time. When this case was filed the amount Ms. Parker owed to the Association was in fact zero. The assessments were fully paid at least through September 2014, at the rate allowed by law. This case should never have been necessary.

Bayside Court is a 33-unit condominium conversion in a former warehouse in Oakland. It was converted in 2000 and the Declaration of Restrictions ("CC&Rs") was recorded July 10, 2000. It has no landscaped common area, no amenities, and minimal maintenance responsibility since most maintenance is done directly by the unit owners.

Debtor's plan was confirmed December 18, 2014. The plan surrenders her Bayside condominium to secured creditors, including Bayside Court HOA. Despite the "surrender" and despite Ms. Parker's October 29, 2014 written offer to transfer title to Bayside or the other creditors, Bayside has not taken any action to obtain title. Legal and equitable title and all ownership rights and right of possession remain with Ms. Parker.

Bayside Court began violating the Section 362 automatic stay almost the day the case was filed, and has continued a pattern of total disregard for the stay, for debtor's rights, and for bankruptcy law in general. [2] This motion addresses at least twenty-five (25) distinct and

---

[1] At the hearing of Bayside's motion for relief from stay (to proceed with foreclosure) on April 17, 2015 the court remarked on the size of Bayside's claim, over $163,000, and asked Bayside's counsel Mr. Jordan what the claim was based on. Mr. Jordan told the court he was not sure, but maybe "upgrades."

[2] Literally on the day the case was filed, the Association and Jennings showed their disdain and disrespect for the legal system in an email to the members. Jennings wrote, "Dear Members: Today Unit 990's owner decided to spend another $5,000 plus to enter bankruptcy and attempt to evade paying her debts. Score another tropical vacation for another attorney. Unit C did the same thing in July - and that bankruptcy has been dismissed. So, there's another $5,000 plus that has been wasted on unnecessary attorney vacations, er, fees - instead of just paying their debts to our association. Round and round we go on the debtor merry-go-round. At least the attorney's (sic) will have nice tan lines to show off! - Your Board." (Exhibit Y)

substantial stay violations by Bayside Court and the individuals responsible for its management. The motion also seeks sanctions under Section 105(a) and the court's inherent power for Bayside's continuous bad-faith litigation tactics. Respondents are using every possible method to pressure Sarah-jane Parker into abandoning her case and causing the case to fail, so that Bayside can resume collection of illegal pre-petition claims.

As will be developed below, the facts of this case are egregious in the extreme and warrant the full range of sanctions including an award of attorney's fees, damages for financial losses, significant emotional distress damages, and a punitive damages award sufficient to deter this and other creditors from engaging in such reprehensible conduct.

## 2. JURISDICTION

This is a core proceeding under 28 U.S.C. 157(b)(2). *In re Zumbrum*, 88 B.R. 250, 253 (B.A.P. 9th Cir. 1988); *In re Butz*, 444 B.R. 301, 302 (Bankr.M.D. 2011). A request for sanctions for violation of the automatic stay is properly brought as a contested matter by motion. *In re Zumbrum*, supra, 252; *In re Karsh Travel*, 102 B.R. 778, 781 (N.D. Calif. 1989). A request for sanctions under the court's Section 105 contempt powers is properly brought as a contested matter by motion. *In re Dyer*, 322 F.3d 1178, fn. 15 (9th Cir. 2003.)

## 3. IDENTITY AND STATUS OF RESPONDENTS

(1) **Bayside Court Owners Association, Inc**. (hereafter "Bayside" or "Association") Bayside is a creditor party to the action.

(2) **Raj Hasmukh Patel**, President; **Justin Hu**, Vice President; **Lawrence Drouin**, Second Vice President, the Bayside board members during the relevant times from October 8, 2014 to the present.

(3) **Laurence Jennings,** former board member and since 2013 Bayside's paid manager. Jennings is the author of virtually all the communications discussed in this brief. His communications on behalf of Bayside are referred to as "Jennings/Bayside."

(4) **Scott Jordan, Esq**. Baysides's bankruptcy counsel.

(5) **Andrew Cantor, Esq**.  Bayside's counsel for state law matters.

### 4. THE BOARD MEMBER RESPONDENTS ARE HIGHLY SOPHISTICATED IN REAL ESTATE, BUSINESS, AND FINANCE

**Justin Hu** is a real estate developer and investor focused on re-development projects including conversion from industrial to residential and commercial spaces. He has experience in equity financing and enhancing value through design and marketing. He has a BFA in Fine Arts from School of the Art Institute of Chicago, in industrial design and architecture. Hu is a partner in **Blue Cap Lofts LLC**, developer of a very similar condo conversion in a 1924 warehouse near Bayside Court. Blue Cap Lofts units sell for between $500,000 and $989,000.

**Lawrence Drouin** has an MBA from Carnegie Mellon University, Tepper School of Business and a BA in Economics from UCLA. He was Managing Director of Finance at Lender Processing Services, Inc (LPS) until 2014. LPS had annual revenue between $1 billion and $5 billion. LPS is a mortgage-foreclosure servicing company.

**Raj Hasmukh Patel** is Senior Director, Corporate and Field Marketing, at Virtual Instruments, a Silicon Valley maker of hardware and software for business systems analysis.

## PART ONE: SUMMARY OF STAY VIOLATIONS

(1)     On October 13, 2014 Jennings/Bayside sent an email to the persons marketing Ms. Parker's unit that the Association was seizing the "exclusive" parking area deeded to the Parker unit. Jennings asserts that based on his own measurements and his interpretation of legal documents the area is not part of Ms. Parker's interest. (Exhibit D)

(2)     On October 21, 2014 the Association emailed the members with a proposal for amendments to the CC&Rs "to protect the financial well being of your association from the greatest threat that has ever faced it: Unit 990's non performance. [ ] The reason we need to do this is that Unit 990's bankruptcy may strip the >$90,000 in liens we now hold." The proposal ends with "If we work together we can thwart this effort and protect ourselves." (Exhibit MM)

(3)     On October 29, 2014 Jennings emailed a "settlement offer" to Ms. Parker's civil attorney Marc Fong, demanding a response by October 31, 2014. The "offer" proposes to settle the pending lawsuit with Ms. Parker[3] by payment to Bayside of $25,000, coupled with a demand that Parker dismiss her bankruptcy case, sell her unit, and agree never to own property at Bayside again. Jennings warns that if the bankruptcy is not dismissed, Bayside "will be moving forward with our lawsuit with new counsel," will sue Parker's realtor, and will file "multiple adverse claims with the Bankruptcy Court." (Exhibit E)

(4)     On December 2, 2014 Jennings/Bayside served a "Late Payment Demand & Notice of Delinquency" on Ms. Parker demanding payment of $169,669.88 for charges going back to September 2012, virtually all of it for pre-petition claims. The payment demand warns that Bayside will take a variety of collection actions if not paid. (Exhibit F)

(5)     On December 15, 2014 Jennings/Bayside declared that the entire 2015 annual assessment, claimed to be $22,558.20, was being accelerated as to Ms. Parker and was due and payable immediately. Jennings/Bayside sent a "BCOA Member Account Notice" dated December 15, 2014 to Ms. Parker with this payment demand. (Exhibit G)

(6)     On January 2, 2015 Jennings/Bayside served another "Late Payment Demand & Notice of Delinquency" on Ms. Parker, claiming $196,256.71, a figure that includes acceleration of the entire Year 2015 assessments, $22,558.20, as well as $163,000 in pre-petition claims. [4](Exhibit H)

(7)     After this case was filed Jennings/Bayside unleashed a blizzard of "rules violations" claims against Ms. Parker, calling "hearings" and imposing grossly excessive fines and charges, all groundless. From December 1, 2014 through March 30, 2015 Bayside imposed 22 separate "violation of rules" fines, for $12,846. (Exhibit I)

(8)     On May 1, 2015 Jennings/Bayside gave notice that a "mistake" had been made in setting the annual assessments in prior years, and that a "Retro Assessment" of $9,856.25 was now due and payable for those prior years on Ms. Parker's unit. (Exhibit V-1)

---

[3] Bayside filed an assessment collection suit against Ms. Parker in state court in 2013.

[4] The "assessments" claimed are not legitimate under California law and the Bayside Court governing documents. No lawful procedure was followed to set or increase assessments during the 2012-2015 time frame, making the claimed "assessments" unlawful and far in excess of what could lawfully be claimed. This subject is discussed infra.

(9)     Also on May 1, 2015 Jennings/Bayside served a "BCOA Member Account Invoice" on debtor imposing a $1,151.52 supplemental 2015 assessment on debtor, on the theory that debtor's unit is larger than Association believed and "thus" should pay a still larger assessment. (Exhibit J)

(10)    On February 10, 2015 Bayside filed a proof of claim asserting it has a valid lien claim against debtor of $163,249. On March 13, 2015 Bayside filed a motion for relief from stay to foreclose the lien. The claim and the lien are invalid and violate Rule 9011(b).

(11)    On April 29, 2015 Jennings/Bayside notified Ms. Parker that they intend to enter her unit and perform various work to "correct the outstanding CC&R violations" and bill her for the charges, under a supposed "right" to do so under the CC&Rs. (Exhibit K)

(12)    On May 13, 2015 an ad appeared in Craigslist offering the Parker unit as a rental, for $5,000 per month. Ms. Parker did not authorize this attempt to rent her property and had nothing to do with the advertisement. (Exhibit L)

(13)    On May 21, 2015 Jennings/Bayside distributed a "Ballot Initiative Package" to the members, calling for a vote on five proposed changes to the CC&Rs. (Exhibit M) The "amendments" would (1) strip the exclusive-use six-car parking area granted to Ms. Parker's Unit 990 from the Condominium Plan and the CC&Rs; (2) allow Bayside to seize debtor's condominium, rent it out, keep the rental income, and credit nothing to Ms. Parker's account; and (3) transfer to Unit 990 maintenance responsibility for virtually the entire structure of Unit 990, in effect a conversion from a condominium to a planned development lot.

        These "amendments" were in fact "adopted" by the Association by written ballot in June 2015 and the Association has implemented them as detailed below.[5]

(14)    After purportedly adopting these amendments, Jennings/Bayside have in fact "rented out" Ms. Parker's Unit 990 and are collecting rent on the property from an occupant without Ms. Parker's consent. The rental income is being taken by the Association rather than paid to Ms. Parker and is not being credited to any debt owed by Ms. Parker to the Association. The Association has obtained an "amended Condominium Plan" purporting

---

[5] The purported "amendments" are unlawful as a matter of substantive California law and are void. The "amendments" are also void ab initio under bankruptcy law as stay violations, discussed infra.

to strip ownership of the "exclusive use parking area" appurtenant to Unit 990 and ceding it to other units or the Association as common area. On June 24, 2015 Bayside emailed all owners informing them that a new tenant was now residing in Unit 990, welcoming the new tenant to Bayside. (Exhibit N)

(15)    Jennings/Bayside have not dismissed the state court action against debtor filed June 17, 2013 which remains active and pending. The action seeks to enforce a claim for pre-petition debts. (Exhibit NN)

(16)    On August 8, 2015 Jennings/Bayside wrote to Ms. Parker informing her that her unit "was found to be among those which require interior [fire] sprinkler modifications in order to meet current standards." The notice informs Ms. Parker that the Association intends to forcibly enter her unit to perform repairs and intends to charge her $6,307.00 for whatever "repairs" are done. (Exhibit O)

# PART TWO: APPLICABLE LAW

## A.  THE AUTOMATIC STAY IS EXTREMELY BROAD AND PROHIBITS ANY ACT TO COLLECT A PRE-PETITION CLAIM, WHETHER DIRECT OR INDIRECT.

11 U.S.C. Section 362(a) provides that a petition "operates as a stay, against all entities, of ... (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; ... (6) any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title." The automatic stay is designed to stop all harassment and collection efforts by creditors, "relieving the debtor of the very pressures which drove him into bankruptcy." *In re Draper*, 237 BR 502, 505 (Bankr.M.D.Fla. 1999); *In re Butz*, 444 BR 301, 303 (Bankr.M.D.Penn. 2011). The automatic stay prevents creditors from attempting in any way to collect a prepetition debt. (Id.) Circuit courts and bankruptcy courts alike have consistently held that the automatic stay should be interpreted broadly. (*Draper*, supra, 505.) Any act designed to coerce or put pressure on a debtor to pay the debt is prohibited. (*Draper,* supra, 506.) While direct actions to collect a debt clearly violate 362(a), coercive, indirect actions whose aim is to induce payment also violate the

automatic stay. *In re Ray*, 355 BR 253, 258-9 (Bankr.D.Oregon 2006).

