

The following constitutes
the order of the court. Signed August 24, 2017

_____
Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

SARAH-JANE PARKER,

      Debtor.

Case No. 14-44083 CN
Chapter 13

**MEMORANDUM DECISION
GRANTING SUMMARY JUDGMENT
IN PART AND DENYING SUMMARY
JUDGMENT IN PART**

On July 28, 2017, this court conducted a hearing on respondents' summary judgment motion in these consolidated contested matters.[1] Parker asserts that BCOA's post-petition and post-discharge HOA fines, assessments, rent collection and annexations regarding her condominium unit violated the automatic stay and the discharge injunction imposed by her Chapter 13 bankruptcy and Chapter 13 discharge. Parker seeks damages under Bankruptcy Code §§ 105 and 362(k) for BCOA's allegedly willful violation of the automatic stay and allegedly knowing violation of the discharge injunction. All appearances were made on the record. For the reasons stated below, the court grants summary judgment in part and denies summary judgment in part.

---

[1] The court shall collectively refer to respondents Bay Court Owners Association, Laurence Jennings, Raj Patel, Justin Hu, Lawrence Drouin, Scott Jordan, Esq. and Andrew Cantor, Esq. as "BCOA." Neither Parker nor BCOA made a concerted effort to identify the individual respondent(s) allegedly liable for any specific automatic stay/discharge injunction violation. The court therefore analyzed the motion in a collective sense, and did not apply the summary judgment standard to each individual respondent. The "sorting out" of individual liability will be made at trial.

1

Virtually all of the underlying acts and incidents are well documented and undisputed. What is not so clear is the significance of some of these acts and incidents, and whether they constitute stay/discharge violations. The pertinent documentation is primarily found in the exhibits that are attached to Parker's original automatic stay and discharge violation motions.[2] The relevant undisputed facts are as follows: Parker filed her Chapter 13 bankruptcy on October 8, 2014 and received her Chapter 13 discharge on December 1, 2015. BCOA received notice of her Chapter 13 bankruptcy and her Chapter 13 discharge. When Parker filed her Chapter 13, she and BCOA were embroiled in contentious litigation in Alameda County Superior Court in which BCOA sought to collect unpaid HOA dues (the "Alameda County litigation") arising from Parker's ownership of a large condominium unit located at 990 28th Street in Oakland, California ("Unit 990"). Parker denied that she owed any pre-petition dues, and she contended that BCOA had illegally increased Unit 990's fees in retaliation to her opposition to certain HOA board members or officers. Parker's pre-petition HOA obligations (disputed or not) arose from BCOA's Declaration of Covenants, Conditions and Restrictions dated July 10, 2000, which were duly recorded with the Alameda County Recorder's Office (the "CC&Rs").[3] In proper parlance, the CC&R's "run with the land," which land includes Unit 990. While the parties dispute the amount and legality of BCOA's assessments, they do not dispute that Unit 990 is, in theory, subject to the CC&Rs and that the owner of Unit 990 must comply with their terms and pay annual assessments to help maintain the condominium development.

Parker owned Unit 990 when she filed her Chapter 13, and she listed unpaid real estate taxes, first and second deeds of trust, and BCOA's disputed HOA lien against Unit 990 on her Bankruptcy Schedule D. Unit 990 was in foreclosure on the petition date, and her bankruptcy filing stayed the second deed of trust holder's trustee sale. Parker filed an amended Chapter 13 plan on November

---

[2] Parker filed her "automatic stay" violation motion on November 3, 2015, and her "discharge injunction" contempt motion on December 15, 2016. This court consolidated the motions for trial by order dated February 22, 2017.

[3] As discussed in greater detail below, BCOA amended its CC&Rs post-petition, which is the source of some of the alleged stay and discharge violations.

13, 2014, which was confirmed on December 17, 2014. The amended plan "surrendered" Unit 990 to her secured creditors - including BCOA - and provided stay relief (upon confirmation) to allow her secured creditors "to exercise [their] right against [their] collateral." The amended plan also revested Unit 990's title in Parker.