Because of the fundamental importance of the automatic stay to the bankruptcy system, Congress provides an express remedy for violations of the stay. Section 362(k)(1) provides, " ... an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." (*In re Butz*, supra, 303.)

This "willfulness test" for automatic stay violations merely requires that (1) the creditor knew of the bankruptcy case, and (2) the actions that violate the stay be intentional. No specific intent to violate the stay is required; a good faith belief that the stay is not being violated is not relevant to whether the act was "willful" or whether compensation must be awarded under 362(k). *In re Peralta*, 317 BR 381, 389 (9th Cir. B.A.P. 2004); *In re Ray*, supra, 258-9; *In re Butz*, supra, 304; *In re Bulson*, 117 B.R. 537, 539 (9th Cir. B.A.P. 1990).

Demand for payment contained in a statement or invoice violates the automatic stay. *In re Butz*, supra, 305-5. Jennings is aware of bankruptcy law and principles including the automatic stay and its restraint of creditor actions, since Jennings himself filed a Chapter 7 case in this court, No. 99-13834 (Santa Rosa Division), and received a discharge as to the claims of 120 creditors.

A post-petition settlement demand can be harassing and coercive and thereby violate the automatic stay. Particularly if the threats to take action in some other forum are groundless or improper, the settlement demand can "cross the line" and become a stay violation. *In re Diamond*, 286 BR 476, 478-9 (D.N.H. 2002).


B.  THE AUTOMATIC STAY PREVENTS ANY ACT AGAINST PROPERTY OF THE ESTATE OR PROPERTY FROM THE ESTATE.


Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Thus, any act by Bayside to obtain or control property of the estate violates the automatic stay and results in automatic and mandatory sanctions. Prior to confirmation of the plan all of debtor's property was property of the estate. After confirmation, all of debtor's income remains property of the estate. (*United States v. Harchar*, 371 B.R. 254, 267-8 (N.D.Ohio 2007); *In re Reynard*, 250 B.R. 241,

245-247 (Bankr.E.D.Va. 2000).) Any act to control or obtain possession of any of debtor's post-petition income violates the automatic stay under 362(a)(3).

C. THE COURT HAS BROAD POWER UNDER SECTION 105(a) AND ITS INHERENT POWER TO CURB AND SANCTION ABUSIVE LITIGATION PRACTICES.

In addition to the power to sanction for violation of the automatic stay under Section 362(k), the court has independent power under 11 U.S.C. 105(a) and under the court's non-statutory general power to curb and sanction virtually any improper, abusive or unethical conduct by anyone in a case before the court. This power extends far beyond mere stay violations and does not depend on existence of a technical stay violation or indeed violation of any statute. "While various statutes and rules provide for the imposition of sanctions, a court's inherent powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. Therefore, if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power [to impose sanctions]." (*In re Avon Townhomes Venture*, 433 B.R. 269, 303-304 (Bankr.N.D.Calif. 2010) [discussing inherent powers and powers under Section 105(a).][6]

The court's inherent power to impose sanctions, including attorney's fees, extends to "a full range of litigation abuses, including those where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when a party participates in an abuse of process or other dilatory conduct, or when the court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled." (Id. 304; internal quotes omitted.) *See also Fink v. Nourse*, 239 F.3d 989, 992 (9th Cir. 2001); *In re Dyer*, 322 F.3d 1178 (9th Cir. 2003).

This power extends to non-parties as well as parties. "The court's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses. See … *In re Rainbow Magazine Inc.*, 77

---

[6] *Avon Townhomes Venture* is a decision by Chief Judge Efremsky of this court.

F.3d at 278 (upholding sanctions levied under the court's inherent power against corporate debtor's principal who orchestrated the bad faith filing of the bankruptcy petition) … Even in the absence of statutory authority, a court may impose attorney's fees against a nonparty as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices." (*Avon Townhomes*, supra, 303-304.)

Therefore, the non-party individuals who are responsible for the bad-faith and abusive litigation practices at issue in this case, including Jennings and the other Board members who orchestrated and authorized the conduct, are equally culpable and equally subject to sanctions as the creditor-party Bayside Court Owners Association. These individuals are personally liable in their capacity as individuals, not just as Board members. (*Avon Townhomes*, supra; See *In re Kaufman*, 315 B.R. 858 (Bankr.N.D.Ca. 2004).)

D.  A CONDOMINIUM ASSOCIATION CANNOT USE COERCION AND SUBTERFUGE TO FORCE PAYMENT OF PRE-PETITION CLAIMS.

Any act taken by a condominium association to coerce payment of a pre-petition assessment or claim violates the automatic stay, even if "allowed" by the governing documents and even if the act or rule also serves some other purpose. *In re Gordon Properties LLC,* 460 BR 681 (Bankr.E.D.Va 2011) involves an association that sought to "recalculate" prior-year assessments and impose the charges on members. When the debtor balked at paying the claim the Association (1) took away his voting rights, and (2) cancelled the annual meeting at which debtor could have solicited support to elect a different Board more sympathetic to his position. Both acts violated the automatic stay and constituted contempt, because both were coercive acts designed to force payment of pre-petition claims. The fact the actions were not "direct" acts to collect the debt was immaterial, for it is the substance and effect of the act that matters: "Not only are obvious acts such as suing a debtor or enforcing a judgment prohibited, but less direct acts are also prohibited. [] Denying a condominium owner the right to vote at an annual or special meeting because pre-petition condominium fees are past due is similarly prohibited. It pressures a unit owner to pay his past-due, pre-petition condominium fees by withholding something of value until the pre-petition assessment is paid." (*Gordon*, supra, 692.)

In addition, invoking the "right" under the governing documents to do these acts was no

excuse. The coercive effect of the acts, not their justification, is what determines a stay violation: "Notwithstanding the asserted justifications for the bylaws voting provisions, they exert pressure on unit owners who are past-due in the payment of their condominium fees by more than 30 days to pay those fees. They are efforts to collect a debt. Even if the bylaws voting provisions also serve other purposes, they remain efforts to collect past-due condominium assessments and violate the automatic stay. An act in violation of the automatic stay may have other legitimate purposes, but if it is also an act in violation of 362(a), the other purposes do not excuse violating or disregarding 362(a)." (*Gordon*, supra, 693-4.)

The court in *Gordon* made clear that an association cannot do by subterfuge what it cannot do directly. Clearly believing the association was gaming the system, the court said "The board has been and is putting pressure on the debtor to pay the recalculated assessment. [] In an effort to avoid the consequences of denying the debtor its right to vote by enforcing the bylaws voting provision, it sought another tactic to achieve the same result. It cancelled the annual meeting. The board of directors simply sought to disguise what it was doing. It attempted to do indirectly what it could not do directly." (Id. 696.) The court held the association in contempt for the many stay violations. (*Gordon*, supra, 700.)

## E. A RECORDED CONDOMINIUM PLAN CANNOT BE ALTERED OR AMENDED WITHOUT THE CONSENT OF THE RECORD OWNER AND ALL MORTGAGE HOLDERS ON A NOTARIZED INSTRUMENT.

California Civil Code Section 4285(c) provides that a condominium plan shall include "a certificate consenting to the recordation of the condominium plan ... that is signed and acknowledged as provided in Section 4290." Section 4290(a) provides that the certificate "shall be signed and acknowledged by all of the following persons: (1) The record owner of fee title to that property included in the condominium project [and] (4) the trustee or the beneficiary of each recorded deed of trust, and the mortgagee of each recorded mortgage encumbering the property."

In order to amend or revoke a condominium plan, Section 4295 requires "a recorded instrument that is acknowledged and signed by all the persons who, at the time of amendment or revocation, are persons whose signatures are required under Section 4290."

In combination these sections require the owner(s) of the property included in the project, plus

all mortgage holders and trustees under deeds of trust, to sign a notarized instrument approving the amendment or revocation. Unless all owners and all mortgage holders sign such instrument, no amendment or revocation is permitted.

PART THREE: THE ASSESSMENT INCREASES ARE UNLAWFUL UNDER CALIFORNIA SUBSTANTIVE LAW AND THE ASSOCIATION'S CC&RS. UNLAWFUL ASSESSMENT INCREASES ARE PER SE OPPRESSIVE, VEXATIOUS BAD FAITH LITIGATION TACTICS AND ALSO STAY VIOLATIONS.

California law places limits on the amount a homeowners association can increase the annual assessments. Civil Code Section 5605(b) [former Section 1366(b)] provides, "Notwithstanding more restrictive limitations placed on the board by the governing documents, the board may not impose a regular assessment that is more than 20% greater than the regular assessment for the association's preceding fiscal year … without the approval of a majority of a quorum of members, pursuant to Section 4070, at a member meeting or election."  Article 6.2.6 of the CC&Rs imposes the same 20% limitation, reciting the text of then-current Civil Code Section 1366(b).

The duly-imposed annual assessment on Ms. Parker's Unit 990 in fiscal 2011 was $720.19 per month, or $8,642.28 for the year. (Exhibit P; Unit 990 is at bottom of page.) The next year's annual assessment was less, $613.00 per month, or $7,356.00 for fiscal 2012. (Exhibit Q). At the October 7, 2012 meeting the Board voted to increase the fiscal 2013 assessment by the 20% maximum. (Exhibit R) However this increase was not put into effect, as explained below.

In disregard of the limits placed by California law and the CC&Rs on assessment increases, Jennings and Bayside announced on October 23, 2012 that the assessments for fiscal 2013 on all units would instead be "calculated" by dividing the total annual budget by the square footage of the entire project, and then applying that average per square foot to the size of each unit to derive the assessment for each unit. The "average" used was $3.09 per square foot. The Association described this as a "clerical correction" rather than an assessment increase. (Exhibit S) Applied to Unit 990 with approximately 6000 square feet this resulted in a new "clerical

correction" assessment of $1,556.64 per month, or an annual rate of $18,679.68. [7] Based on this theory, Jennings and Bayside sent monthly assessment bills to Ms. Parker claiming $1,556.54 for the months of November and December 2012. [8]

In January 2013 Jennings and Bayside asserted that Unit 990 was larger than they had believed and "thus" the "clerical correction" assessment should actually be $1,879.85 per month, or $22,558.83 for fiscal 2013. Jennings and Bayside billed Ms. Parker at that amount during all of 2013. (Exhibit T) On December 15, 2013 Jennings and Bayside "accelerated" the entire 2014 annual assessment, $22,558.20, demanding payment of the entire amount immediately. (Exhibit F pg. 3) On December 15, 2014, two months after this case was filed, Jennings and Bayside served a Member Account Invoice on Ms. Parker announcing that the entire 2015 annual assessment, again $22,558.20, was being accelerated and was immediately due and payable, in addition to the pre-petition assessment claim of $162,928.18. (Exhibit G) On May 1, 2015 Jennings and Bayside asserted that even this figure was too low and that the real "clerical correction" assessment should be $24,285.48 per year for her Unit 990. (Exhibit V-2)

The Board never voted to increase the 2014 assessment by any amount. No member vote took place allowing an assessment increase for fiscal 2014. (Parker declaration) The lawful 2014 assessment thus remained the same as the assessment for 2012-2013, $7,356.00 per year.

The Board never voted to increase the 2015 assessment by any amount. No member vote took place allowing an assessment increase for fiscal 2015. (Parker declaration) The lawful 2015 assessment thus remained the same as the 2012-2013 assessment.

Increasing the *2014* assessment to $22,558.20, almost triple the lawful amount, is illegal. Increasing the supposed *2015* assessment by almost triple the lawful limit is not just illegal but (since this case was by then on file) an abusive, bad-faith, oppressive, vexatious and wanton act (*Avon Townhomes Venture*, supra, 304) intended to harm debtor. An illegal act of that kind is per se a bad-faith and abusive litigation tactic. These illegal acts also challenge the authority of the

---

[7] The re-calculated assessment scheme produced a *reduction* in assessments for 28 of the 33 units. The Parker unit was the only one to receive an increase anything like triple the lawful rate.

[8] This theory is wrong and had been challenged as patently unlawful by at least three attorneys representing unit owners and buyers long before this case was filed. This subject is discussed further in the "Punitive Damages" section of Part Five below. Jennings and Bayside were on notice their conduct was unlawful.

court to control proceedings in cases before it and to uphold the integrity of the court and the bankruptcy system. (*Avon Townhomes Venture*, supra, 304, 315.)

The sophistry engaged in by Jennings in his October 23, 2012 memo asserting this is merely a "clerical correction" and not an assessment increase, reveals that Jennings and Bayside know their conduct is questionable. Jennings later admitted "Yes, this is obviously an assessment increase." (Exhibit FF, Jennings November 22, 2013 letter to attorney Marc Fong.)