Despite obtaining stay relief through the confirmation order, BCOA filed a motion for relief from the automatic stay on March 15, 2015, which Parker did not oppose. BCOA internal documents describe its stay relief motion as a request for a "comfort order." BCOA's relief from stay pleadings argued that Unit 990 was worth less than the secured debt against it, and that its negative equity (combined with Parker's failure to pay her assessments) justified relief from the automatic stay. BCOA's prayer for relief sought, in part, "That the automatic stay be terminated so that BCOA may exercise or cause to be exercised any and all rights under the CC&R's and any and all rights after the foreclosure sales, including, but not limited to, the right to consummate foreclosure proceedings on the Property and the right to proceed in unlawful detainer." This court's relief from stay order simply states that the "Motion is granted."

Parker vacated Unit 990 in November 2014 and moved to Frisco, Texas. As discussed in greater detail below, BCOA took control of Unit 990 in early 2015 and initially used it for storage. In June, 2015, under the guise of amended CC&Rs, BCOA leased Unit 990 and retained the rental income. BCOA never foreclosed on its HOA liens. Instead, the first deed of trust holder foreclosed on Unit 990 on December 6, 2016.[4]

**I. Parker's Section 362(k) Claims**[5]

Parker alleges that BCOA's stay violations began immediately after she filed the Chapter 13. These alleged stay violations include the following:

1.   In December 2014 and January 2015 BCOA sent "Late Payment Demands and Notices of

---

[4] BCOA objected to certain evidence submitted by Parker. The court overrules all of its objections except as to Exhibit C to Marlene Fong's declaration. BCOA's objection to Exhibit C is sustained since it was not timely filed and served.

[5] This memorandum will not address Parker's contention that BCOA's filing of its proof of claim violated the automatic stay. During argument, the court held, as a matter of law, that BCOA's filing of a proof of claim did not violate the stay.

3

MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 3 of 18

Delinquencies" to Parker seeking payment of its (disputed) pre-petition HOA assessments. BCOA does not deny sending these invoices, but claims that they should have been imprinted with a watermark overlay stating that they were "For Informational Purposes Only." See Exhs. F, G and H. Parker never contacted BCOA regarding these invoices, and BCOA asserts that Parker cannot demonstrate that she suffered any actual damages due to her receipt of these documents. While Parker's deposition testimony is equivocal on this element, previous declarations submitted by Parker in this contested matter (which were incorporated into her response to BCOA's summary judgment motion) suggests that she was "extremely surprised and fearful" when she saw these demands. (See Docket Entry 74).

2. BCOA made a post-petition settlement offer to resolve the Alameda County litigation (Exh. E). On October 29, 2014, BCOA (by email) offered to resolve the Alameda County litigation if, among other things, Parker agreed to pay it $25,000.00, sell Unit 990, dismiss her Chapter 13 and agree not to file another bankruptcy for at least 90 days. In return, BCOA agreed to, among other things, dismiss the Alameda County litigation and accept 60 cents on the dollar for its existing liens. BCOA warned that if its offer "is not accepted, we will be moving forward with our lawsuit with new counsel, and cross complaining Unit 990's tenant and realtor among other things-inclusive of filing multiple adverse claims, with the Bankruptcy Court. This will occur if you manage to maintain the Chapter 13 filing (which is full of errors by the way) vis a vis the Trustee's current valid move to dismiss, or convert to Chapter 7 as has always been expected. (The original Chapter 13 being a familiar stall tactic-just as it was for BCOA Unit C in 2006-2008). . . ."

3. BCOA made "retroactive HOA assessments" on Unit 990 (Eh. V-2) in May 2015 to address "significant unreported loft area built illegally without building permits." The documentary and deposition evidence suggests that the retroactive assessments covered pre-petition periods.