The illegal post-petition assessment increases and the efforts to collect them are also stay violations, because they are coercive attempts to compel payment of pre-petition debt by increasing "the financial pressures … which drove the debtor into bankruptcy." (*In re Schwartz*, 954 F.2d 569, 571 (9th Cir. 1992). Further, they are also stay violations since the only source of collection is debtor's income. Post-petition income is property of the estate, protected under Section 362(a)(3). Bayside continues to bill debtor for the illegal post-petition assessments. (Exhibit Z) While some level of assessments is in theory allowed, the attempt to *collect* them from property of the estate is not, absent a motion for relief. (Authorities Part Two Section B above; *In re Sedgwick*, 266 B.R. 185 (Bankr.N.D.Cal. 2001).)

The assessment increases are also a violation of the provisions of the CC&Rs regulating how assessments are set and how the assessments are allocated among the units, and a breach of the Association's fiduciary duty to not treat members differently or unfairly. Imposing a tripled assessment on Ms. Parker alone among the 33 owners violates that duty. In the context of bankruptcy law, such breaches of duty aimed at financially harming the debtor in an unfair and unjustifiable manner constitute abusive and oppressive litigation tactics.

# PART FOUR: RESPONDENTS HAVE COMMITTED MULTIPLE VIOLATIONS OF THE AUTOMATIC STAY AND CONTEMPTS

## A.  THE POST-PETITION DEMANDS FOR PAYMENT OF PRE-PETITION ASSESSMENTS AND OTHER CLAIMS VIOLATE THE AUTOMATIC STAY.

The December 2, 2014 "BCOA Late Payment Demand & Notice of Delinquency" is an unqualified, direct demand for payment of pre-petition debts, a classic violation of the automatic

stay. The "Demand" states that the balance as of October 2, 2014, immediately before this case was filed, is $162,928.18. The "Demand" has a box of information at the bottom of each page warning of the consequences if the full amount is not paid immediately, including sale of the property, acceleration of the entire annual assessment, and other remedies. It concludes with "It is therefore very important that you provide full payment to avoid the foregoing CC&R 6.6 enforcement activities from affecting your account and your Association property." This is a direct, coercive demand for payment of pre-petition debt, an act expressly prohibited by 362(a)(6).

Jennings/Bayside served another "BCOA Late Payment Demand & Notice of Delinquency" on January 2, 2015, with the demand for immediate payment of $196,256.71, including $162,925.18 in pre-petition claims as of October 2, 2014. The same box of warnings about what the Association will do to collect is at the bottom of each of the four pages. This is another unqualified, unmistakable violation of the automatic stay.

B. ACCELERATION OF THE 2015 ASSESSMENT VIOLATES THE STAY.

The January 2, 2015 "Demand" adds that the entire 2015 annual assessment, $22,558.20 has been accelerated, and that a "late fee" of $2,255.82 has been charged plus a "finance charge" of $1,772.82. A creditor must seek relief from the stay before accelerating an unmatured debt. Acceleration for the purpose of taking action against the debtor violates the automatic stay. (*In re St. Vincent's Catholic Med. Centers*, 440 B.R. 587, 603 (Bankr.S.D.N.Y. 2010); *In re Payless Cashways, Inc.*, 287 B.R. 482 (Bankr.W.D.Mo. 2002).) No relief from stay was requested here, therefore acceleration of the 2015 annual assessment is a stay violation.

The plain intent of this voluntary action is to pressure Ms. Parker to pay the pre-petition debt, or impose such financial stress that she is unable to afford to make the payments to the Chapter 13 trustee and the direct payments under the confirmed plan, leading to dismissal. This violates the automatic stay, regardless whether the "acceleration" may also have some other purpose. (*Gordon*, supra.) The "acceleration" is also part of an obvious plan to make up for the discharged pre-petition debt by running up post-petition charges, another variety of stay violation in addition to being a bad-faith tactic sanctionable under Section 105(a) and the court's inherent power.

Jennings/Bayside had notice of the filing of the case and the stay by October 8, 2014, prior to issuing the December 2, 2014 and January 2, 2015 "Demands" and prior to deciding to accelerate the 2015 assessments. (Exhibit Y) Jennings is the agent for service for Bayside. The Notice of Bankruptcy was mailed to Jennings at his "notice" address by the clerk. (Exhibit A) Further, the October 29, 2014 "settlement offer" emailed by Jennings to debtor's attorney Marc Fong makes specific reference to the existence of this case, showing actual knowledge. (See next section below.) These facts satisfy the first element of "willful" violation, knowledge of the stay. (*Peralta*, supra, 389.)

The second element for a stay violation, that the act be "intentional," is also satisfied. The "intent" is only the intent to commit the act, not an intent to violate the stay. (*Peralta,* supra, 389.) It was not inadvertence or accident that caused Jennings/Bayside to send multiple demands for immediate payment of pre-petition debts to debtor, nor to accelerate the entire 2015 annual assessment on December 15, 2014, nor to impose a monthly late charge starting January 2015 equal to one-tenth of the annual assessment. These acts were "intentional" for purposes of a stay violation damages award.

Acts in violation of the stay are void ab initio. *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343 (1940); *Griffin v. Wardrobe* (*In re Wardrobe*) 559 F.3d 932 (9th Cir. 2009); *In re Perl*, 513 B.R. 566 (9th Cir. B.A.P. 2014); *Wash. St. Corp. v. Lusardi*, 329 F.3d 1076 (9th Cir. 2003); *In re Schwartz*, 954 F.2d. 569 (9th Cir. 1992).

C. THE OCTOBER 29, 2014 POST-PETITION SETTLEMENT DEMAND IS HARASSING AND COERCIVE AND VIOLATES THE AUTOMATIC STAY.

On October 29, 2014 Jennings sent an email to debtor's counsel in the civil action, Marc Fong, demanding that debtor pay $25,000 to Bayside, that she sell her property, that she promise never to own property at Bayside again, that she dismiss her cross-complaint in the civil action (discussed below), that she dismiss her bankruptcy case, and promise not to re-file for at least 90 days. (Exhibit E)

The settlement demand threatens to take various actions if the demand is not accepted within 48 hours. First, Jennings (a non-attorney) threatens to move forward with the civil suit, apparently ignorant of the scope of an automatic stay, and to sue debtor's "tenant" and her realtor

on unspecified grounds. Jennings threatens to file "multiple adverse claims with the bankruptcy court." Jennings remarks that the Chapter 13 filing "is full of errors by the way" and comments on the potential the Chapter 13 trustee may dismiss the case or convert to Chapter 7 "as has always been expected." Jennings shows his disdain for the Chapter 13 process by calling this case "a familiar stall tactic – just as it was for BCOA Unit C in 2006-2008," a reference to a prior Chapter 13 case by a different owner. (See Part Five Sec. D (e) below.)

This "settlement offer" is nothing but coercion and harassment. As a non-attorney Jennings has no basis to make any of the statements made in the letter about the validity of various legal processes or the likely outcome of any of them. Jennings was warned before by counsel for a potential buyer of debtor's Unit about the unlicensed practice of law (Exhibit GG) but appears to be undeterred, as shown by his October 29, 2014 communication.

When a supposed "settlement" offer is harassing or coercive it crosses the line from "negotiation" into "stay violation." (*Diamond*, supra, 478; *In re Jamo*, 283 F.3d 392, 399 (1st Cir. 2002).) This offer is "harassing" because of its terms, impossible to achieve within any reasonable time frame, and because the terms are simply unacceptable given the pending Chapter 13 case that provides a far better option to debtor than does the proposal. Jennings cannot seriously have imagined debtor and her counsel, both civil and bankruptcy, would agree to such an ill-conceived proposal made by a person ignorant of the law. It is "coercive" because it threatens numerous consequences that will come to pass if the proposal is not accepted within 48 hours. Allowing very little time to consider and respond to a proposal increases the pressure, a typical tactic of coercion.

Jennings had "knowledge of the stay" because he references this case in the "Offer" and demands it be dismissed as part of the deal. This satisfies the first "willfulness" element of stay violation. (*Peralta*, supra, 389.) Jennings "intended" to commit the act of drafting and sending the email, since it could not have happened by inadvertence. The "intentional act" element for a stay violation is satisfied.

D. THE PURPORTED SEIZURE OF PARKING SPACES ATTACHED TO DEBTOR'S CONDOMINIUM UNIT VIOLATES THE AUTOMATIC STAY.

Unit 990 has an exclusive-use parking area appurtenant to the unit, shown on recorded Condominium Plan and identified as exclusive use in the CC&Rs, and in the legal description in the grant deed of what the "unit" includes. The parking area is outside Unit 990 in an enclosed paved area.

CC&Rs Article II "DEFINITIONS" subpart 2.22 provides, "The term "Parking Space" shall mean those portions of the Common Area shown on the Plan as individually lettered and numbered areas designated "F" or "M" or as **"Parking exclusive to Unit #990 28th Street."** (Bolding added.) Subpart 2.23 provides that "Plan" means the Condominium Plan attached as Exhibit A to the CC&Rs. The "Parking exclusive to Unit 990" shown on the recorded Condominium Plan is 41.0 by 49.0 feet. (Exhibit C)

The parking area referred to in 2.22 and the Plan is included in the Grant Deed and legal description for Unit 990. The grant deed conveys "Exclusive easements for the use, occupancy and possession of ... Parking Exclusive to 990 28th Street and the roof deck as shown on the Condominium Plan ..." (Exhibit U)

On October 13, 2014 Jennings emailed debtor announcing that he had measured the parking area and, based on his interpretation of the deed to debtor's unit and other legal documents, had concluded that rather than the 41 foot by 49 foot open parking area shown on the recorded Condominium Plan as "PARKING EXCLUSIVE TO 990 28TH STREET," debtor's Unit 990 in fact has only a single parking space. Jennings informs debtor that Bayside intends to build a garbage enclosure on the Unit 990 parking area. The email is addressed to "Dear Everyone Involved With the Unit 990 Use, Sale and Purchase." (Exhibit D) Debtor's Unit 990 was for sale and was being actively marketed. The obvious motive is to scare off realtors and depress the value of the property by reducing the available parking.

Jennings is not an attorney. Neither is Jennings a licensed civil engineer. Nonetheless, in paragraph 6 of his October 13, 2014 email Jennings states "there are no estoppel issues" in disregarding the recorded condominium plan and seizing of the exclusive reserved parking area by Bayside. This kind of legal analysis requires a law degree and expertise in real property and common interest development law, plus a license to practice law, none of which Jennings possesses. Likewise to "pull the dimensions shown on the parking plan" (Exhibit D paragraph 4) and conclude that the plan prepared by a licensed civil engineer "is highly inaccurate" (same) requires training and a license in civil engineering and surveying, none of which Jennings

possesses.

Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." As of October 2014 debtor's real property and all rights attached to the property were "property of the estate." Jennings/Bayside's attempt to seize control of the property of the estate is therefore a clear violation of the automatic stay, sanctionable under 362(k)(1).

The conduct aimed at killing the potential sale of the property, and reduce its value and desirability, is also a stay violation under 362(a)(6) as an attempt to coerce payment of a pre-petition debt. It is one more example of the continuous campaign of harassment and coercion aimed at debtor in retaliation for filing this case. The conduct is patently intended to be another point of leverage to force debtor to pay the pre-petition claims, and/or be unable to sell her property. Only by selling or transferring title can debtor escape ongoing liability for post-petition assessments. Jennings/Bayside by continuously interfering in ongoing sales efforts have kept debtor in the property, unable to transfer it by sale.[9] In this regard it is significant that Jennings/Bayside ignored debtor's October 29, 2014 written offer to transfer the property to Bayside (Exhibit X) and has never responded to or acknowledged the offer.

The two elements of "willfulness," knowledge of the case filing and intent to do the act, are present. Jennings/Bayside had notice of the case filing prior to October 13, 2014 and indeed on the day the case was filed. (Exhibit Y) The pronouncement of seizure of the property has never been withdrawn and remains in effect. The element of "intent" is established by the investigation that Jennings describes in his email announcement, showing this is not a whim or an accident but a deliberate decision to seize real property, followed by action on the intent. The violation is complete and sanctions are mandatory under 362(k).

Jennings/Bayside did not seek or obtain the consent of all owners and all mortgage holders and trustees before purporting to amend or revoke the existing Condominium Plan recorded in 2000. The supposed "amendment" adopted by the Association at Jennings/Bayside's urging is therefore void ab initio and of no force or effect. The parking area reserved as exclusive to debtor's Unit 990 remains the property of debtor and Unit 990.