4. BCOA did not dismiss the Alameda County litigation until January 27, 2017, more than a year after Parker received her Chapter 13 discharge. BCOA did, however, file a notice of stay in the Alameda County litigation on October 29, 2014 and thereafter only attended Alameda County Superior Court compliance hearings.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

4

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 4 of 18

5. After BCOA took control of Unit 990 (and with Parker residing in Texas), BCOA issued numerous "disciplinary fines" against Parker in the spring of 2015 for, among other things, "Acting in a Manner Which Reduces General Building Security," "Hanging An Item Weighing In Excess of Ten Pounds From The Ceiling Of Your Unit," improper lighting fixture installment, and unpermitted electrical wiring. BCOA notified Parker of these violations and gave her 60 days to remedy them. It also set a June 28, 2015 hearing for these violations and gave her notice of that hearing. Parker did not cure these violations and did not attend the June 28th hearing. (Exhs. I - K). Parker has not disputed the violations; instead she contends that BCOA controlled Unit 990 at this time and it therefore served no legitimate purpose for it to fine her when she could not access Unit 990. In addition, the amount of some of these fines appear to exceed the CC&R's disciplinary guidelines. See Exh. QQ. Parker asserts that BCOA levied the fines as part of a scheme to "recoup" its losses arising from its inability to collect the pre-petition HOA assessments against Unit 990. This assertion is the recurring theme for many of the remaining alleged stay violations.

6. In May 2015, BCOA listed Unit 990 for rent in anticipation of amended CC&Rs which would authorize it to (among other things) lease "abandoned" units. The evidence indicates that Unit 990 was the "abandoned" unit which spurred several of these CC&R amendments. BCOA's "June [2015] Ballot Initiative Explanation Summary" (Exh. M) explained the rationale for the proposed CC&R amendments. For example, CC&R 3.4.8 was amended to grant BCOA "the right to lease any Unit which is at least 60 days or more delinquent in its Member Account obligations, if the respective Unit has, for the same period of delinquency, also been abandoned for at least 60 calendar days. The lease proceeds shall be used to fund the BCOA's Operating & Reserve Accounts as the Board may determine appropriate. The lease proceeds shall not be used to reduce the delinquent Member Account balance in any manner whatsoever. The lease proceeds are the permanent property of the BCOA, and no other entity shall have the right thereto, for any reason whatsoever." The June 2015 ballot initiative also sought to amend the CC&Rs "to assign maintenance of and repair responsibility for Unit 990 to Unit 990's owner-rather than to the Membership which has never received a fair assessment therefore from Unit 990's owners to date. All owners of Unit 990 to date have enjoyed the benefits of a ridiculously incorrect assessment calculated in error (in direct

5

violation of Bayside CC&Rs), by the original shoddy developer and a string of incompetent Management Agents who violated the law governing assessment calculation. The existing owner of 990 has never fully paid the incorrectly low assessment! When Unit 990's ownership changes hands, all of the proper assessments for it will be lost forever. This amendment assures that the other 32 members of the association will not have to pay for this loss in the future. This is a simple "Fiscal Responsibility" measure. If you don't want to have your association shell out >$50,000 . . . in 2017 to replace the roof of Unit 990 in response to incoming AB 968-you'll want to approve this revision."[6]

The June 2015 ballot initiative was approved. BCOA asserts that Parker responded to the ballot by executing a proxy in favor of the ballot initiative. BCOA has not produced, however, the proxy signed by Parker. Parker denies voting in favor of the ballot initiative, either directly or otherwise.

Parker asserts that the June 2015 ballot initiative violated California law and was proposed and adopted as part of BCOA's scheme to recoup its pre-petition losses caused by her bankruptcy filing. The evidence suggests that BCOA intended to aggressively pursue Parker's pre-petition HOA dues (see, e.g. Exh. MM). Moreover, the CC&R amendment authorizing it to rent abandoned units was deemed to be (at least by Andrew Cantor, BCOA's HOA counsel) "nothing short of brilliant" in accomplishing this fiscal goal. Andrew Cantor's June 5, 2015 letter reads in pertinent part that "Mr. Jennings has worked closely with my office on the resolution of the myriad of issues surrounding your Unit #990. Together with the assistance of Bankruptcy Counsel Scott Jordan . . . we have developed a potent plan to help the BCOA recover from the long-term economic damage inflicted by 990's delinquent owner. [¶] In regards to 990, this has resulted in the BCOA plan to lease the property to allow BCOA to recoup reserves funding necessary for your Board to take care of its fiduciary duty of properly running your association. Revising your CC&Rs to authorize the leasing of delinquent and abandoned units in order to protect the membership from severe economic

---

[6] The June 2015 ballot initiative also proposed to change the parking spaces assigned to several units, including Unit 990, and increase the HOA assessments against several units, including Unit 990.