---

[9] This subject is discussed in more detail in the punitive damages section, Part Five D(1)(c) below.

E. SEIZURE OF THE EXCLUSIVE PARKING AREA HARMS THE INTERESTS OF SECURED CREDITORS, CLOUDS THE TITLE AND MAKES THE CONDOMINIUM UNSELLABLE.

The exclusive parking area purportedly stripped from Unit 990 has significant value to the owner of the Unit. The supposed seizure of the property by Bayside fundamentally changes the nature and extent of the real property interest and the market value of the property. It is obvious that a condominium unit with a 41 by 49 foot exclusive-use parking area (the equivalent of six standard 12 by 25 foot parking spaces) is worth more than the same unit without it.

The mortgage lender, Ocwen, has a deed of trust to the property co-extensive with the grant deed and all appurtenances including the parking area. Ocwen has not consented to this alteration of Ocwen's secured interest in the property. Ocwen has commenced foreclosure proceedings against the property. With the right to possession and use of the parking area uncertain, Ocwen may be unable to complete the foreclosure since the extent of its interest is in question. Likewise, Ocwen will not have marketable title if the extent of its ownership is uncertain. Neither does debtor have marketable title to the property, which she still owns.

Jennings' interference in the parking area title status caused the failure of the short sale that was pending in October 2014. Realtor Maureen Caldwell-Meurer reported to the escrow officer on October 28, 2014 that Fidelity Title refused to insure title "due to the latest event, being unit 990's parking lot's designated exclusive area challenged by the BCOA manger." (Exhibit RR) This conduct is an abusive bad-faith tactic designed to harm debtor and interfere in the orderly administration of this case, sanctionable under Section 105(a) and the court's inherent power.

F. IMPOSITION OF "RETRO ASSESSMENTS" FOR PRIOR YEARS VIOLATES THE AUTOMATIC STAY AND IS VOID.

On May 1, 2015 Jennings/Bayside served a "BCOA Member Account Invoice" on Ms. Parker demanding payment by May 15, 2015 of $9,856.25 for "understated" prior years' assessments. (Exhibit V) The description in the invoice is "Retro-Assessment for actual BCOA unit area found in 2015 to have been understated in previous assessment billings to your member

account: $9856.25." The most recent "Member Account Invoice" for October 2015 continues to demand payment of this pre-petition claim. (Exhibit Z)

The supposed basis for claiming that prior years' assessments were "understated" is that the Parker unit may be larger than shown on the recorded Condominium Plan.[10] True or not, the "reason" is irrelevant. The only relevant fact is that Jennings/Bayside is demanding payment of a pre-petition claim in violation of the automatic stay. Assessments for any time prior to October 8, 2014 are "a claim against the debtor that arose before the commencement of the case under this title" (Section 362(a)(6)) and could have been asserted in those prior years. (Section 101(5)(A) [defining "claim" as a "right to payment" in extremely broad terms].) As such those pre-petition assessments are within the scope of the automatic stay and any attempt to collect them is a violation subject to mandatory sanctions under 362(k)(1).

Any act in violation of the stay is void (authorities supra) and of no force or effect. This "Invoice" and the underlying claim is thus void and unenforceable, aside from being a stay violation. The court can and should decree that the claim for prior-years' assessments is void as a stay violation, and under the court's inherent powers and power under Section 105(a) to make "any order" that is appropriate.

This attempt to run up the charges is yet another instance of Jennings/Bayside's relentless campaign to ruin Ms. Parker financially and emotionally. It shows complete disregard and disrespect for the bankruptcy system and laws. It is part of a concerted, continuous program of harassment and coercion intended to punish Ms. Parker for having the nerve to file this case after being driven into bankruptcy by Jennings/Bayside, and warrants the full measure of sanctions available under both 362(k)(1) and 105(a) and the court's inherent power.

By May 2015 Jennings/Bayside had "knowledge" of the case as they had appeared in the case and filed a proof of claim. The act of sending the invoice was "intentional." The elements of "willfulness" are therefore both present and sanctions under 362(k)(1) are mandatory

G. IMPOSITION OF FINES FOR SUPPOSED RULES VIOLATIONS IS PART OF A SCHEME OF HARASSMENT AND COERCION AND VIOLATES THE AUTOMATIC

---

[10] This contention as to how assessments are set is wrong and illegal. See discussion in punitive damages section Part Five D(1)(a) below.

STAY. THE FINES ARE VOID AND UNENFORCEABLE IN ADDITION TO BEING A STAY VIOLATION.

Jennings/Bayside forced Ms. Parker to flee her California home in late 2014 and relocate far away from the source of the endless harassment. She has a good friends in Texas who offered to allow Ms. Parker to stay with them in their home. Ms. Parker continues to live with her Texas friends. She cannot presently afford to buy or rent a home of her own. The reason for having to leave California was the continuous barrage of harassment and interference in her life by Jennings/Bayside, who took every opportunity to sabotage Ms. Parker's efforts to market and sell her Bayside condominium, as mentioned above, and harm her financially and emotionally. The mental strain of dealing with the harassment by Jennings/Bayside was intolerable. The financial strain and stress was also significant as Ms. Parker's savings and income were being consumed defending against the collections lawsuit filed by Jennings/Bayside. Ms. Parker filed a cross complaint but the cost of litigation is beyond her ability to pay. (Parker declaration.)

Fines had been used as a tool of harassment against Ms. Parker long before this case was filed. On April 1, 2014 Jennings/Bayside imposed $2,000 in fines for "failure to pay property taxes," "use of the common areas for unreasonably offensive activity," "improper location and/or quantity of signage," and "filing of frivolous lawsuit complaints against [the Association and board members and Jennings]"[11] at $500 each.

Jennings/Bayside began a campaign of "rules violations" hearings and "disciplinary fines" imposed in absentia against Ms. Parker. Knowing that Ms. Parker is living in Texas, without the means to attend "hearings" held in Oakland, Jennings/Bayside began a program of groundless charges and fines for a welter of "violations." (Exhibit I) These include:

(1)     On December 1, 2014 Jennings/Bayside imposed a $1,500 fine for supposed violation of rental rules, despite the fact the unit was not rented.

(2)     On March 1, 2015 Jennings/Bayside served an invoice for supposed window graffiti and rodent control, for $1,345.87.

---

[11] This is a reference to Ms. Parker's cross-complaint against Jennings and the Association in the collection suit filed by Bayside in 2013. Resort to the court system to redress grievances is a Constitutionally protected activity not subject to "violation fines" by a homeowners association.

(3)     Also on March 1, 2015 Jennings/Bayside served a notice of two $500 fines for window
        graffiti and supposed rodent control, total $1,000, payment by March 15, 2015
        demanded.

(4)     Also on March 1, 2015 Jennings/Bayside served a notice of *five* $500 fines being
        imposed for things like "failure to pay city taxes" and "acting in a manner which reduces
        general building security," total $2,500, payment by March 15, 2015 demanded.

(5)     On April 30, 2015 Jennings/Bayside served a notice of *thirteen* separate $500 fines, for
        such things as "hanging an item weighing in excess of ten pounds from the ceiling," total
        $6,500, payment by May 15, 2015 demanded.


        In just the 60 days from March 1, 2015 to April 30, 2015 Jennings/Bayside levied fines of
$11,345 against debtor, and $12,846 since the case was filed. These "fines" are so obviously
trumped-up and ridiculously excessive that they can have no purpose except to coerce and harass
debtor into paying pre-petition debt. As the court said in *Gordon* a condominium board cannot
do by subterfuge and indirection what it cannot do directly. Here, the "fines" are patently
intended to ratchet up the stress and pressure, emotional as well as financial, on debtor for the
purpose of coercing payment. Among the many stresses created by this bad-faith conduct, if
debtor is forced to pay these outlandish "fines" she will have insufficient income remaining to
stay current on plan payments, leading to dismissal. That this result is exactly what
Jennings/Bayside intends, can be inferred from the facts and the context. The coercive and
harassing nature of these acts makes each of them an independent stay violation, each
independently sanctionable and each independently a contempt. It also appears that the supposed
conditions all existed before this case was filed, making them pre-petition claims as defined in
101(5) directly within the scope of the stay.

        The "knowledge of the case filing" and "intent" elements are both present, making
sanctions mandatory under 362(k)(1).

        Aside from being contempts and stay violations, the fines are void and unenforceable
under the Association's own rules. The original "Rules and Regulations of the Association,"
adopted by the Association in July 2002, recite that the purpose of notices of violations, and fines
if appropriate, is "to correct matters regarding health and safety in a timely manner." (Exhibit
QQ, Page 5.) The Rules provide that "A courtesy warning will be given for first violations. Fines

for second violations shall be $25.00, increasing in cost for subsequent violations." (Id. Page 5.) Nothing justifies first-instance fines of $500.00, even in cases where a legitimate "health and safely" purpose is served by the Rule and the imposition of a fine, in any amount. The "Rules" cannot lawfully be used to bludgeon debtor to obtain an advantage in litigation, and for no purpose connected to health and safety concerns.

The court can and should declare that these "fines," a bad-faith abusive litigation practice being used for an improper purpose (*Avon Townhomes Ventures*, supra 303), are void as stay violations and unenforceable under 105(a) and the court's inherent power.


H. RENTING OUT DEBTOR'S RESIDENCE WHILE SHE STILL HOLDS LEGAL TITLE IS AN ATTEMPT TO COLLECT A PRE-PETITION DEBT, AN ACT TO OBTAIN POSSESSION OF PROPERTY OF THE ESTATE, AND A CONTEMPTOUS BAD FAITH LITIGATION TACTIC.


On May 13, 2015 an advertisement appeared on Craigslist's "East Bay" real estate listings, offering debtor's condominium for rent at $5,000 per month. (Exhibit L) The ad expounds on the features of debtor's unit that make it ideal for "artist studios, design or construction firms, or any other office/work collective" including a 4500 square foot warehouse space, five individual work spaces downstairs, and a 3 bedroom 2.5 bath residence upstairs.

Ms. Parker did not authorize anyone to rent her unit, had nothing to do with the ad, and was dumbfounded to see her property being offered for rent by persons unknown but doubtlessly Jennings/Bayside. (Parker declaration.) The Association has now in fact "rented out" debtor's Unit 990 and is collecting and keeping the rental income for itself.

On June 5, 2015 the Association's latest attorney issued a self-congratulatory memo to all Board members taking credit for this clever use of the law to recoup otherwise uncollectible pre-petition claims against debtor. (Exhibit AA.) In his June 5, 2015 memo attorney Andrew S. Cantor says that he and fellow attorney Scott Jordan "have developed a potent plan to help the BCOA recover from the long-term economic damage inflicted by 990's delinquent owner." The "plan" is to seize Debtor's unit, rent it out, and keep the rental income. Mr. Cantor lauds Laurence Jennings for having come up with the idea. (Id.) Incredibly, Mr. Cantor adds, "Revising your CC&Rs to authorize the leasing of delinquent & abandoned units in order to

protect the membership from severe economic hardship, is nothing short of brilliant." (Id.) A word other than "brilliant" might be more appropriate. Attorney Cantor adds that he has "learned a lot about problem solving and HOA law" from non-attorney Jennings. (Id.)

This June 5, 2015 letter from the Association's attorney admits that the rental of debtors' Unit 990 is to "recoup reserves funding" necessary for operation of the Association, in other words to "recoup" the pre-petition assessments claimed by the Association. (Id.) This is a patent violation of the automatic stay under 362(a)(3) and (6).

Renting out property not owned by the Association and seizing the rental income is an act to collect a pre-petition debt, prohibited by 362(a)(6). Plus, any payments by a unit owner to the Association must first be applied to delinquent assessments, exclusive of any other charges, until the delinquent assessments are fully paid. (Cal. Civil Code Sec. 5655(a).) Here, Bayside claims over $163,000 in pre-petition assessments and charges, as well as post-petition charges, thus any "payments" by debtor must be applied to assessment claims, and nothing else.

All post-petition income, even after plan confirmation, is property of the estate. (11 U.S.C. 1306(a)(2); *United States v. Harchar*, 371 B.R. 254, 268 (N.D. Ohio 2007); *In re Reynard*, 250 B.R. 241, 245-7 (Bankr.E.D.Va. 2000); *In re Khan*, 504 B.R. 409, 414 (Bankr.D.Md. 2014).) Any income arising from rental of the real property still owned by Ms. Parker is property of the estate. Jennings/Bayside's seizure of this income violates 362(a)(3).