6

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 6 of 18

hardship, is nothing short of brilliant. Proceeding in this manner is clearly beneficial to the BCOA in my professional opinion. I have taken the time to put the legal instruments in place required to protect the BCOA from litigation, and have reviewed and approved the lease document, adding an addendum waiver of liability that must be duly signed to initiate the lease." (Exh. AA).[7]

As stated above, BCOA preemptively exercised the powers proposed by the June 2015 ballot initiative. BCOA prepared a lease agreement dated May 19, 2015 for Unit 990. The lease's "Special Advisory" provision states that "BCOA Unit 990 comprises 12% of the BCOA's annual assessment revenue. The BCOA is dependent upon its assessment revenue scheme in order to provide legally required services to its Members. The owner of Unit 990 has filed for, and been granted, Federal Chapter 13 bankruptcy protection. She has left the state of California and surrendered her property deed to the property's secured creditors . . . . The BCOA cares for the property and must now Lease it in order to continue to properly care for it. In 2015 the BCOA was granted the right to foreclose on the property. The BCOA was also granted the right to attempt to recover the revenue and operating costs it is legally entitled to, pursuant to its CC&Rs which are provided along with this Lease. These powers were formally granted by a Federal Bankruptcy Judge in Federal Bankruptcy Court. As a direct result, the BCOA is now leasing the surrendered property to a third party through this Lease Agreement." (Exh. A, 2017 Fong Decl.).[8] BCOA leased Unit 990 for $5,000.00 per month, which on an annual basis significantly exceeded Unit 990's yearly HOA obligations. While the June 2015 ballot initiative stated that the rent generated from "abandoned" units would be BCOA's funds, Jennings testified at his deposition that BCOA set aside the Unit 990 rent for Parker's senior deed of trust holder. BCOA did not submit any evidence demonstrating how it

---

[7] BCOA did not present any evidence indicating that there were other abandoned units.

[8] The court rejects, at least at the summary judgment stage, BCOA's argument that the this court's relief from stay order gave it carte blanche to collect it pre-petition claim. BCOA's request for a "comfort order" can reasonably be interpreted to mean that it sought a specific order authorizing it to foreclose on its HOA liens. The scope of its motion was similarly limited. In addition, the right to rent Unit 990 was nowhere to be found in the CC&Rs when BCOA filed its stay relief motion.

7

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 7 of 18

actually booked the rental income.[9]

Bankruptcy Code § 362(k) authorizes damages for willful violations of the automatic stay. Section 362(k) provides in pertinent part that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Willful conduct requires that 1) the creditor knew of the automatic stay and 2) the actions that violate the stay be intentional. No specific intent is required; a good faith belief that the conduct in question does not violate the stay is not relevant to whether the act was willful or whether damages must be awarded. *In re Peralta*, 317 B.R. 381, 389 (B.A.P. 9th Cir. 2004).

The summary judgment standard is also well established. Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), applicable here by Fed. R. Bankr. P. 7056. The moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court "draws all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Contra Costa Transit. Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45 (E.D.Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

---

[9] BCOA's emails to its leasing agent note that Unit 990 was in good shape and that BCOA needed a "solid tenant in there to provide a revenue source so that we have an active funding source to pay for the care." (Exh. B, 2017 Fong Decl.). Despite this statement, BCOA send an August 8, 2015 email to Parker informing her that Unit 990 required "interior sprinkler modifications" to meet current standards, and that the estimated $6307.00 cost would be billed to her membership account. BCOA's email also requested "access" to Unit 990 (which BCOA already had).

8

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**

that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rationale trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted.).

There is no genuine dispute that BCOA knew of Parker's automatic stay at all relevant times, since BCOA received this court's form notice of the bankruptcy, which includes an explanation of the automatic stay. Except as to the early invoices, there is also no genuine dispute that BCOA's acts were intentional, and as to the invoices, a genuine dispute exists regarding whether their issuance was a (repeated) mistake or intentionally done. The critical question that remains is whether there are genuine disputes that BCOA's conduct violated the automatic stay.

Bankruptcy Code § 362(a)(1) and (6) appear to be the pertinent automatic stay provisions. Section 362(a)(1) stays "the commencement or continuation, including the issuance or employment of process, of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of this case under this title . . . ."