Further, upon plan confirmation on December 18, 2014 the real property itself revested in debtor, "free and clear of any claim or interest of any creditor provided for by the plan." Debtor's plan provides for both the secured and unsecured claims of Bayside. Asserting control over debtor's residence as a way to recoup pre-petition claims, or post-petition claims, or for *any* purpose, violates the automatic stay under 362(a)(3) and 362(a)(6). Jennings/Bayside have no right to seize the real property and use it to pay off "any claim or interest" they may believe they have against debtor or her property. (*In re Sedgwick*, 266 BR 185,186 (Bankr.N.D.Calif. 2001; Section 1327(c).)[12] This latest act is a continuation of the pattern of harassment and coercion intended to compel payment of a pre-petition debt, or to induce Ms. Parker to give up and

---

[12] *In re Sedgwick* is a decision by Judge Jaroslovsky of this court.

abandon this case, or be unable to make her plan payments, leading to dismissal. It is doing by subterfuge and indirection something Jennings/Bayside could not do directly. (*Gordon*, supra.)

Seizure of the physical real property itself, and the income from the property, undermines the authority of the court over the assets of the debtor and the estate and prejudices pre-petition creditors. The conduct deprives debtor of funds she could use to fund her plan and pay her living expenses, and thus undermines her ability to complete the plan and obtain the fresh start to which she is entitled. As such the conduct is a contempt as well as a stay violation, sanctionable under Section 105(a) and the court's inherent power. (*Avon Townhomes Venture*, supra, at 315 noting that "the bigger concern was the violence committed by the parties against the integrity of the bankruptcy system.") Seizure of the property and the income is theft or embezzlement, by any standard an "abusive litigation practice" that warrants sanctions. (*Avon Townhomes Venture*, supra, 304.)

The unit is being rented at the rate, apparently, of $5,000.00 per month. Bayside has therefore embezzled in the range of $25,000.00 from debtor and the estate during the five months the property has been rented by Bayside. In addition to all other sanctions and damages the court needs to order disgorgement of this illicit income by Bayside and turnover to debtor, plus interest and costs of recovery. The court can order disgorgement as a sanction under its inherent power. (*Avon Townhomes Venture*, supra, 316.)

I. AMENDING THE GOVERNING DOCUMENTS TO "ALLOW" SEIZURE OF DEBTOR'S EXCLUSIVE PARKING AREA, SEIZURE OF DEBTOR'S CONDOMINIUM UNIT ITSELF, AND SEIZURE OF THE INCOME FROM RENTING DEBTOR'S CONDOMINIUM, ARE VIOLATIONS OF THE AUTOMATIC STAY AND A CONTEMPT.

On May 21, 2015 Jennings/Bayside distributed a "ballot" as described in Part One item (13) above that would purport to erase debtor's "Exclusive" parking area shown on the Condominium Plan and the grant deed to Unit 990, and would purport to give Bayside the power to take total control of debtor's condominium without benefit of a transfer of legal or equitable title, plus the power to rent out the unit, keep the income, and not credit anything to debtor's assessment account. (Exhibit M) The proposal would also increase the maintenance responsibility of debtor for Unit 990 by adding new structural components to the list of

components in existing Article 5.3. The "amendments" were in fact adopted in June 2015 and are now being implemented by the Association.

Apart from the obvious lawlessness of these proposals under substantive law, they are all aimed at seizing control of property of debtor held by debtor free and clear of all claims by Jennings/Bayside. These actions have the express "purpose" of inflicting financial harm on debtor and seeking to collect a prepetition claim, as the "June Ballot Initiative Explanation Summary" recites. Jennings says the purpose is "to prevent the unpaid obligations of delinquent members who choose not to fulfill their obligations from being assessed to the remaining members" (Exhibit M, Ballot Explanation Summary Item 03) because "when Unit 990's ownership changes hands, all of the proper assessments will be lost forever." (Summary Item 05.) This is a direct attempt to collect pre-petition claims, a violation under 362(a)(6), an act to coerce payment of a prepetition claim, likewise a violation under 362(a)(6), and an act to obtain possession or control of property of the estate (post-petition income), a violation under 362(a)(3).

Moreover, renting out debtor's Unit presents a whole new range of risks and expenses to debtor and undermines the confirmed Chapter 13 plan. Taking on a tenant in rent-controlled Oakland, with its very elaborate tenants-rights ordinances and a community of tenants-rights attorneys ready to lodge suits against landlords for a wide spectrum of claims, *without debtor's consent*, is utterly incompatible with debtor's reorganization plan. Debtor would also be potentially liable for trip and fall accidents, illegal conduct on the premises by persons unknown to debtor that could lead to seizure of the property, and a host of other unacceptable potential liabilities. The rent may constitute "income" to debtor for income tax purposes and for purposes of this case. The very concept is ridiculous and patently unlawful. This court can and should decree that the "amendments" are void as to debtor's property in addition to imposing sanctions for violation of the stay.

J. SUBMITTING A FALSE CLAIM AND FILING A MOTION FOR RELIEF FROM STAY BASED ON A FALSE CLAIM ARE VIOLATIONS OF THE AUTOMATIC STAY AND CONTEMPTS.

Anyone who presents a particular position to the court has an affirmative duty to conduct a reasonable investigation into both the law and the facts before doing so, and that investigation

must lead to the conclusion that the position is warranted by existing law or a non-frivolous argument. (F.R.B.P. 9011(b); *Frantz v. United States Powerlifting Federation*, 836 F.2d 1063, 1064 (7th Cir. 1987).) Proofs of claim are within Rule 9011(b) and sanctions may be imposed for filing a claim in violation of the Rule. (*In re Cassell*, 254 B.R. 687, 691 (6th Cir. B.A.P. 2000); *In re Rogers*, 391 B.R. 317, 323 (Bankr.M.D.La. 2008).)

Further, when a creditor files a false proof of claim, that filing contravenes the purpose of a specific bankruptcy statute and rule, namely 11 U.S.C. 501 and 502(a) [allowing filing of proof of claim and claim deemed allowed], and Rule 3001(f) [proof of claim is prima facie evidence of its validity]. (*Campbell v. Countrywide Home Loans, Inc*., 545 F.3d 348, 356 n.1 (5th Cir. 2008).) The court may impose sanctions under Section 105(a) for filing a false proof of claim. (Id.; *In re Chaussee*, 399 B.R. 225, 241 (9th Cir. B.A.P. 2008).)

The proof of claim filed by Bayside on February 10, 2015 asserts that Bayside has a valid claim against debtor of $163,249, and that such claim is a valid basis for asserting an assessment lien under California Civil Code Sections 5675 and 5700(a). In fact the claim is entirely invalid, none of the claimed assessments and other related charges are lawful, and the claim is false and fraudulent. Had Bayside and its attorney complied with the statutory duty to investigate the law and the facts before filing the claim, and to determine that the claim is valid, the claim would never have been filed. (See discussion of invalidity of the claim in Part Three above and in Part Five below.)

This claim is so incredibly large, over $163,000 as of the date this case was filed, in a homeowner association assessment matter, that any reasonable person, and certainly any reasonable attorney, would have stopped and realized something was seriously wrong. The obligation to conduct a pre-filing investigation extends also to an investigation into "obvious" defenses the debtor may have available. (*Matter of Excello Press Inc*., 967 F.2d 1109, 1113-1113 (7th Cir. 1992).) Here, the "obvious" defense that would be raised, and had already been raised in the answer and cross-complaint in Bayside's state court suit over these assessments (Exhibit NN), is that the assessments are unlawful and that the method of "calculation" contravenes California law and Bayside's own CC&Rs. The same defenses had also been previously raised in the near-identical state court suit involving unit owner Curtis Brown.

This anomaly was obvious to the court at the hearing of Bayside's motion for relief from stay on April 17, 2015. The court directly asked Bayside's counsel Mr. Jordan what the basis of

this extremely large claim could be. Mr. Jordan said he was not sure, but possibly "upgrades." This is a nonsensical answer, both because attorney Jordan already knew exactly what the assessments were based on (Exhibit 1 to Bayside's motion is the list of assessments and related charges), and because "upgrades," whatever that may mean, are not a foreclosable item.

The claim is also false because the lien that Bayside sought permission to foreclose contains thousands of dollars in disciplinary fines, expressly prohibited from being included in a foreclosable lien claim by California Civil Code 5725(b). An investigation into the law and the facts would have revealed this defect and the proof of claim would not have been filed containing such claims, nor would a motion have been filed to enforce the defective lien.

The court should impose the full range of sanctions under 9011 for this false claim. Jennings and Bayside were "unrepresented parties" when the proof of claim was filed on February 10, 2015 and are expressly subject to sanctions under 9011(b)(2), (3) and (c)(2). The attorney is subject to sanctions under 9011(b)(2), (3) for filing a motion based on the patently false claim after becoming Bayside's counsel. The claim is also a stay violation, as it is coercive and harassing, an attempt to compel payment of a pre-petition claim, sanctionable under 362(k) and 105(a). Jennings' March 13, 2015 declaration in support of the motion is a perjury.

K.  FAILURE TO DISMISS CIVIL SUIT VIOLATES THE AUTOMATIC STAY.

Section 362(a)(1) automatically stays "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." This statute prohibits the continuation of judicial proceedings. (*Eskanos & Adler P.C. v. Leetien* (*In re Eskanos*), 309 F.3d 1210 (9th Cir. 2002). The mere continued existence of the action on the state court docket violates the stay; no active prosecution of the action is required. (Id.) The action must be *dismissed*, not just left fallow: "Consistent with the plain and unambiguous meaning of [362(a)(1)], and consonant with Congressional intent, we hold that 362(a)(1) imposes an affirmative duty to discontinue post-petition collection actions." (Id.; *Sternberg v. Johnson*, 595 F.3d 937, 943-944 (9th Cir. 2010); *Knupfer v. Lindblade* (*In re Dyer*) 322 F.3d 1178, 1191-1192 (9th Cir. 2003).) In *Eskanos* a 23-day delay between learning of the bankruptcy case and

dismissing the civil action violated the stay and resulted in sanctions under (former) 362(h). Two months was too long in *In re Granados Communications Inc*, 503 B.R. 726, 737 (9th Cir. B.A.P. 2013), resulting in a stay violation.

Bayside's civil action against debtor, Alameda County Superior Court No. RG13-683940, remains active and on file. No steps have been taken by Bayside to dismiss the action despite knowledge of this case since early October, 2014, thirteen months ago. Continued existence of the action as an active case is a violation of the 362(a)(1) stay.

## PART FIVE: DAMAGES FOR VIOLATIONS OF AUTOMATIC STAY AND FOR CONTEMPT

### A. ATTORNEYS' FEES INCURRED IN BRINGING MOTION AND ENDING VIOLATIONS

Section 362(k)(1) provides "... an individual injured by a willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Once the court finds the violation is "willful" damages are mandatory. The debtor is entitled to all reasonable attorney fees and costs; the court does not have discretion to award less. *In re Snowden*, 769 F.3d 651 (9th Cir. 2014); *In re Lopez*, 405 BR 24, 26 (1st Cir. B.A.P 2009); *In re Stanton*, 139 BR 232 (9th Cir. B.A.P. 1992).

This motion addresses at least twenty-five (25) distinct stay violations and contempts, each of which has required separate evaluation to determine how debtor should respond. The legal research and factual investigation has required consideration of the effect of non-bankruptcy law, particularly the California Civil Code chapters comprising the Davis-Stirling Common Interest Development Act, and evaluation of the Bayside Court governing documents, relied on by Jennings/Bayside to justify their conduct. It has required understanding of the issues in the parallel case involving former owner Curtis Brown, hounded out his unit and forced into bankruptcy by Jennings/Bayside.

Attorneys Marlene Fong and Marc Fong, bankruptcy and civil counsel respectively, will at the appropriate time file a fee motion and will submit declarations in support of the fee request

showing the hours spent on this matter and the hourly rate. This attorney time has been entirely in response to actions by Jennings/Bayside. Applying the relevant factors and taking into account the experience of counsel in the area of common interest development law, the court will be asked to award not less than $50,000.00 in attorney fees against the persons and entities responsible for the violations, jointly and severally. This amount does not include dealing with any response to this motion or other acts that may be taken by the violators nor preparing for and attending the hearing.

The court can also award unlimited attorney's fees for the bad-faith abusive litigation tactics, under the court's inherent powers and under 105(a). Attorney's fees awards under 105(a) can be awarded for all legal work, including litigating the contempt action all the way through the final order and litigation of the damages claim. The court may award actual damages, punitive damages, and attorneys' fees as a civil contempt sanction for a willful violation of a court order, including the automatic stay. (*In re Granados Communications Inc.*, 503 B.R. 726, 734-5 (9th Cir. B.A.P. 2013); *Avon Townhomes Venture*, supra, 304.)