Parker contends that BCOA's settlement offer and failure to dismiss the Alameda County litigation violated § 362(a)(1). The court grants summary judgment in BCOA's favor regarding the Alameda County litigation. *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210 (9th Cir. 2002) required BCOA to stay or dismiss the Alameda County litigation after it learned of the bankruptcy filing. BCOA promptly filed a notice of stay in Alameda County Superior Court on October 29, 2014, which stayed the Alameda County litigation. It took no further steps to litigate the matter. This conduct satisfies *Eskanos & Adler*. The court denies summary judgment, however, as to BCOA's post-petition settlement offer. As noted by the First Circuit in analogous circumstances, "there is a fine line between hard-nosed negotiations and predatory tactics-and if the automatic stay is to have any bite, it most forfend against the latter. . .we hold that, while the automatic stay is in effect, a creditor may engage in post-petition negotiations pertaining to a bankruptcy-related reaffirmation agreement so long as the creditor does not engage in coercive or harassing tactics." *In re Jamo*, 283 F.3d 392, 399 (1st Cir. 2002). *See also In re Diamond,* 346 F.3d 224 (1st Cir. 2003). Drawing all reasonable inferences in Parker's favor, the October 2014 settlement offer could be construed as

9

coercive and harassing, and it was clearly an effort to collect on a pre-petition debt.

Parker's remaining automatic stay claims appear to fall within § 362(a)(6), which stays any act "to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title. . . ." The court denies summary judgment as to BCOA's December 2014 and January 2015 "Late Payment Demands and Notices of Delinquencies." These invoices sought payment of pre-petition assessments, and a question of material fact exists regarding whether BCOA intentionally sent these invoices. The court also denies summary judgment as to the May 2015 "retroactive assessments," as a question of material fact exists regarding whether these assessments included pre-petition HOA debt.

Parker's remaining stay violation claims address BCOA's post-petition increase of her HOA dues, the fines regarding Unit 990's condition, and the control exercised by BCOA over this supposedly abandoned unit. These claims highlight the tension, at least in this case, between an HOA's lawful right to assess property subject to its CC&Rs against a debtor's right to the automatic stay's protection. Parker does not argue that her surrender of Unit 990 terminated her ownership interest, and she seemingly concedes that she, as Unit 990's owner, remained personally liable for the post-petition HOA obligations.[10] Instead, she argues that BCOA's post-petition, disciplinary fines, annexations, increased assessments and newly minted "rent" power under the June 2015 ballot initiative were thinly veiled attempts to recover its pre-petition claim. BCOA rightly contends that it was authorized to assess Unit 990 post-petition, and that since Unit 990 revested in Parker after plan confirmation, it did not need stay relief to recover any post-petition debt against Unit 990. *See In re Jones*, 657 F.3d 921, 924(9th Cir. 2011)[11]. Its argument must be tempered, however, by the fact that Parker was personally liable for these post-petition assessments and fines (at least through December 6, 2016) and, more importantly, that when all reasonable inferences are drawn in Parker's favor,

---

[10] The court refers the parties to Bankruptcy Judge Johnson's well reasoned decision in In re David Roth, Case No. 10-55727. The court notes, however, that BCOA's decision to take to control of Unit 990 and rent it created, perhaps, an interesting wrinkle that Judge Johnson was not required to address.

[11] Parker's confirmed Chapter 13 plan did not rely on Unit 990 to generate funds for her plan payments.

10

there are material questions of fact regarding why BCOA levied these fines (particularly since Parker apparently could not cure them) and passed a ballot initiative that allowed it to rent Unit 990 for far more than Unit 990's annual HOA dues, but failed to credit Parker for *any* of the rent generated (not even to the extent that the rent surpassed Unit 990's annual HOA dues). Put plainly, was BCOA trying to recover its pre-petition claim against Parker by these acts (as opposed to trying to develop a comprehensive plan to generate the funds necessary to address this significant loss of revenue)? The court reminds the parties that it is considering these matters through the limited lens of a summary judgment motion. It is not weighing the evidence and making findings of fact. Rather, it has simply concluded that there are genuine issues of material fact regarding why BCOA acted as it did.