There is a remedy for every wrong, and the court should freely impose a fee sanction for every wrong perpetrated by respondents not just against debtor but against the integrity of the court and the law. Here, "the very temple of justice has been defiled." (*In re Avon Townhomes Venture*, supra, 304.)

B. DAMAGES FOR EMOTIONAL DISTRESS

"Section 362(k) permits an award of emotional distress damages if the bankrupt petitioner (1) suffers significant harm, (2) clearly establishes the significant harm, and (3) demonstrates a causal connection between that significant harm and the violation of the automatic stay (as distinct, for example, from the anxiety and pressures inherent in the bankruptcy process)." (*Snowden*, supra, at 656-657 citing *In re Dawson*, 390 F.3d 1139, 1149 (9th Cir. 2004).) *Snowden* involved a nurse who took out a $575 payday loan to make ends meet for herself and her daughter. The lender cashed the check securing the loan after the Chapter 7 case was filed, resulting in an $816 overdraft. This sent debtor "into a tailspin because her finances careened out of control at the moment when she thought she was finally getting them together." (Id.) Snowden was "panicked" and worried that every other creditor would do the

same thing, which "was very overwhelming" for her. She "could not concentrate," was "agitated," and "felt miserable." (Id.) Snowden filed a motion for sanctions under 362(k). The Ninth Circuit upheld the $12,000 award for emotional distress, the $12,000 for punitive damages, and refund of the loan and bank charges, and remanded for a larger award of attorney's fees.

No financial losses are needed to establish emotional distress damages. (*Dawson*, supra, paragraph 38.) Corroborating medical evidence is not needed to establish the severity of the emotional distress, particularly where the violator engaged in egregious conduct. Further, "the circumstances may make it obvious that a reasonable person would suffer significant emotional harm" even without egregious conduct. (Id.)

Here, Ms. Parker's declaration in support of the motion amply demonstrates significant and long-lasting emotional distress, caused directly by the repeated and egregious stay violations and bad-faith, abusive and oppressive litigation tactics. She is suffering severe depression, anxiety, anger, fear, and all the other markers of "severe" emotional distress, caused by the conduct of Jennings/Bayside.

The only issue is the measure of damages: How to compensate for the emotional trauma of a nonstop campaign of harassment and intimidation in violation of a fundamental principle of bankruptcy law and policy, the automatic stay? The young nurse in *Snowden* experienced only a single stay violation and was not driven from her home or forced to take a stress-induced leave of absence. In the present case Ms. Parker has been the victim of literally dozens of stay violations and contempts calculated to hurt her so badly she will abandon this case or be dismissed out of it. She was forced to abandon her home, the friends she had acquired after 14 years of living in California, and her beloved pets, no small thing for a single person without children or nearby family.

Unlike the usual situation with a dispassionate creditor making a forbidden but business-based attempt to collect a legitimate debt, this case involves something altogether different. This case presents instead a deliberate, personal vendetta by one individual abusing his position of power to inflict maximum hurt on a defenseless person, using illegal and trumped-up charges to assure that this case does not result in a discharge of old claims and a fresh start for the debtor.

Just like in *Snowden*, Ms. Parker believed that by filing this case, submitting a reasonable plan that was quickly confirmed, and keeping up her payments to the trustee and creditors, she

would have the "respite from the forces that led [her] to bankruptcy" (*Dawson*, supra) and could get on with putting her financial and personal life back together. Instead, the opposite happened.

Jennings/Bayside have been inflicting deliberate emotional trauma on Ms. Parker for years, and continued after the case was filed. She has had to live with this every day for the last 360 days, at minimum. She has felt the anxiety, fear, anger, uncertainty, hopelessness, depression, and all the other components of severe emotional distress for every one of those 360 days. Using the Association's own standard of $500.00 for each "violation" a reasonable and fair compensation for 360 days of deliberately-inflicted emotional distress is $180,000.00.

## C. DAMAGES FOR FINANCIAL LOSSES

Section 362(k)(1) provides for a mandatory award of "actual damages." This necessarily includes such things as wages lost due to stress caused by the violations, expenses of relocating to get away from the source of the distress, medical bills incurred to treat the distress, and at least $25,000 in embezzled rental income. These are described in Ms. Parker's declaration filed herewith.

## D. PUNITIVE DAMAGES

Punitive damages are expressly made available under 362(k)(1) in "appropriate circumstances." This case presents such "circumstances" in abundance. The same factors discussed in Part B above regarding emotional distress show the "reckless or callous disregard for the law or the rights of others" that warrants punitive damages. (*Snowden*, citing *In re Bloom*, 875 F.2d 224, 228 (9th Cir. 1989) and *In re Pavon*, 192 F.3d 902, 909 (9th Cir. 1999).)

This case goes far beyond "reckless and callous" into the area of "deliberate intent to cause harm." A merely "reckless and callous" person is just indifferent to the potential his acts will cause harm. The person who acts deliberately *intends* for the harm to result and relishes the idea of hurting the victim. That is what Jennings and Bayside have been doing to Ms. Parker for the last twelve months, and for years before this case was filed.

Punitive damages are especially appropriate to deter a pattern of behavior that ignores the automatic stay. (*In re Klotz*, 239 B.R. 706, 713 (Bankr.N.D.Ohio 2002).) The violation in *Klotz*

was a series of post-petition calls and letters to the debtors, warranting significant punitive damages to "get the attention" of corporate management. (Id. 713.) "Under the facts of this case punitive damages in a large amount are essential. This Court finds that the facts in this case show such egregious and troubling behavior on the part of [the creditor], such contempt for the bankruptcy process, and such harassment of the debtors that significant punitive damages are in order. [The creditor] did everything in its power to trample on the rights of the Debtors and other creditors by attempting to collect on its claim outside the bankruptcy process." (Id. 713.) This passage could have been written specifically for the present case as it perfectly fits the facts.

Jennings and Bayside began plotting how to evade the law and concoct some way to get the pre-petition assessments literally on the day the case was filed. The smirking and disdainful email sent out on October 8, 2014 (Exhibit Y), quickly followed by the proposal to amend the CC&Rs to collect the pre-petition claims (Exhibit M), patently a subterfuge of the kind condemned in *Gordon*, and everything that followed, shows the Association and the respondents have nothing but contempt for the law, this court, and the rights of debtor and other creditors.


## The Kaufman case


Punitive damages are supposed to hurt, enough to stop the violator from continuing the violations and to make an example to dissuade others. The United States Supreme Court "has observed that the purpose of punitive damages in civil cases is the governmental one of deterrence and retribution," limited only by the rule that the award not be grossly excessive or arbitrary. *In re Kaufman*, 315 B.R. 858 (Bankr.N.D.Calif. 2004), citing *BMW of North America v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599; 134 L.Ed.2d. 809 (1996); *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 416; 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585 (2003).

"The fact finder has considerable discretion in fixing damages. The factors to be considered are (1) the nature of the defendant's acts; (2) the amount of the compensatory damages awarded; and (3) the wealth of the defendants." (*Kaufman*, supra, 869, citing *Professional Seminar Consultants v. Sino American Tech. Exchange Council Inc.*, 727 F.2d 1470, 1473 (9th Cir. 1984.) .

In *Kaufman*, Judge Jellen of the Oakland Division provided an excellent discussion of how a bankruptcy judge goes about deciding what kind of punitive damages are required to make the point that stay violations are a serious matter and have serious consequences. The case involved a particularly cold-blooded foreclosure by a predatory lender, which then evicted Ms. Kaufman and her young child from their Orinda home. The lender and its agents then removed the entire contents of the home to a storage area. Ms. Kaufman pleaded to be allowed to retrieve the contents, including her clothes and all the child's toys, but the defendants refused. Ms. Kaufman then filed a Chapter 13 case and gave notice to defendants and their attorneys. Defendants then sold off the contents at a fraction of the market value and kept the proceeds for themselves. Kaufman filed an adversary proceeding for damages for violation of the stay.

First, Judge Jellen ruled that the unlawful sale of the house contents was a clear stay violation. He fixed the likely market value of the furniture and other contents at $116,000 and awarded that amount as economic losses. Next, Judge Jellen evaluated the factors for determining whether punitive damages were warranted and how much the damages should be.

1. Defendants' Acts.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendants' conduct [citing U.S. Supreme Court's *BMW* decision, supra]. Here, the misconduct of Defendants, from the time of eviction and continuing after the bankruptcy filing to and after the dates of the lien sale was not only unlawful, intentionally so, but cruel." (*Kaufman*, 869.) The court observed that the lien sale of the house contents "was conducted with little or no regard for the fact that its purpose was presumably to pay storage charges," all of which could have been avoided by obeying the law. The court found a stunning lack of decency and downright malevolent conduct by the defendants. (Id. 870-1.)

Significantly, the court took into account the *pre-petition conduct* of defendants in order to evaluate whether the stay violations post-petition were an isolated act. Over defendants' protests that only post-filing conduct could be considered when evaluating punitive damages the court found the whole course of dealing highly relevant to showing that this "was not an isolated incident, *but rather, the culmination of a series of events designed by Defendants to humiliate Kaufman and to denude her of her personal property for their own economic advantage*." (Id. 871; italics added.)

## 2. Defendants' Wealth

The court examined the wealth of each of the four defendants. All were wealthy individuals, investors, and financiers. (Id. 872.)

## 3. Relation to Actual Damages

The court observed that the US Supreme Court has held that punitive damages of four times the actual damages is constitutionally permissible. (Id. 872.) Taking the relative wealth of the individuals into account the court adopted a multiplier of between one time and 3.9 times the actual damages to determine punitive damages. (Id. 872.)

## 4. Analogous Civil Penalties

The US Supreme Court in *BMW* held that reference to analogous civil penalties can be used to set punitive damage awards. "However, the Bankruptcy Code does not prescribe any statutory penalty for violation of the automatic stay. Thus a comparison is not possible." The Ninth Circuit rejects the idea of a cap on damages in this context. (*Kaufman*, 873.)

After considering all these factors Judge Jellen imposed punitive damages of **$570,000, $360,000, $170,000,** and **$135,000** against the four defendants, a total of **$1,235,000**, plus in each case costs and attorneys' fees. The liability was joint and several. (Id. 873.)

## **Application of *Kaufman* principles to this case**

## 1. Defendants' Acts

A proper evaluation of the reprehensible conduct of Jennings and his cohorts has to go back more than two years. Just as in *Kaufman*, the trail of evidence is much older than just the post-petition conduct. A brief history follows.

(a) Unlawful assessment claims set stage for bankruptcy

At the core of this malicious conduct by Bayside and its management are the illegal

assessments "imposed" by respondents starting in late 2012, on the theory that all assessments are to be based on the size of each unit, despite the plain-English text of the CC&Rs to the contrary. This cascade of ever-greater and plainly illegal assessments, late charges, finance charges, and the rest, is what pushed debtor into bankruptcy, when it should never have been necessary.

Bayside Court is a 33-unit warehouse conversion. 32 of the units vary in size from 482 square feet to 1781 square feet, as shown on the Condominium Plan incorporated into the CC&Rs. (Exhibit C) One unit, debtor's Unit 990, is far larger than the others at 6088 square feet. Unit 990 is a separate structure from the rest of the project, built 25 years later. Not surprisingly, the CC&Rs provide that Unit 990 is treated differently from the other units with respect to assessments and maintenance responsibility.

Article 5.3 of the CC&Rs "MAINTENANCE OF UNITS" provides, "The Owner of Unit 990 28th Street shall also keep the roof of that Unit in good condition and repair, at the Owner's expense. The Owners of Units 990 28th Street and 2825A Myrtle Street shall have sole responsibility to maintain all roof and parapet surfaces of the roofs of their Units." This fact is repeated in the Department of Real Estate's Final Subdivision Public Report for the project dated November 1, 2000, which advises potential buyers that the owners of Unit 990 and the Myrtle Street unit are responsible for this major expense, not the Association. This responsibility also includes the roof deck, reserved for the sole use of the Unit 990 and Myrtle Street owners. All unit owners are responsible for maintenance and repair of windows, all interior surfaces, floors, ceilings, walls, doors, lighting fixtures, plumbing, roll-up doors, and other components, as well as the exterior of doors and windows. (Article 5.3.)