The court also recognizes BCOA's argument that HOAs may be compelled to tread lightly around delinquent property owners who file for bankruptcy, and to incur attorney's fees to obtain appropriate relief from the automatic stay. BCOA, perhaps, "protests too much." As a general principle, HOAs may collect post-petition HOA dues without stay relief. Violations of the automatic stay must be measured, however, on a case-by-case basis. And that is exactly what this court is attempting to do.

## II. Parker's § 105 Automatic Stay Claims

Bankruptcy Code § 105 authorizes this court to hold parties in contempt and award damages for a knowing violation of a court order, such as the automatic stay. Parker must establish by clear and convincing evidence that BCOA (1) knew that the automatic stay was applicable and (2) intended the actions which violated the stay. *See*, *e.g.*, *In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006). Whether a party is aware that the order is applicable to its claim "is a fact-based inquiry which implicates a party's subjective belief, even an unreasonable one." *In re Taggart*, 548 B.R. 275, 288 (B.A.P. 9th Cir. 2016).

Simply, § 105 imposes a more difficult standard than § 362(k). Section 362(k) asks whether the creditor knew of the automatic stay and intended to commit the act which violated the stay; § 105 requires that the contemnor knew 1) of the stay's existence and 2) that it applied to the act in question.

For the reasons stated above, the court grants summary judgment on the § 105 claim as it

11

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 11 of 18

relates to Parker's allegation that BCOA improperly continued the Alameda County litigation. This court denies summary judgment on the remaining § 105 claims. BCOA knew that the automatic stay was in place, and there are reasonable questions of fact regarding whether its conduct violated the stay. When examining the totality of the evidence and drawing all reasonable inferences in Parker's favor, there are also genuine issues of material fact regarding whether BCOA knew that the stay applied to its conduct.

**III. Parker's Violation of Discharge Injunction Claims**

Bankruptcy Code § 524(a)(2) provides that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . ." Section 524(a)(2) does not provide a private right of action. *See Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502 (9th Cir. 2002). Instead, a debtor may only seek redress under Bankruptcy Code § 105(a) through a contempt finding. "Compensatory civil contempt allows an aggrieved debtor to obtain compensatory damages, attorneys fees, and the offending creditor's compliance with the discharge injunction. Therefore, contempt is the appropriate remedy and no further remedy is necessary." *Walls, supra,* 276 F.3d at 507. Parker must prove by clear and convincing evidence that BCOA (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction. *In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006).

There is no dispute that BCOA knew that Parker received her Chapter 13 discharge.

Parker asserts that many of the acts which violated the automatic stay continued past her December 1, 2015 discharge and thus also violated the discharge injunction. She refers this court to Exhibits A - RR which are attached to her initial stay violation motion, and Exhibits SS - TT which accompanied her discharge violation motion. Parker's blanket references to exhibits are not particularly helpful, since this court needs to examine each incident (or group of related acts) to determine whether they violated the discharge injunction. The court will mainly focus on the acts which Parker raises in her discharge motion.

Parker alleges that the following acts violated the discharge injunction:

1.   BCOA sent a "Late Payment Demand and Notice of Delinquency" to Parker on April 2,

12

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 12 of 18

2016. The invoice included, among other amounts, the unpaid 2015 and 2016 annual assessments (each of which exceed $22,000), and the household fines and retroactive assessments discussed above. Parker alleges that the rates used to calculate the 2015 and 2016 assessments were illegally adopted by BCOA in 2013.

2. BCOA continued to lease Unit 990 post-discharge. Parker alleges that BCOA has collected at least $60,000 in rent.

3. Through its June 2015 amended condominium plan (Exh. SS), BCOA improperly annexed parking locations assigned to Unit 990 intending to sell or lease them. There is no evidence that any of Parker's parking spaces were leased.

4. Parker also asserts that BCOA seized part of the development's common area (in which all members have an interest) and assigned it to Unit C, and also took approximately forty square feet (by moving walls) from Unit 990 and incorporated it into Unit C. BCOA owned Unit C at all relevant times. Parker asserts that this decreased the value of Unit 990 and increased the value of Unit C. These annexations resulted from BCOA's June 22, 2105 amended Condominium Plan, which BCOA recorded with the Alameda County Recorder's office. Parker alleges that the annexations and recordation were illegal under California law and were done in order to collect her pre-petition (and now discharged) HOA obligations.