All units are separately metered for water, electricity, and gas. The unit owners pay such expenses directly, not through their assessments. The Association pays for certain common expenses such as insurance, local taxes and assessments levied on the common area, routine maintenance on the common area, and exterior lighting. (Article 6.5.2.) There is no landscaped common area, no pool, no amenities, and no recreational facilities. The buildings are brick and concrete, with an extremely long expected life and little maintenance needed.

Because (1) the expense of roof maintenance and repair for Unit 990 belongs to the unit owner, not the Association, (2) all the utilities are paid directly by the unit owner, and (3) maintenance and repair of much of the structure itself is paid by the unit owner, the Association

needs to assess very little in respect to Unit 990, indeed for any of the units. Thus, the fact that Unit 990 is larger than the other units is irrelevant to the cost of operating the project.

Assessments are allocated pursuant to Articles 6.2.2 and 6.2.3. Article 6.2.2(b) provides that the Association will estimate the total amount needed annually to operate and maintain the project and establish "reasonable reserves for replacement of any improvements within the Project *for which the Association is responsible*." (Italics added.) This means the Association cannot assess anything against any owner for the cost of maintaining the Unit 990 roof or roof deck or landscaping, all of which are the sole responsibility of Unit 990.

Article 6.2.3 "Allocation of Regular Assessments" treats certain *reserves* assessments and *operating expense* assessments differently. First, "The items in the budget designated as reserves for *painting and roof replacement, insurance premiums, and electricity, gas and water not separately metered to the Units* shall be allocated to all Units in the same proportion that the square footage of each Unit bears to the total square footage of all Units in the Project." (Italics added.) This is a very short list of "square footage" components, extending only to painting, roof replacement, insurance, and non-unit utilities. Other major items such as structural repairs to the building itself, routine maintenance and repair of the roofs, common area wiring and plumbing, paving repair and replacement, and any other common-area components, are excluded from the list and are assessed equally among the 33 units. (See below re Article 6.2.3.)

Further, since this "square footage" formula applies only to "items in the budget **designated as reserves**," and only items for which the Association is responsible (6.2.2 (b)), it cannot include any amount for Unit 990's roof, deck, or exclusive use common area, and **no amount of any kind for operating expenses as to any Unit.**

Second, Article 6.2.3 treats all operating expense and certain reserves assessments by providing, "**All other items in the budget** shall be allocated 98.5 percent to all Units other than Unit C, **and divided equally among them**, and 1.5 percent to Unit C." (Bolding added.) Thus, 98.5% of the operating expense portion of the annual budget, and any reserves items not on the short list above, is to be allocated equally among the 32 units **regardless of the size of any Unit.**

By 2012 Jennings had become President of the Board of Directors and began exerting his influence on Association management and policy. In October 2012 Jennings concluded that Article 6.2.3 should be interpreted as requiring *all* the regular assessments (all operating expenses as well as all reserves) to be allocated among the 33 units according to the *square*

*footof of each unit*. (Exhibit S) Jennings' announced that former Boards had "under-assessed" the members using the wrong basis for assessments. Jennings and his fellow Board members further decided that this square-footage-based allocation should be imposed *retroactively*, going back to the year 2009, which Jennings declared was the last year not barred by the statute of limitations. Jennings decided the "correct" assessment on Ms. Parker's Unit 990 should have been $1,566 per month in 2009, and increasing in each following year.

Accordingly, Jennings produced a bill for retroactive assessments on Unit 990 for the years 2009, 2010, 2011, 2012, and 2013, claiming the difference between the actual assessment that had been imposed and $1,566 for each month of each year. The invoice served on Ms. Parker in September 2013 demanded $10,557.84 (year 2009), $14,812.68 (year 2010), $10,150.20 (year 2011), $8,458.50 (year 2012), and a further $4,332.54 described as "recapture of unearned reimbursement of 2009 assessments," grand total $48,311.76, all due and payable by October 1, 2013. (Exhibit BB) A "credit" was applied for the Cruz settlement. (See (b) infra.)

As discussed in Part Three above, Jennings/Bayside accelerated the annual assessments for 2014 and 2015, claiming $24,285.48 per year plus late charges and "finance charges," nearly three times the maximum lawful assessment that could even in theory have been charged.

Ms. Parker worked out a payment plan with the Board in January 2012 to get current by paying at least $1000.00 per month. (Exhibit CC; see discussion in Parker declaration.) Ms. Parker made the payments and performed on the plan. It was not until the outlandish Jennings-directed assessment "corrections" started in November 2012 that it became impossible for Ms. Parker to keep up with the Association's demands. After that point, it was inevitable that Ms. Parker would be forced into an unwanted and unnecessary bankruptcy, as in fact happened.

(b) Jennings/Bayside vow to "play ultimate hardball without pause"

On June 17, 2013 Bayside filed suit in Alameda County Superior Court, Action No. RG13-683940 to collect what Bayside claimed were the Unit 990 assessments due at that time, based on Jennings' interpretation of the assessment provisions of the CC&Rs. The named defendant is Ms. Parker's former co-owner John Cruz. Ms. Parker was later added as a named defendant. The amount claimed is $37,557.52 plus "late charges" of $5,187.06. (Exhibit NN)

Cruz was trying to divest himself of ownership and entered into a settlement agreement

with Bayside. In August 2013 Cruz paid $16,106.75 to Bayside in exchange for a dismissal. This left Ms. Parker as the sole target of what shortly was a $100,000-plus claim. Ms. Parker retained attorney Marc Fong, an expert in common interest development law. In November 2013 Attorney Fong began communications with Bayside and its attorney in the collection suit, John Richards, requesting a full accounting of Bayside's claim.

Apparently on orders from Jennings, attorney Richards replied, "OK, I have order (sic) to move forward on the non-judicial foreclosure on the liens. Also, your client continues to fail to pay assessments. **My client will be in full steamroll process from here on out**. I've tried to work with you, but evidently you're just trying to delay the process. Your client's place is huge and is approximately 12% of the annual budget of the HOA. **They want her to pay or get out, basically.**" (Exhibit DD; emphasis added.)

Later on November 11, 2013 attorney Fong emailed attorney Richards requesting an explanation of what exactly the claimed "assessment underpayment" charge of more than $48,000 was based on, how there could be another $52,000 claimed in addition to the $48,000 "underpayment," and why the settlement with Cruz was so low compared to the claim amount. (Exhibits DD, EE)

Attorney Fong continued to press attorney Richards for a full accounting. On November 22, 2013 attorney Fong emailed a list of questions asking for an explanation of the claimed charges. This time Jennings himself responded. (Exhibit FF) In reply to Fong's "Question 7" asking what the $48,000 surcharge is based on, after chiding attorney Fong for asking such "neophyte questions" Jennings says "it is for underpayment of assessment resulting from epically (sic) incorrect assessment levels set by incompetent management agents and their in-house or 3d party accounting subcontractors. [] The assessment computation methodology is extremely simple and is codified in CC&R 6.2.3., any uninfluenced 8th grader could run the correct math – it is not rocket science." (Id. pg. 4 para. 2.) Jennings adds, "CC&R 6.2.3 says that assessments are calculated by dividing the annual BCOA budget by the total BCOA member unit square footage, to obtain an annual BCOA cost per unit sq ft" and applying the size of the unit to arrive at the assessment for a given unit. "Very simple" says Jennings. (Id. pg. 4 para. 2.) Also completely wrong, as shown by the actual provisions of Article 6.2.3.

Jennings says, "I will however tell you that what the BCOA is seeking from your client is the correct and lawful assessment she never paid, the fines/interest she never paid, and all the

costs of collecting these funds. **If she fails to do this in good faith here – the BCOA will play ultimate hardball without pause**." (Id. pg. 4 para. 5; Emphasis added.)

In response to Mr. Fong's Question 8 asking what the "attorney fee" claims are based on, Jennings says "A8 - Inquiry refused as unreasonable. This will be taken up with the court when we prevail as "reasonableness" is very much for the court to judge then - not you here counselor. You are wasting the BCOA's time here and you will not be accommodated." (Exhibit FF pg. 4 bottom.) Jennings directs attorney Richards "to ignore all further Fong communication that is not a pleading or settlement offer." (Id.)[13]

In fact Civil Code 5605(b) (former 1366(b)) allows at most a 20% annual assessment increase, as does Article 6.2.6 of the CC&Rs.[14] Thus the maximum lawful 2013 assessment would be $735.60 per month for Unit 990, or $8,827.00 per year. Co-owner John Cruz' payment of $16,106.75 in August 2013 therefore paid *all possible lawful assessments through September 2014*, two years' worth of assessments from October 2012 forward.

In his December 3, 2013 email to Mr. Richards Attorney Fong referred to *River Garden Farms v. Superior Court*, (1972) 26 Cal.App.3d 986, holding that an unreasonably low settlement with one defendant amounts to extortion as to other defendants. (Exhibit OO.)  Fong conveyed Ms. Parker's offer to pay the same amount Cruz had paid, $16,106.75, by December 9, 2013 to settle Bayside's claims against her. (Id.) Jennings/Bayside refused and went forward with the "ultimate hardball without pause" as Jennings had promised.


(c)     Jennings/Bayside make it impossible to sell Debtor's Unit 990 and interfere in the pending sale agreement


Ms. Parker entered into a sales agreement for her unit 990 in January 2014. The buyers were Scott Sorensen and Robert Martin. On February 20, 2014 the attorney for the buyers, Robert Capron, emailed Jennings a list of questions asking for an explanation of all the claims being made against Ms. Parker and Unit 990 and requested copies of the minutes of all Board

---

[13] The Jennings letter is an attorney-client communication from Jennings to Richards, however Jennings waives the privilege and directs Mr. Richards to transmit the entire letter to Mr. Fong. (Pg. 5 bottom.)
[14] Regular annual assessments can be increased above 20% by a vote of the members. No such vote was taken in any of the years 2012-2015.

meetings from November 1, 2013 forward. Jennings responded with a demand for payment of $60 per hour for providing documents and insisted that attorney Capron provide "confirmation from the escrow officer" that Capron represents Sorensen and Martin.

Attorney Capron replied on February 21, 2014 warning Jennings that Jennings was engaging in the unlicensed practice of law, and that Jennings's conduct is "designed to intentionally interfere with and frustrate the contracts my clients have with the owner of Unit 990 to buy that unit." Capron followed with a detailed discussion of how Jennings' conduct is wrongful on a wide range of grounds. Capron concluded by re-stating his demand that Jennings account for the claims being made, so that the transaction can close. (Exhibit GG) Jennings refused to provide any explanation.

Attorney Capron continued for several more months trying to get Jennings to explain the justification under the law for the assessment demands, fines, and other charges. Jennings and Bayside stonewalled all of Capron's requests. On May 21, 2014 Mr. Capron sent Jennings and the Board a 4-page email asking very specific questions about the assessments, how each supposed delinquency or charge was calculated, and what all the other charges were based on. The buyers hoped to reach an agreement with Bayside and pay off or assume the reasonable and lawful charges as part of the purchase. Jennings responded on May 27, 2014 that Bayside would provide no information until Capron proved the purchase financing was assured. (Exhibit HH pgs. 3-8.)

Mr. Capron replied on May 27, 2014 pointing out again that Jennings and Bayside were acting unlawfully in refusing to supply information at an owner's request. Capron closes with, "You will sense a tone of urgency in this repeated request. That urgency is because my clients have basically only the month of June within which to secure the information they need to close their purchase of Unit 990 and the information I have requested is essential to that closure. If I do not get this information I have requested, I am afraid my clients will not be able to close escrow, which would mean they would lose their present contractual right to purchase Unit 990 and become solid, assessment paying, water valve problem solving members of your association." (Exhibit HH pgs. 1-2.) Negotiations continued through August 2014 but failed.

Jennings and Bayside refused to respond to Capron's (i.e. Ms. Parker's) requests for answers. Clearly, *it was far more important to Jennings and Bayside to use their power to prevent Ms. Parker from completing the sale, and to ruin her financially*, than to actually solve

any of what Jennings and Bayside claimed was the problem and get a new "assessment paying" and "problem solving" member into the association. When given the clear chance to once and for all settle the accounting issues, get a new owner into Unit 990, and have a steady assessment stream from Unit 990, Jennings and Bayside made the utterly perverse and senseless decision to instead ruin Ms. Parker. This is "cruel" and malicious conduct at least as bad as the sell-off of household contents in *Kaufman*, and indeed it is far worse.

As a direct result of Jennings' and Bayside's interference and obstruction the transaction was cancelled. Plainly, but for Jennings' and Bayside's conduct Ms. Parker would have ceased to own the unit in February 2014, or July 2014 at the latest, would not have continued to be responsible for any assessments or other charges, and would not have needed to seek protection in bankruptcy. When the transaction was cancelled in July 2014 Ms. Parker had no option but bankruptcy and began preparing this case with her bankruptcy counsel.