5. BCOA amended its bylaws on April 11, 2016. Parker asserts that some of the amendments were directly aimed at her, including amendments which:

    a. Accelerate annual assessments of anyone who files, or has ever filed, bankruptcy.

    b. Block short sales unless BCOA is paid one third of "profit" on sale.

    c. Impose a $500 fine on members who "frivolously file suit" against BCOA or any of its directors.

    d. Decree that Unit 990 only has one parking space.

    e. Permit BCOA to annex common area.

    f. Permit BCOA to seize and rent Unit 990 and retain the income without providing any credit to Parker.

    g. Require all unit leases to be handled by a BCOA approved agent.

     h.     Require all unit deeds to be reviewed by BCOA's attorney, which deeds must conform to the amended Condominium Plan.

     i.     Authorize BCOA with the right not to tender the defense of all litigation to its insurance carrier.

6.     BCOA failed to dismiss the Alameda County litigation until January 27, 2017.

Bankruptcy Code § 524(a)(2) prohibits creditors from seeking to collect or offset any discharged debt against the debtor personally. Not all of the alleged discharge injunction violations sought to directly collect amounts from Parker. Regardless, "Notwithstanding the facial permissibility of a lawsuit or some other action taken by a creditor vis a vis a discharged debtor, a violation of § 524(a)(2) may still be found if the debtor proves the creditor acted in such a way as to 'coerce' or 'harass' the debtor improperly, i.e., so as to obtain payment of the discharged debt. . . . The inquiry is objective; the question is whether the creditor's conduct had the practical, concrete effect of coercing payment of a discharged debt, and bad faith is not required. By the same token, the presence of some other procedural impropriety of error in connection with the debtor's action will not give rise to a violation of the discharge injunction if the objective effect is not to coerce payment of a discharged debt: The discharge prohibits prepetition creditors only from collecting their prepetition debts. It is not a lifelong shield against other acts -- including assertions of claims and litigation -- by those same creditors, even where these other acts are undertaken wrongfully and in bad faith. If an act is not in fact one to collect or enforce a prepetition debt, then whatever its faults, it is not a violation of the discharge, even though undertaken by the holder of a discharged debt. Accordingly, a debtor may establish that a creditor who has taken an action not overtly prohibited by § 542(a)(2) nevertheless violated the discharge injunction, but to do so the debtor must prove not merely that the creditor's act is not what it appears to be, but that the act in question is one to collect a discharged debt." [citations and all emphasis omitted]. *Paul v.Iglehart (In re Paul)*, 534 F.3d 1303, 1308 (10th Cir. 2008).

With these standards as its guide, the court examines the alleged § 524(a)(2) violations.

Summary judgment is denied regarding the April 2, 2016 invoice. Material questions of fact exist regarding whether BCOA sought to collect pre-petition, retroactive assessments, which

14

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**

seemingly would constitute an attempt to collect a discharged debt. Summary judgment is also denied regarding Parker's allegation that BCOA was renting Unit 990 to collect or offset the discharged debt. As discussed above, there are material questions of fact regarding why BCOA was renting Unit 990 and what it did with this revenue, which arose from property still owned by Parker.

Summary judgment is also denied as to BCOA's alleged "annexations." Again, BCOA's CC&Rs "run with the land," and its post-petition CC&R/condominium plan amendments do not, at first blush, raise the specter of discharge injunction violations. Parker still owned Unit 990 after her discharge, however, and any systematic dismantling/partition/annexation of Unit 990 raises the natural question of whether BCOA was seeking to offset its pre-petition losses by selling her parking spaces and increasing the value of a BCOA owned unit.[12] To the extent that this conduct continued post-discharge, summary judgment is denied as to these § 524(a)(2) claims. Summary judgment is also denied regarding BCOA's failure to dismiss its Alameda County litigation claims immediately after it received notice of Parker's discharge. Once Parker received her discharge, the protection previously provided by the notice of stay ended. BCOA's maintenance of its pre-petition claims served no purpose after the discharge was entered. Given its aggressive litigation strategy, material questions of fact exist regarding whether its conduct was part of a strategy to coerce or harass Parker into paying her discharged HOA debt.