 (d)     Jennings/Bayside demands become even more outlandish in 2014, driving Ms. Parker to file bankruptcy

Ms. Parker could have stayed current on the lawful assessments but not the $163,000.00 claim the Association was demanding on the eve of this bankruptcy filing. This bankruptcy case is the product of unlawful conduct by respondents, more than any financial problems encountered by Ms. Parker. But for the outrageous conduct of respondents Ms. Parker would not today be in bankruptcy, her creditors would not be taking a reduced payout on legitimate claims, the court system would not be burdened by this case, and this motion would not have been necessary.

But once the 2014 and 2015 tripled assessments were "imposed," once the fines began piling up, once the 2009-2013 "correction assessments" were dreamed up and imposed, once Bayside did everything it could to prevent Ms. Parker from selling her unit, the end result was guaranteed.

(e)     Jennings/Bayside have done this before and know how to drive an owner into bankruptcy and take his condominium

Sarah-jane Parker is not the only owner to be targeted by Jennings and Bayside. In the virtually identical case involving Curtis Brown, owner of the small Unit C, Jennings applied his "calculation" of what the assessments "should" have been and began the same process of outlandish demands. Jennings/Bayside filed a civil collections action against Brown on December 2, 2013 demanding $88,000 in assessments and charges. (Alameda County Superior Court Action RG13-705175.) Unit C is the smallest unit, designated as work-only in the CC&S. As noted above it is treated specially in Article 6.2.3, paying half the reserves amount per square foot as other units and only 1.5% of the operations budget, essentially nothing. Jennings concluded that this assessment scheme was wrong and began billing Unit C at a much higher rate, despite the CC&R provisions.

Brown filed a cross-complaint for fraud, emotional distress, unfair business practices, and many other related claims, in addition to attacking the "recalculated" assessments as unlawful and a violation of the Association's fiduciary duty. Jennings and his spouse Jo Lee were named as individual defendants along with all the board members.

Jennings and Bayside adopted a scorched-earth litigation policy, making the case too expensive for Brown to continue to prosecute. Brown filed a Chapter 13 case in the Oakland Division on July 16, 2014, No. 14-42976. At the meeting of creditors, attended by attorney Richards, the Association proposed to purchase Brown's unit from him. This appeared to Brown to be the best way out of the civil suit and the bankruptcy. Brown sold his Unit C to the Association for $116,000 in August 2014. Brown sent an email message to other members including Ms. Parker saying "I am financially bankrupt, after putting up a fight against crazy. [] After two years to the date of fighting lunacy, it is time to move on and put this mess behind me." (Exhibit II) Brown dismissed his Chapter 13 case. The Association then rented out Unit C, treating it as a money-maker. (Exhibit W pg. 2.) Bayside still owns and rents Unit C today.

Brown's case is the model for what Jennings and Bayside are doing to Ms. Parker. They know how to drive an owner into bankruptcy, and then how to seize the owner's condominium and turn it into a rental income source.

(f)      The Association has hit on a strategy of keeping Ms. Parker on title to her unit and continuing to assess "post-petition" assessments and impose fines, while refusing to take the deed offered in October 2014 or foreclose on the unit

On October 29, 2014 Ms. Parker served a written offer to turn over title to her unit to the Association and offered to execute a quitclaim deed immediately. (Exhibit X) The reason for doing so was to avoid precisely the situation that has unfolded, with Ms. Parker continuing to be on legal title to the property, despite surrendering it to secured creditors under her plan and moving to Texas soon after the case was filed. The Association never responded to or even acknowledged the offer to transfer title.

A "surrender" in a plan does not divest title and the owner continues to be liable for post-petition assessments until title changes hands. (*In re Spencer*, 457 B.R. 601, 603, 612 (E.D.Mich.2011).) This creates the unfair situation of an owner with no desire to remain on title but unable to sell or divest the property, yet continuing to be liable for accruing assessments.

The Association has decided that this situation suits its interests. Rather than take title, the Association has elected to keep Ms. Parker pinned down, stuck with ongoing liability for assessments, fines, interest, and whatever other charges Jennings and the Association can think of, all of which is in theory non-dischargeable post-petition debt. The concept is obviously to keep running up huge post-petition claims that will counterbalance and make up for the dischargeable pre-petition claims.

This conduct violates the stay under 362(a)(3) as it seeks recovery from property of the estate, Ms. Parker's post-petition income. There is no other source of payment for the huge "assessment" claims, fines, late fees, "finance charges," and all the rest. The monthly payment demands that continue to issue are payable only from property of the estate. If the Association thinks it is entitled to collect anything from property of the estate protected under 362(a) it needs to bring a motion for relief from stay or to condition the stay. Absent relief from the stay in advance of such collection efforts, each bill to debtor is a renewed violation of the stay. The same conduct is also an obvious subterfuge aimed at coercing payment of pre-petition claims, prohibited by 362(a)(6). (*Gordon,* supra.)

Likewise, the deliberate decision to keep Ms. Parker on title and bleed her dry with outrageously excessive and unlawful "assessments" and fines and charges, when the Association has had the option of taking title to the property since the day the case was filed, is a bad-faith abusive, vexatious, oppressive litigation tactic sanctionable under the court's inherent power and under Section 105(a). (*Avon Townhomes Venture*, supra.)

The fact that the Association believes it can "rent out" Ms. Parker's unit, and can collect and keep the rent income, while refusing to take actual title to the property and while continuing to "assess" and fine Ms. Parker, adds to the reprehensible nature of this entire course of conduct. If Jennings and Bayside want to rent out the property, they can take title and do it legally. Jennings and Bayside however have chosen a different path.

(g)    <u>Jennings has inflicted this harm on Ms. Parker for personal financial gain</u>

Until 2012 Bayside Court was managed by professional common-interest development managers and financial experts. Regular professionally-prepared reserves studies were done and annual financial statements were prepared and distributed as required by law and by the CC&Rs. The professional management that preceded Jennings was paid $18,450.00 in 2011 (Exhibit KK), $18,000.00 in 2010 and $18,000.00 in 2009. (Exhibit LL.)  That all changed in 2012 when Jennings decided the prior professional managers were all incompetent and had failed to recognize that assessments are to be imposed based on square footage of the unit. Jennings decided that Bayside Court needed a more enlightened manager. He gave the job to himself. He also decided his wife Jo Lee could do a better job handling the finances of the Association than the professional managers so she was hired too. (Exhibit R pg. 2 para. 8.1.)

Jennings was paid $40,000.00 per year to manage Bayside Court starting in October 2012, as announced in the October 23, 2012 "Assessment Corrections" memo (Exhibit S). The "Annual Disclosure Report for 2013-2014" dated November 7, 2013 lists "Association Management" as a $40,000.00 expense. (Exhibit JJ pg. 2 para. 2.0.) Jennings' salary is the largest expense item in the 2014 budget except for "Utilities" at $48,400.00. It is twice the next-largest item "Insurance" at $20,325.00 and nearly three times the $15,000.00 "Maintenance" budget.

Jennings' salary for managing Bayside increased to $60,000.00 per year with the 2015 budget released on November 22, 2014. (Exhibit PP) The 2015 budget includes a $5,000.00 "Consulting-Financial" item, presumably Jo Lee Jennings' fees. Jennings' salary is now by far the largest item in the budget, three times the "Maintenance and Repairs" budget item, three times the "Insurance" budget item, and twice the "Utilities" budget item. There is also a "Leasing

Services" entry (Item 2.10) for $2,600.00, presumably Jennings' fee for managing the rental of Unit C, the former Brown unit purchased during Brown's Chapter 13 case. (Id.)[15]

It is evident that Jennings is using the massive assessment claims, fines, interest, retroactive assessments, and the other charges, and now the rental income from Ms. Parker's condominium, to create a slush fund to pay his own salary from claims against Sarah-jane Parker. Item 1.2 of the 2015 budget projects $60,000.00 in "Assessment Revenue Collections (past due collections)," exactly the amount of Jennings' increased 2015 salary. The only "past due collections" as of November 22, 2014 was the Association's pre-petition claim against Ms. Parker, so this projected "revenue" can only be the pre-petition assessments. The 2015 budget thus *presumes* the Association will be engaging in stay violations and other illegal conduct against Ms. Parker, and in fact the numbers in the budget do not add up without the stay-violating abusive tactics that the Association in fact has unleashed against Ms. Parker. The budget was prepared after this case was filed.

Like the defendants in *Kaufman*, Jennings is motivated by personal financial gain at the expense of an essentially defenseless person. Just as in *Kaufman,* this "was not an isolated incident, *but rather, the culmination of a series of events designed by Defendants to humiliate Kaufman and to denude her of her personal property for their own economic advantage*." (*Kaufman*, supra, 871; italics added.) In the same way, Jennings and his co-respondents have deliberately set out to humiliate Sarah-Jane Parker and denude her of her property, her dignity, and her right to be free of bullying harassment, for their own economic advantage. The court needs to remedy this wrong and impose sanctions that truly achieve the purpose for which sanctions are made available in the law: to restore respect for the law, respect for the court, and respect for the rights of debtors under the Bankruptcy Act.

## 2. Defendants' Wealth

(a) **Bayside Court Owners Association**: Bayside Court has a cash reserves account of over

---

[15] Attorney Cantor's June 5, 2015 letter (Exhibit AA) says extreme measures are needed "to protect the membership from severe economic hardship." A 33-unit minimal-services association that can pay $67,600 for management, and could buy Unit C for $116,000 in cash, does not have any sort of "economic hardship," other than self-inflicted.

$200,000.00. Bayside owns Unit C, value at least $100,000. Bayside also has the legal power to specially assess its members to pay a judgment. (Civil Code Sections 5600(a), 5610(a)) Bayside also has regular assessment revenue that is available to pay a judgment. With 32 units owned by members other than Ms. Parker there is adequate depth to be able to pay a significant judgment.

(b) **Lawrence Drouin**: Owns multiple properties.

(c) **Justin Hu**: Real estate developer and investor, partner in Blue Cap Lofts LLC. Owns multiple properties.

(d) **Raj Hasmukh Patel**: Owns multiple properties.

(e) **Laurence Jennings:** Paid manager of Bayside Court Owners Association for at least three years. Is paid $60,000.00 per year. Spouse Jo Lee Jennings has been paid bookkeeper for the same period of time, at a pay rate not clear from the records. Over the last three years the Jennings pair have been paid at least $140,000.00 for directing the operations of the Association and setting policy. This $140,000.00 is income derived from making the policy decisions that constitute the many unjust and unlawful violations during the last three years. It can be disgorged to pay damages. Jennings owns a home in Willits, California.

### 3. <u>Relation to Actual Damages</u>

Actual damages will consist of attorney's fees on this motion of at least $50,000.00, attorney fees in the state court action of $20,000.00 at present, $4,800.00 in this bankruptcy action that should never have been required, loss of income of at least $10,000.00, embezzlement of $25,000.00 in rental income, and emotional distress damages, using the Jennings/Bayside $500-per-violation standard, of at least $180,000.00. Combined actual damages are at least $289,800.00.

### 4. <u>Appropriate Punitive Damages Award</u>

Using the *Kaufman* approach of between 1.0 and 3.9 times the actual damages depending on the wealth and culpability of a particular defendant, the court will set an appropriate punitive damages award.

CONCLUSION

The deliberate, unlawful and cruel behavior directed at Ms. Parker for the last three years is "reprehensible" in the extreme by any standard. This is exactly the kind of behavior Congress intended to stop and punish with the enactment of Section 362(k)(1). Our Ninth Circuit courts place maximum emphasis on the "reprehensible" nature of the violator's conduct when determining the appropriate amount of punitive damages. Defendants' conduct here is every bit as "reprehensible" as the cold and heartless conduct in *Kaufman* and warrants punitive damages in the same range.

Respondents' belligerent, willful refusal to comply with the law, coupled with the continuous use of intimidation tactics against anyone who challenged them, is the epitome of the oppressive, abusive, bad-faith conduct that results in substantial punitive sanctions against those who engage in such tactics. The integrity of the court is also impugned by this sort of wanton behavior without regard for the law. Nothing but a significant damages award is sufficient to bring home the message to these and other persons guilty of such disrespect for the court and the law, and to compensate Sarah-jane Parker for her losses and damages.

Dated: November 2, 2015  FONG & FONG APC

           By: <u>Marlene A. Fong</u>

           Attorney for Debtor Sarah-jane Parker