Parker's remaining § 524(a)(2) claims (which arise from the 2016 bylaw amendments) are more problematic. There is no evidence that Parker was negotiating a short-sale after her discharge was entered. Nor has Parker cogently argued or presented any evidence suggesting that the insurance tender amendment was implemented to coerce or harass Parker into paying a discharged debt.[13] The same is true regarding the 2016 amendments that annexed common area space and which require BCOA approved professionals to handle leases and review unit deeds. These amendments affected all BCOA members, and Parker's argument to the contrary is speculation at best. Speculation does

---

[12] For the same reasons, material questions of fact exist regarding whether this action violated the automatic stay.

[13] This amendment could only affect how much Parker might recover on her pending Alameda County litigation claims.

15

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**

Case: 14-44083   Doc# 170   Filed: 08/24/17   Entered: 08/24/17 15:30:59   Page 15 of 18

not create a material question of fact. Summary judgment is granted as to these claims.

This court also grants summary judgment and dismisses the claim regarding the amendment to impose a $500 fine against members who bring "frivolous" litigation against BCOA and its directors. Both the Federal and California Rules and Code of Civil Procedure frown upon "frivolous" litigation (See Federal Rule of Civil Procedure 11 and California Code of Civil Procedure §§ 128.5 and 128.7). While this amendment may have been passed with Parker's own claims pending in Alameda County Superior Court, Parker has not raised a concrete factual dispute that this fine was meant to coerce or harass Parker into paying a pre-petition debt.

Finally, the court denies summary adjudication as to the accelerated assessment amendment. This court reasonably infers that this amendment targeted Parker. While Jennings' deposition testimony provided a facially understandable explanation for this amendment, material questions of fact emerge when it is more closely scrutinized. Chapter 7 and 13 debtors are far more financially fragile than non-debtors, and this amendment prevents them from paying their annual assessment over time. Under this amendment, Parker would be liable for the entire annual assessment even if she sold Unit 990 midway through a fiscal year. Material questions of fact therefore exist regarding whether this amendment was passed as part of BCOA's alleged overall scheme to coerce or harass Parker into paying her discharged debt.

BCOA also asserts that the equitable doctrines of mitigation and judicial estoppel require this court to grant its summary judgment motion. The court rejects both arguments for purposes of this motion. First, BCOA ignored Parker's October 2014 offer to quitclaim Unit 990. Had BCOA accepted this offer, Parker would not have accumulated her § 362(k)/105 claims. Second, to the extent that Parker should have accepted BCOA's invitation to transfer title in December 2015, the court will consider her failure to do so if and when it needs to determine damages.

The court also rejects BCOA's argument that Parker is judicially estopped from asserting her claims "that [she] acquired by [her] silence." The court cannot resolve this on summary judgment for two reasons: First, Parker did not acquire these claims by her silence; she acquired them as a result of BCOA's allegedly intentional conduct. Material questions of fact exist regarding what BCOA was seeking to achieve by its post-petition and post-discharge conduct regarding Unit 990.

16

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 16 of 18

Second, the court is uncertain whether the doctrine applies. "Judicial estoppel is an equitable doctrine, invoked by a court at is discretion, that precludes a party from gaining an advantage by asserting one position and subsequently taking a second position . . . In determining whether to apply the doctrine of judicial estoppel, courts consider: (1) whether a party's position is clearly inconsistent with its earlier position; (2) whether the first court accepted the party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped." *In re Andrada Fin., LLC*, 2011 WL 3300983, at *6 (B.A.P. 9th Cir. April 7, 2011). At the very least, no one has enunciated what Parker's earlier position was, when she made it, and how this court accepted it.

BCOA shall prepare an appropriate order.

* * * END OF ORDER * * *

Case No. 14-44083 CN

**COURT SERVICE LIST**

Recipients are ECF participants

18

**MEMORANDUM DECISION RE: SUMMARY JUDGMENT MOTION**
Case: 14-44083    Doc# 170    Filed: 08/24/17    Entered: 08/24/17 15:30:59    Page 18 of 18