Marc Alan Fong SBN 80049
Marlene A. Fong SBN 111560
FONG & FONG APC
2161 Harbor Bay Parkway
Alameda, CA 94502
Tel. 510-748-6800
Email: mfong@fonglaw.com
Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                          **Chapter 13**

SARAH-JANE PARKER, Debtor                       **CASE NO. 14-44083 CN13**

Vs.                                             DEBTOR SARAH-JANE PARKER'S
                                                POST TRIAL BRIEF

BAYSIDE COURT OWNERS
ASSOCIATION, INC; LAURENCE
JENNINGS; RAJ PATEL; JUSTIN HU;
LAWRENCE DROUIN; ANDREW
CANTOR, ESQ.,

Respondents
_____

**TABLE OF CONTENTS**

**I. AUTOMATIC STAY VIOLATIONS** .…………………………………………………… 6

1. SEIZURE AND RENTAL OF DEBTOR'S CONDOMINIUM VIOLATED THE AUTOMATIC STAY .……………………………………………………………… 7

A. THE SEIZURE AND RENTAL WAS TO COLLECT A PRE-PETITION CLAIM .………7

B. NONE OF RESPONDENTS' JUSTIFICATIONS FOR SEIZING AND RENTING PARKER'S UNIT 990 ARE A DEFENSE TO A STAY VIOLATION CLAIM .…………… 9

1. Rental of 990 was not to collect "post-petition assessments." .……………………..…… 9

(a) Bayside submitted no evidence it was renting 990 to collect post-petition assessments. .. 10

(b) Bayside never told Parker it was renting her unit to collect post-petition assessments. .... 10

(c) The amendments explicitly state the rent from a seized unit is not for payment of assessments or any other claim arising from ownership of the unit. .…………………..……… 10

(d) Bayside never in fact invoked the amended CC&Rs to justify leasing 990 .……..……… 10

2. The extreme and bizarre language in the proposed amendments shows the money collected from renting 990 was for pre-petition claims .……………….…………………… 12

3. The Declaration forbids seizing and renting an owner's separate interest unit. This unlawful act was harassing and coercive .…………………………………………….……….. 12

4. Renting an owner's unit to collect unpaid assessments is not allowed by law. This was a harassing and coercive attempt to force Parker to pay stayed pre-petition claims .………… 13

5. The "rent" greatly exceeded the annual assessment .…………………………….……… 14

6. Bayside's "book and hold for the lender" excuse is patently false .………………….…… 14

7. Wall repairs are irrelevant .………………………………………………….……… 14

2. DEMANDS FOR PAYMENT OF PRE-PETITION CLAIMS VIOLATED THE STAY ..15

(1) The December 2, 2014 BCOA Late Payment Demand. .………………………… 15

(2) The January 2, 2015 BCOA Late Payment Demand .………………………………… 16

3. THE SETTLEMENT PROPOSALS OF OCTOBER 29, 2014 AND DECEMBER 15, 2014 VIOLATED THE STAY .………………………………………………………..… 16

(1) October 29, 2014 Offer .………………………………………………….…………… 16

(2) December 15, 2014 Offer .…………………………………………….……… 17

4. ACCELERATION OF THE FISCAL 2015 ANNUAL ASSESSMENT VIOLATED THE STAY .……………………………………………………….………………………….. 17

5. THE FINES IMPOSED POST-PETITION VIOLATED THE STAY …….……………. 18

6. AMENDMENT OF THE GOVERNING DOCUMENTS VIOLATED THE STAY …... 19

7. "RETRO ASSESSMENTS" IMPOSED IN MAY 2015 VIOLATED THE STAY …….. 20

8. THE AUGUST 8, 2015 NOTICE OF BILLING FOR FIRE SPRINKLER WORK IN UNIT 990 VIOLATED THE AUTOMATIC STAY …………………………...………. 20

9. SEIZURE OF UNIT 990'S PARKING AREAS VIOLATED THE STAY …………….. 21

C. THE SUPPOSED PROXY IS IRRELEVANT AND HAS NO EFFECT ON PARKER'S CLAIMS FOR STAY AND DISCHARGE VIOLATIONS ………………….. 22

1. The supposed proxy is not genuine ……………………………………………… 22

2. Respondents bypassed Parker's attorneys and improperly sent the ballot package direct to Parker …………………………………………………………………………... 23

3. Parker did not sign the proxy ………………………………...……………… 23

4. The "proxy" was for a vote on CC&R amendments adopted after 990 was already leased out and which were never invoked by respondents as a basis for seizing and leasing Parker's property …………………………………………………………………….. 24

5. The Association owed a fiduciary duty to Parker to act in good faith and not arbitrarily. Parker could rely on Association complying with its fiduciary duties ………………...……… 24

II. DISCHARGE VIOLATIONS ………………………………………. 24

1. CONTINUED RENTAL OF 990 VIOLATED THE DISCHARGE INJUNCTION ……. 25

(1) Respondents knew the discharge injunction was applicable to rental of 990 …………… 25

(2) Respondents intended the actions that violated the injunction ………………………… 27

2. ACCELERATION OF THE 2016 ANNUAL ASSESSMENT VIOLATED THE DISCHARGE INJUNCTION ………………………………………………….. 27

3. THE APRIL 2, 2016 PAYMENT DEMAND INCLUDING "RETRO ASSESSMENTS" VIOLATED THE DISCHARGE INJUNCTION ………………….…… 28

4. FAILURE TO DISMISS BAYSIDE'S CIVIL ACTION AGAINST PARKER FOR MORE THAN A YEAR AFTER THE DISCHARGE VIOLATED THE DISCHARGE INJUNCTION ……………………………………………… 28

III. MITIGATION OF DAMAGES ……………………………………… 28

IV. LIABILITY OF INDIVIDUAL RESPONDENTS …………………………… 31

V. DAMAGES ………………………………………………...……… 32

A. Compensatory damages under 362(k) and 105(a) …………………………………….. 32

(1) Parker has suffered severe emotional distress as a direct result of the stay and discharge violations …………………………………………………………………………………….. 32

(2) Parker has suffered financial losses as a direct result of the stay and discharge Violations …………………………………………………………………………………… 34

(3) Attorney's fees ……………………………………………………………………...…… 34

B. Punitive damages are available under 362(k)(1) and 105(a) and are highly appropriate under the egregious facts of this case …………………………………………...………….. 35

**TABLE OF AUTHORITIES**

<u>Cases</u>

*In re Abrams*, 127 B.R. 239 (9th Cir. BAP 1994) …………………………………….. 34

*In re Avon Townhomes Venture*, 433 B.R. 269 (Bankr.N.D.Cal. 2010) …………………… 34

*In re Breul*, 533 B.R. 782 (Bankr.C.D.Calif. 2015) …………..…………………………. 25, 27

*In re Butz*, 444 BR 301 (Bankr.M.D.Penn. 2011) …………………………..... 6, 16, 17, 18

*Cohen v. Kite Hill Community Association* (1983) 142 Cal.App.3d 642 …………..……… 24

*In re Cousins*, 404 B.R. 281 (Bankr.S.D.Ohio 2009) …………………………………… 16

*In re Dawson*, 390 F.3d 1139 (9th Cir. 2004) …………………………………………… 32

*In re Diamond*, 346 F.3d 224 (1st Cir. 2003) …………………………………………… 17

*In re Draper*, 237 BR 502 (Bankr.M.D.Fla. 1999) …………………………..…………. 6

*In re Gordon Properties LLC*, 460 BR 681 (Bankr.E.D.Va 2011) …………………..… 17, 18

*Goudelock v. Sixty-01 Association of Apartment Owners*,

       895 F.3d 633 (9th Cir. 2018) …………………………………..………. 6, 16, 20, 25, 27, 28

*In re Henry*, 266 B.R. 457 (Bankr.C.D.Cal. 2001) ………………….…………………. 26, 34, 35

*In re Jamo*, 283 F.3d 392 (1st Cir. 2002) ………………………………………………… 17

*In re Kaufman*, 315 B.R. 858 (Bankr.N.D.Cal. 2004) ………………………………… 6, 35

*In re Klotz*, 239 B.R. 706 (Bankr.N.D.Ohio 2002) …………………………..………… 35

*In re Paul*, 534 F.3d 1303 (10th Cir. 2008) …………………………………………… 27

*In re Perl*, 513 B.R. 566 (9th Cir. BAP 2014) …………………………………………… 34

*In re Peralta*, 317 BR 381 (9th Cir. BAP 2004) ……………………..………………. 6, 34

*In re Ray*, 355 BR 253 (Bankr.D.Oregon 2006) ……………………………………….. 6

*In re Roman*, 283 B.R. 1 (9th Cir. BAP 2002) ………………………………..……… 29

*In re Schwartz*, 954 F.2d 569 (9Th Cir. 1992) ………………………………… 34

*In re Snowden*, 769 F.3d 651 (9th Cir. 2014) ……………………………………… 32, 34

*In re Spencer*, 457 B.R. 601 (E.D.Mich, 2011) …………………………………… 7

*In re Taggart*, No. DC 3:12-cv-00236 MO (April 23, 2018, 9th Cir.) …………………… 25

*In re Zilog*, 450 F.3d 996 (9th Cir. 2006) ……………………………………...……… 25

*In re Zotow*, 432 B.R. 252 (9th Cir. BAP 2010) ……………………………..……… 16

*In re Wardrobe*, 559 F.3d 932 (9th Cir. 2009) ……………………………….....…… 6


<u>Statutes</u>
11 U.S.C. 101(5)(A) ………………………………………...……………… 25, 28
11 U.S.C. 101(15) ……………………………………………………… 31
11 U.S.C. 105(a) ……………………………………………………… 20, 34
11 U.S.C. 362(a) …………………………………………………6, 7, 26, 31
11 U.S.C. 362(a)(1) ……………………………………………… 17
11 U.S.C. 362(a)(3) ……………………………………… 16, 17, 18, 22
11 U.S.C. 362(a)(6) ……………………… 7, 9, 12, 13, 14, 15, 16, 17, 18, 20, 21
11 U.S.C. 362(k) ……………………………………...…………6, 7, 9, 32, 34, 35
11 U.S.C. 524(a) ……………………………………………..……………… 27
11 U.S.C. 1328(a) ………………………………………………… 6, 25, 28

Cal. Civil Code Sec. 4125 ……………………………………………… 15
Cal. Civil Code Sec. 4145(a), (b) ……………………………………… 15
Cal. Civil Code Sec. 4270(a)(3) ……………………………………… 11
Cal. Civil Code Sec. 4510 ……………………………………………… 13
Cal. Civil Code Sec. 5110(a) ……………………………………...…… 23
Cal. Civil Code Sec. 5145(a) ………………………………………… 22
Cal. Civil Code Sec. 5600(a), (b) ……………………………………..… 15
Cal. Civil Code Sec. 5650(b) ……………………………………… 13, 19
Cal. Civil Code Sec. 5800(a) ………………………………………… 31
Cal. Civil Code Sec. 5855 ……………………………………………… 18
Cal. Civil Code Sec. 5905 ……………………………………………… 18
Cal. Civil Code Sec. 5910 ……………………………………………...… 18
Cal. Corp. Code Sec. 7231 ……………………………………………24, 31
Cal. Corp. Code Sec. 7233 ………………………………………...……… 24

## I. AUTOMATIC STAY VIOLATIONS

The evidence is overwhelming that respondents violated the automatic stay and caused substantial damages by their deliberate conduct. The rationalizations respondents have attempted are irrelevant and provide no defense. Stay violations are in effect a strict liability offense for which no excuse is available.

11 U.S.C. Section 362(a) provides that a petition "operates as a stay, against all entities, of ... (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; ... (6) any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title." The automatic stay is designed to stop all harassment and collection efforts by creditors, "relieving the debtor of the very pressures which drove him into bankruptcy." *In re Draper*, 237 BR 502, 505 (Bankr.M.D.Fla. 1999); *In re Butz*, 444 BR 301, 303 (Bankr.M.D.Penn. 2011). The automatic stay prevents creditors from attempting in any way to collect a prepetition debt. (*Id.*) The automatic stay should be interpreted broadly. *Draper*, supra, 505; *In re Wardrobe*, 559 F.3d 932, 934 (9th Cir. 2009). Any act designed to coerce or put pressure on a debtor to pay the debt is prohibited. (*Draper,* supra, 506.) While direct actions to collect a debt clearly violate 362(a), coercive, indirect actions whose aim is to induce payment also violate the automatic stay. *In re Ray*, 355 BR 253, 258-9 (Bankr.D.Oregon 2006).

Under 362(k)(1) an individual injured by "any willful violation of a stay … shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages." The "willfulness" test for stay violations merely requires that (1) the creditor knew of the bankruptcy case, and (2) the actions that violate the stay be intentional. No specific intent to violate the stay is required; a good faith belief that the stay is not being violated is not relevant to whether the act was "willful" or whether compensation must be awarded under 362(k). *In re Peralta*, 317 BR 381, 389 (9th Cir. BAP. 2004); *In re Kaufman*, 315 B.R. 858, 865 (Bankr.N.D.Cal. 2004).

Homeowner Association assessments are a pre-petition obligation, created when the unit owner takes title to the unit. "In this case, Goudelock's personal obligation to pay CA assessments was not the result of a separate, post-petition transaction but was created when she took title to the condominium unit. As a result, the debt for assessments arose pre-petition and is dischargeable under Section 1328(a) …" *Goudelock v. Sixty-01 Association of Apartment*

*Owners*, 895 F.3d 633 (9th Cir. 2018). Thus, collection of any assessment debt, regardless whether for installments billed before or after the case was filed, is within the scope of the automatic stay of 362(a)(6) as "a claim against the debtor that arose before the commencement of the case." *Goudelock*, supra.

The majority of the pre-petition claims Bayside tried to collect and did collect post-petition are claims that arose and were billed pre-petition, chiefly the $163,000 claim for assessments and charges Bayside asserted were due as of October 8, 2014, but *all* assessment claims were stayed by 362(a) regardless when billed or claimed.

Respondents had knowledge of the bankruptcy and all the actions taken by respondents discussed below were intentional, making all the violations "willful" under 362(k)(1).

## 1. SEIZURE AND RENTAL OF DEBTOR'S CONDOMINIUM VIOLATED THE AUTOMATIC STAY.

### A. THE SEIZURE AND RENTAL WAS TO COLLECT A PRE-PETITION CLAIM.

On May 19, 2015 respondent Jennings signed a lease for 990 on behalf of Association. (Ex. AZ.) Rent was $6,500 per month. The lease describes Bayside as the "landlord." The tenant took possession and occupied the unit. Bayside collected a $19,500 payment at the outset of the lease and monthly rent thereafter. (Patel; Ex. AZ part 2.0.) The initial lease term was one year starting June 15, 2015. (Ex. AZ part 3.0.) The tenant paid the rent.

Parker owned all legal and equitable title to 990 until the foreclosure by Deutsche Bank and recordation of the trustee's deed on December 6, 2016. The "surrender" of 990 to all secured creditors in Parker's Chapter 13 plan was only a statement that debtor will not resist a foreclosure. It does not transfer title and Parker continued to own all rights in the property. *In re Spencer*, 457 B.R. 601, 612 (E.D.Mich, 2011).

Nothing in substantive California law or Bayside's CC&Rs as they existed in May 2015 gave Bayside the power to seize possession of an owner's separate interest condominium, place the property on the rental market, lease the property, collect and keep the rental income derived from the property, and credit nothing to the owner's assessment account or any other claim asserted against the owner. Nothing in Bankruptcy law permits such conduct by a creditor. There is no explanation for this conduct besides an "attempt to collect a pre-petition claim."

Exhibits F and H (December 2, 2014 and January 2, 2015 invoices) show that Bayside believed it was owed and could collect over $196,000 in assessments, nearly all of it for pre-filing installments.

Exhibit W (March 10, 2015 board minutes, item 10.0) shows that Bayside "is undeterred in its collections efforts by a Member's decision to file bankruptcy" and had created and implemented "BCOA's extensive unit 990 2015 debt collection plan."

Exhibit AM (October 21, 2014 message to members) shows that only two weeks after this case was filed Bayside was calling Parker's bankruptcy case the "greatest danger" the Association had ever faced, was telling the members that "Unit 990's owner and its buyer are working together to fleece our association for personal gain," and that if the Board and members "work together – we can thwart this effort and protect ourselves."

Exhibit BW (December 1, 2014 message to members) shows that Bayside was "hot on the heels of collecting from the Unit 990 highly delinquent owner."

Exhibit AA (June 5, 2015 Cantor letter) shows that the "potent plan" adopted by Bayside, its directors, and Cantor "to help the BCOA recover from the long-term economic damage inflicted by 990's delinquent owner" was to take possession of Unit 990, lease it out, and apply the rent proceeds to "recoup reserves" and "protect the membership from severe economic hardship." By this point Unit 990 had already been leased out, on May 19, 2015. (Ex. AZ.)

Exhibit BT (May 21, 2015 Jennings email to rental agent Andrea Day, paragraph 6) shows that as of that date respondents were still asserting Bayside "was a secured creditor owed $220,000+," despite the bankruptcy case.

Exhibit BZ (June 2, 2015 "50 accomplishments" letter to members) Item 44 recites "**Unit 990 $78,000./yr Lease Deal Produced: 05/2015** (enables recapture of all costs & delinquent amounts from Unit 990's unfortunate 2005-2015 member resident history)"

Exhibit BZ Item 41 shows that Bayside contended it could do this because the "Parker Federal Bankruptcy Protection [was] Defeated," which "prevents delinquent member from forcing debt on 32 BCOA members."

Exhibit BZ is a direct and indisputable admission that the purpose of renting Unit 990 was to "recapture" all "delinquent amounts" for the period 2005 through 2015. The statement in Item 44 implies that Unit 990 will be rented out indefinitely at $78,000 per year until all the "delinquent amounts" for 2005-2015 have been "recaptured." This document was intended for

use at the 2015 Annual Meeting of Members (BZ introductory paragraph) and was distributed to all members of the Association (Id.). As an official record created to inform the membership of the facts, Exhibit BZ must be given great weight and its admissions must be taken as true statements of fact.

The groundless assertion that the bankruptcy case was "defeated" confirms that Bayside felt it was free to do whatever it wanted under its interpretation of the CC&Rs, including rent out Parker's Unit 990 to collect 2005-2015 claims.

The lease itself incorporates this wrong contention as to what bankruptcy law is, referring to the motion for relief from stay and the resulting order. The lease recites at Part 0.1 that "*The BCOA was also granted the right to attempt to recover the revenue and operating costs it is legally entitled to, pursuant to its CC&Rs which are provided along with this Lease. These powers were formally granted by a Federal Bankruptcy Judge in Federal Bankruptcy Court.*" (Ex. AZ.) BCOA's mischaracterization of the order reflects an intent and purpose to "recover the revenue and operating costs," i.e. previously-accrued claims.

These Bayside admissions, combined with the lack of any lawful basis for seizing and renting Parker's property, show that the rental of 990 was a device to collect the pre-filing claims Bayside contended it had against Parker, who had owned 990 since 2005, in violation of 362(a)(6). Parker proved at trial that (1) respondents knew of the bankruptcy case (Exs. A, Y), and (2) respondents' acts were intentional. The violation is thus "willful" for purposes of 362(k)(1).

## B. NONE OF RESPONDENTS' JUSTIFICATIONS FOR SEIZING AND RENTING PARKER'S UNIT 990 ARE A DEFENSE TO A STAY VIOLATION CLAIM.

Respondents raised a shifting series of justifications for seizing Unit 990, renting it out, and keeping all the revenue. In the end, respondents never settled on a coherent theory of why their conduct did not violate the stay. Respondents variously argued the rental of 990 was to collect post-petition assessments, then that it was to raise money for repairs, then it was to "book" the money and "hold it for the lender." None of the supposed justifications was a legally valid excuse or defense even if true, which the evidence plainly shows they were not.

## 1. Rental of 990 was not to collect "post-petition assessments."

(a) <u>Bayside submitted no evidence it was renting 990 to collect post-petition assessments.</u>

Respondents did not submit any contemporaneous document such as minutes or memos reciting that the rental is to collect post-petition assessments. To the contrary, Bayside consistently said the rental of 990 was to "recoup reserves" and similar backwards-looking language. (Ex. AA; Ex. BZ item 44; Ex. AT.) The absence of any contemporary mention of a plan to collect future assessments is evidence of the absence of such a purpose.

(b) <u>Bayside never told Parker it was renting her unit to collect post-petition assessments.</u>

Respondents submitted no evidence they ever told Parker that her unit 990 was being rented to collect her accruing post-petition assessments. There is no evidence Bayside ever told Parker her unit was being rented at all, for any reason.

(c) <u>The amendments explicitly state the rent from a seized unit is not for payment of</u> <u>assessments or any other claim arising from ownership of the unit.</u>

The "June Ballot Initiative Explanation Summary" and the proposed amendment language (Ex. 35/M) sent out by Bayside on May 21, 2015 explains that Article 3.4.8 "Association's Easements" was to be amended to grant Bayside "the right to lease any Unit which is at least 60 days or more delinquent in its Member Account obligations, if the respective Unit has, for the same period of delinquency, also been abandoned for at least 60 calendar days. The lease proceeds shall be used to fund the BCOA's Operating & Reserve Accounts as the Board may determine appropriate. *The lease proceeds shall not be used to reduce the delinquent Member Account balance in any manner whatsoever.* The lease proceeds are the permanent property of the BCOA, and no other entity shall have the right thereto, for any reason whatsoever." (Ex. 35/M, ballot item [03].)

Since it was not to apply to or reduce Parker's member account balance "in any manner whatsoever" the only other explanation is that it was to pay off the pre-petition claims. Bayside declared its intent to collect these pre-petition claims and that rental of 990 was the way to do it. Again, it doesn't matter why Bayside took the money. There is no valid excuse that makes the act not a stay violation.

(d) <u>Bayside never in fact invoked the amended CC&Rs to justify leasing 990.</u>

Association seized and rented out Unit 990 more than a month before the vote was taken on proposed amendments to the CC&Rs to supposedly allow renting "abandoned" and "delinquent" units. The lease was signed on May 19, 2015 before the ballot measure was even mailed out to the members. (Exs. AZ, 35/M.) The stay violation was therefore complete before the "amendments" were voted on and recorded. The later recording of the amendments on June 22, 2015 did not wipe away the stay violation. CC&R amendments are effective from date of recordation forward; they are not retroactive in operation. CC&Rs Article 9.1.5. (Ex. 8 all versions); Cal. Civil Code 4270(a)(3).

Bayside has argued that it was "allowed" to lease out 990 by the amended CC&Rs recorded June 22, 2015 (Ex. 8D) following the vote on the proposed amendments (Ex. 35/M). But at trial Bayside submitted no evidence that Bayside ever *invoked* the amendments or gave notice to Parker that Bayside was going to do so.

Invoking amended Article 3.4.8 would have required *notice and a hearing*. Article 9.2.1 of the CC&Rs "Right of Enforcement" (all versions 8A through 8E) provides, "No determination of whether a violation has occurred shall be made until notice and hearing has been provided to the owner." Respondents produced no evidence at trial of notice or a hearing being given to Parker that Bayside intended to invoke amended 3.4.8 to take possession of Unit 990, rent it out, and seize the rental proceeds. This is patently an "enforcement" action that requires notice.

Bayside never told Parker, at any time, that Bayside had made a determination under amended Article 3.4.8 that Parker's unit was deemed "abandoned" and "payment delinquent" under the newly adopted rule. There is no evidence of any notice given to Parker that Bayside regarded 990 as eligible to be leased out under the new rule. There is no evidence that Bayside gave Parker an opportunity to contest any such determination that 990 was abandoned and payment delinquent after the amendment was adopted.

The "June Ballot Initiative" does not inform Parker that if adopted the "right" to lease out "abandoned and payment delinquent" units would be applied *retroactively* to Parker's unit, which by May 19, 2015 had already been leased (without her knowledge). Such application would violate the CC&Rs and Civil Code 4270(a)(3), supra.

Bayside thus was not using whatever "rights" may have been created under the June 22, 2015 amendments, regardless of their validity under substantive law, in seizing and renting 990.

## 2. The extreme and bizarre language in the proposed amendments shows the money collected from renting 990 was for pre-petition claims.

The "Explanation Summary" for item [03] recites that the amendment to 3.4.8 "enables your association to lease abandoned & payment delinquent Bayside Units by your association so that their delinquent payment burden is not shifted onto the backs of the remaining responsible Members who pay their lawful obligations on time." (Ex 35/M, "Ballot Item [03].")

The "Explanation Summary" for item [05] urges amendment of CC&R Article 5.3 "to assign maintenance of - and repair responsibility for - Unit 990 to Unit 990's owner – rather than to the Membership which has never received a fair assessment therefor from Unit 990's owners to date. All owners of Unit 990 to date have enjoyed the benefits of a ridiculously incorrect assessment calculated in error (in direct violation of Bayside CC&Rs) by the shoddy original developer and a string of incompetent Management Agents who violated the law governing assessment calculation. The existing owner of 990 has never fully paid the incorrectly low assessment! When Unit 990's ownership changes hands, all of the proper assessments for it will be lost forever. This amendment assures that the other 32 members of the association will not have to pay for this loss in the future." (Ex. 35/M.)

Exhibit 35/M "June Ballot Initiative Explanation Summary," items [03] and [05] reveal a "grievance" mentality, that Bayside needed to compensate for "the ridiculously incorrect assessment" levied in prior years. The costs associated with Unit 990 needed to be shifted onto Parker, "rather than to the Membership which has never received a fair assessment therefor from Unit 990's owners to date." [Item 05; underline original.] This extreme language highlights respondents' belief that Unit 990 had *never* paid a "fair" assessment, going back 15 years to the foundation of the project, and that action needed to be taken to compensate for those "ridiculously incorrect" pre-petition assessments. Respondents took action to recoup and recover those pre-petition claims by renting Parker's Unit 990, a clear violation of 362(a)(6).

## 3. The Declaration forbids seizing and renting an owner's separate interest unit. This unlawful act was harassing and coercive.

Article 9.2.1 of the CC&Rs "Right of Enforcement" provides, "*Notwithstanding anything to the contrary contained in this Declaration*, the Association shall not have the power to cause a forfeiture or abridgement of an Owner's right to the full use and enjoyment of the Owner's

individually owned Unit, including access thereto over and across the Common Area, due to the Owner's failure to comply with the provisions of the Project Documents, unless the loss or forfeiture is the result of the judgment of a court, an arbitration decision or a foreclosure proceeding or a sale conducted pursuant to this Declaration." This provision is contained in the original CC&Rs recorded July 10, 2000 (Ex. 8A), and all subsequent versions (Ex. 8B-E). Article 9.2.1 mirrors the provisions of Cal. Civil Code 4510 prohibiting acts that limit access to an owner's separate interest unit, but 9.2.1 adds the important provision that the association cannot interfere in the owner's right to "full use and enjoyment of the Owner's individually owned Unit."

Plainly, this provision in the CC&Rs and its companion Civil Code section are intended to prevent exactly what respondents did to Parker. Article 9.2.1 applies to protect the rights of the individual owner "*Notwithstanding anything to the contrary contained in this Declaration,*" which would include inconsistent amendments designed to *deprive* an owner of the full use and enjoyment of the owner's separate interest. Respondents did this without any order of a court, an arbitration decision, or a foreclosure sale. The rental is therefore unlawful under Article 9.2.1 and Civil Code 4510. Illegal conduct is harassing and coercive by its very nature and violates 362(a)(6).

### 4. Renting an owner's unit to collect unpaid assessments is not allowed by law. This was a harassing and coercive attempt to force Parker to pay stayed pre-petition claims.

The rights of a homeowner association to enforce claims for unpaid assessments are set forth in the Davis-Stirling Common Interest Development Act, Cal. Civil Code Sections 4000 through 6150. Collection of assessments is dealt with in Sections 5600 – 5740. Section 5650(b) provides that if an assessment is unpaid the association can collect a late charge not exceeding 10% of the installment, interest at 12%, and reasonable attorney's fees, in addition to the assessment. Nothing in the Davis-Stirling Act permits an association to seize possession and rent out the separate interest unit of an owner to collect unpaid assessments.

Article VI of the Bayside CC&Rs recorded July 10, 2000, February 13, 2015 and June 22, 2015 dealing with assessment collection, do not include a "right" to seize and rent an owner's unit as an assessment collection practice. The supposed right to lease a unit first appears in Article 3.4.8 of the June 22, 2015 amended CC&Rs, relating to "Association Easements" and

adopted after 990 was already rented out. Collection methods not allowed under the CC&Rs are per se harassing and coercive and violated 362(a)(6).

### 5. The "rent" greatly exceeded the annual assessment.

Unit 990 was rented out in May 2015 at the rate of $6,500.00 per month, starting June 15, 2015. (Ex. AZ part 2.0.) Rent for June through December 2015 at that rate would be $45,500.00. This is twice the total annual assessment for 2015. (Ex. G.) Rent for January 2016 through December 2016 would be $78,000. The annual assessment for all of 2016 was $24,258. (Ex. AT, 01/01/16 entry.) The rent collected in 2016 was over *three times* the amount of the claimed 2016 annual assessment.

Therefore, even if Bayside was applying the rent income to its post-petition accruing assessments, the contention that the rental was merely to pay ongoing post-petition assessments is not true. Bayside collected $128,500 from renting 990 from June 2015 through December 2016, while the claimed annual assessments for 2015 and 2016 totaled approximately $50,000. Bayside collected about 250% more than the annual assessments for the 2015-2016 time period. The only explanation that fits the evidence is that Bayside was using the rental of Unit 990 to collect a pre-petition claim in violation of 362(a)(6).

### 6. Bayside's "book and hold for the lender" excuse is patently false.

Bayside asserted at trial it "booked" the rent received from 990 to "hold" it for the senior lender, apparently Deutsche Bank. Respondent Jennings admitted at trial that no payments were actually made to the lender and could not explain the concept to the satisfaction of the court. Respondents submitted no documentary proof of the existence of such an accounting practice. This is plainly a bogus theory cooked up post facto to try to justify respondents' seizure and use of the rental income from 990.

### 7. Wall repairs are irrelevant.

Respondents introduced at trial the new excuse that the Association "had to" spend large amounts of money repairing the brick exterior walls of Unit 990, paid for by renting 990. This supposed fact is not in the Joint Pretrial Order, no supporting documents are in respondents' document list, none were presented at trial, and no witnesses are identified in respondents'

witness list on this subject. The subject is also irrelevant. It makes no difference what respondents did with the money obtained by a stay violation.

In any case, the Association had the duty to maintain the exterior walls, which are "common area" as defined in the CC&Rs and within the scope of the Association's general maintenance obligations. The walls are not part of "Unit 990" but are pure common area. (Ex. 8A Articles 2.7, 2.27, 5.1.1, 5.3.) The cost of such maintenance is included in the annual budget for the entire association. (Ex. 8A 6.2.2(a), (b); Cal. Civil Code 5600(a).) The Association cannot charge Parker personally for the supposed work on top of her assessment. (Civil Code 5600(b).) The June 2015 amendment to Article 5.3 purporting to place all maintenance responsibility for the common area exterior walls on the owner of 990 is void under Civil Code Secs. 4125 (definition of "condominium") and 4145(a), (b) (definition of "exclusive use common area"). The exterior walls are not "exclusive use common area" and are not subject to being converted to exclusive use common area by amendment of the CC&Rs.

## 2. DEMANDS FOR PAYMENT OF PRE-PETITION CLAIMS VIOLATED THE STAY.

### (1) The December 2, 2014 BCOA Late Payment Demand.

On December 2, 2014 Bayside emailed a "BCOA Late Payment Demand & Notice of Delinquency" to debtor directly, with a cover email. (Ex. F.) The email demands "full payment at this time" of $169,669.88, including $162,928.18 for installments that pre-date the commencement of this case, threatens that "your ENTIRE ANNUAL ASSESSMENT becomes due and payable" if the entire invoice is not paid within 30 days, and threatens foreclosure sale. (Ex. F fifth page.) Bayside presented no evidence the email was written in error. At the bottom of each page of the invoice is a box of information warning debtor what can happen if the entire bill is not paid immediately.

Respondents argue that the "Late Payment Demand" was not in fact a "Late Payment Demand" but merely a notice or account statement. However, the invoice and accompanying email contain no such limiting language. Bayside admits the invoices were sent without a supposed "watermark" to the effect that the Late Payment Demand is for "informational purposes only." (Joint Pretrial Order "Respondents' Facts" paragraphs 2 and 3; Respondents' Opening Statement, May 29, 2018.)

Even *with* a statement that the invoice is "for informational purposes only" the payment demand puts pressure on the debtor and violates the stay. "[A]s noted by other courts reviewing similar language, such a self-serving disclaimer 'does not obviate the fact that the invoice seeks payment from the debtor' and such a collection action violates the stay 'if it amounts to pressure on the debtor to pay.'" *In re Cousins*, 404 B.R. 281, 288 (Bankr.S.D.Ohio 2009); *In re Butz*, 444 B.R. 301, 304-305 (Bankr, M.D. Penn. 2011); *In re Zotow*, 432 B.R. 252, 258-59 (9th Cir. BAP. 2010). This payment demand put significant pressure on debtor to pay, and was harassing and coercive.

All assessments are a pre-petition claim, regardless when billed. *Goudelock*, supra. Attempts to collect *any* assessments after the case is filed violated the stay. Here, the invoice is for installments billed before the case was filed, thus is a stay violation regardless of the effect of *Goudelock*. This pre-confirmation payment demand violated both 362(a)(3) and 362(a)(6).

**(2) The January 2, 2015 BCOA Late Payment Demand.**

On January 2, 2015 Bayside emailed another "BCOA Late Payment Demand & Notice of Delinquency" to debtor directly, with a cover email demanding immediate payment. (Ex. H.) All that is said immediately above applies to this payment demand as well, with the exception that the demand is post-confirmation and violated only 362(a)(6).

**3. THE SETTLEMENT PROPOSALS OF OCTOBER 29, 2014 AND DECEMBER 15, 2014 VIOLATED THE STAY.**

**(1) October 29, 2014 Offer.**

Respondents' October 29, 2014 "settlement offer" is clearly an attempt to collect pre-petition claims. (Ex. E.) The proposal demands payment of $25,000 in cash up front, dismissal of all of Parker's civil claims against Bayside, payment of 60% of the lien amount then pending, dismissal of the bankruptcy case, payment of all the Association's legal fees, no release of the lien even if paid, sale of the unit, a promise to never own property in Bayside again, and other demands. Parker is given 48 hours to respond. If not accepted, Association threatens to move forward with its pending civil lawsuit, cross-complain against everyone involved in sale of Unit 990, and file "multiple adverse claims with the Bankruptcy Court." (Ex. E.)

A post-petition settlement offer can violate the stay if it crosses the line between "hard-nosed negotiations and predatory tactics – and if the automatic stay is to have any bite, it must forfend against the latter." If the tactics are coercive or harassing, the offer violates the stay. *In re Jamo*, 283 F.3d 392, 399 (1st Cir. 2002); *In re Diamond*, 346 F.3d 224 (1st Cir. 2003.) This offer "crosses the line" by a wide margin. It sends an unmistakable message to debtor that her bankruptcy case will not protect her, that the case will be dismissed, and that Bayside will expand all its many claims against her unless she agrees to the terms of the offer. This conduct violated 362(a)(1), 362(a)(3), and 362(a)(6).

Respondents' witnesses testified unconvincingly that the settlement proposal does not mean exactly what it says. The testimony was inconsistent, illogical, and muddled. It is much more likely that the document means what it says and was intended as a coercive tactic to frighten Parker into submitting to Bayside's demands.

## (2) December 15, 2014 Offer.

The December 15, 2014 offer, sent by Bayside's attorney Andrew Cantor, is nearly identical to the October 29, 2014 offer authored by respondent Jennings. (Ex. H.) The terms are the same, the threatened consequences if not accepted are the same. The offer was communicated prior to plan confirmation at a time when all property was property of the estate. The offer is harassing and coercive. It is an attempt to obtain property of the estate, and an attempt to collect a pre-petition claim, as well as continue a pending civil action.

## 4. ACCELERATION OF THE FISCAL 2015 ANNUAL ASSESSMENT VIOLATED THE STAY.

In December 2014 Bayside sent a "Member Account Invoice" to Parker accelerating her entire fiscal 2015 annual assessment, in the amount of $22,558.20. (Ex. G.) Payment in full was demanded by December 15, 2014.

Any act taken by a condominium association to coerce payment of a pre-petition assessment or claim violates the automatic stay, even if "allowed" by the governing documents and even if the act or rule also serves some other purpose. *In re Gordon Properties LLC,* 460 BR 681 (Bankr.E.D.Va 2011). The coercive effect of the acts, not their justification, is what determines a stay violation. (*Id.*, 693-4; *In re Butz*, supra, 304.)

No good-faith basis existed to accelerate 100% of a *future year's assessment* at a time when Parker had surrendered the property under her Chapter 13 plan, had offered to covey a quitclaim deed to Bayside on October 29, 2014 (Ex. X), and had every expectation of being off title and gone from the property before 2015 even arrived. The acceleration was done to put pressure on Parker and frighten her with the prospect of facing new, non-dischargeable, post-petition claims.

The entire fiscal 2014 assessment had been accelerated in December 2013, thus no monthly assessments accrued between case filing on October 8, 2014 and when the 2015 assessment was imposed on December 1, 2014. Parker was not "delinquent" on anything. There were no assessments, no fines, no late charges between case filing and December 1, 2014, thus the acceleration was unlawful under the governing documents. (Ex. AV/37, 2016 bylaws Art X and F-8, F-9.) Acceleration of the 2015 assessment amounts to punishing Parker just for *having* pre-petition debt, plainly a "harassing and coercive" act.

Accelerating the 2015 assessment was a ruse and subterfuge to offset the pre-petition claims, by adding another $22,000 to the "post-petition" claim. It also put improper financial pressure on Parker at a time when every dollar was allocated to making her plan payments. The acceleration was pre-confirmation, thus violated 362(a)(3) as well as 362(a)(6).

The assessments are a pre-petition claim, regardless when billed whether pre- or post-petition. (*Goudelock,* supra.) As a matter of law the collection attempt violated the stay.

**5. THE FINES IMPOSED POST-PETITION VIOLATED THE STAY.**

Any act taken by a condominium association to coerce payment of a pre-petition assessment or claim violates the automatic stay, even if "allowed" by the governing documents and even if the act or rule also serves some other purpose. *In re Gordon Properties LLC,* 460 BR 681 (Bankr.E.D.Va 2011); *In re Butz*, supra, 304-305.

Bayside imposed $11,500.00 in fines against Parker between December 1, 2014 and April 30, 2015. (Ex. I.)

The first fine, $1,500 on December 1, 2014, was unilaterally imposed without notice or a hearing, violating Article 9.2.1 of the CC&Rs and Civil Code sections 5855, 5905, 5910 (fair hearings with notice). Parker testified her unit did not have a tenant at the time stated in the fine notice, thus the fine is substantively wrong as well as procedurally wrong. (Ex. I first page).

The $2,500 in fines imposed on May 15, 2015 (Ex. I third page/Ex. 47) are mostly for matters the Association has no right to control or responsibility for. Fines for "failure to pay assessments," and "failure to pay city taxes" are per se unlawful. None of these things gives an association the right to impose fines. An association's rights against an owner for non-payment of assessments are limited by the CC&Rs (Ex. 8A Article 6.6.3) and Civil Code 5650(b). Parker had no "tenant" at this time thus the fine for "failure to advise of tenant identity" is groundless.

The 13 separate $500 fines on May 16, 2015 (Ex. I fourth and fifth pages/Ex. 47) are all for conditions inside Parker's separate interest unit, which Bayside has no duty or right to maintain. (CC&Rs, Ex. 8A Articles 5.1.1 and 5.3.) All the fines are substantively and procedurally invalid. The important point is that all these "conditions" date from *after* when respondents took over control of 990 in February 2015 and began using 990 for their own purposes. (Ex. BT.) Unit 990 was leased out only *three days later*, on May 19, 2015, thus the condition of the interior must have been safe and habitable for a tenant. (Ex. AZ.) Exhibit BT explicitly says 990 is in good condition with no problems. Parker had no access to 990 and no ability to make the "corrections" respondents claimed were needed.

All these fines were a ruse and a subterfuge to collect pre-petition claims, and to put intense financial pressure on Parker to harass and coerce her.

## 6. AMENDMENT OF THE GOVERNING DOCUMENTS VIOLATED THE STAY.

The May 21, 2015 proposal to amend the CC&Rs, and the adoption and recordation of the amended CC&Rs on June 22, 2015 (Ex. 35/M, Ex. 8D) were attempts to collect pre-petition claims. All five proposed amendments contained in the "June Ballot Initiative Explanation Summary" and the ballot that it "explains" expressly target Parker and her Unit 990. No other Bayside members are targeted.

The extreme language used in the "explanation" for Item [05] shows that the amendment was intended to make up for the "incorrectly low assessment calculated in error" going back to the formation of the project in 2000. No other explanation fits the evidence.

The amended condominium plan recorded with the CC&Rs on June 22, 2015 *erased the "Parking Exclusive to 990 28th St." area from the map*. The Court can see this by comparing the maps in Exhibits 8A and 8D, especially the "parking" maps. This act implemented the threat made on October 14, 2014 to deprive Parker of her property.

**7. "RETRO ASSESSMENTS" IMPOSED IN MAY 2015 VIOLATED THE STAY.**

On May 1, 2015 Bayside served a "BCOA Member Account Invoice" on debtor demanding payment by May 15, 2015 of $9,856.25 for "understated" prior years' assessments, with an explanation that the previous assessments for the years 2010, 2011, 2012, 2013, 2014 and 2015 should have been higher "due to" the unit being larger than the condominium plan shows. (Ex. V.)

Assessments for any time prior to October 8, 2014 are "a claim against the debtor that arose before the commencement of the case under this title" (362(a)(6)) and could have been asserted in those prior years. (Section 101(5)(A) [defining "claim" as a "right to payment" in extremely broad terms]; *Goudelock*, supra.) As such those pre-petition assessments are within the scope of the automatic stay. "Retro assessments" announced post-petition are still pre-petition claims. Under *Goudelock* they are pre-petition claims regardless when announced. The May 1, 2015 Invoice is a direct demand for payment of a pre-petition claim, a textbook violation of 362(a)(6). It is also harassing and coercive, plainly intended to pressure Parker to pay the pre-petition claims.

**8. THE AUGUST 8, 2015 NOTICE OF BILLING FOR FIRE SPRINKLER WORK IN UNIT 990 VIOLATED THE AUTOMATIC STAY.**

On August 8, 2015 Bayside sent an email directly to Parker telling her the Association was about to enter Unit 990 for "interior sprinkler modifications in order to meet current standards." The work was going to be done "within the next 90 days." The estimated cost of $6,307.00 would be "billed to your Member Account." (Ex. O.) The notice does not ask permission but tells Parker that Bayside *will* enter her property and *will* bill her for whatever the cost may be.

By August 8, 2015 Unit 990 had been in Bayside's possession for six months, since early February 2015. (Ex. BT.) Unit 990 had been rented out by Bayside since May 19, 2015 and some $19,500.00 in rent had been collected from the tenant. (Ex. AZ.)

Bayside's May 21, 2015 email to the rental agent Andrea Day recites that as of that date the unit has never required repair, there are no "structural or system issues in play," and Bayside has been performing basic maintenance including "performing sprinkler inspections" and other

work since February 2015 "on an almost daily basis." (Ex. BT.)

The sprinkler system is part of the "Unit" as defined in 2.27 of the CC&Rs (Ex. 8A.) The system is not part of the "structural portions of the buildings" maintained by Association under 5.1.1. Respondents had no right or obligation to make such "repairs" in the first place.

The August 8, 2015 notice served no purpose except to harass and coerce Parker and to run up the post-petition charges against her in as part of a program to collect pre-petition claims and put financial pressure on Parker to cause her plan to fail. This conduct violated 362(a)(6).

## 9. SEIZURE OF UNIT 990'S PARKING AREAS VIOLATED THE STAY.

On October 13, 2014 Bayside sent an email to a group of people including Parker and Scott Sorensen, who was then negotiating to purchase Unit 990. (Ex. D.) The email asserts that, based on measurements made by Jennings and Jennings' own interpretation of the governing documents and Parker's title documents, Unit 990 does not own the "Parking Exclusive to 990 28th St" area shown on the condominium map recorded in 2001. (Ex. 8A, "Parking Plan" and "Condominium Plan.") The email states that Bayside will shortly start construction of a garbage enclosure that will "project well into what the plan labels as 'Parking Exclusive to 990 28th St.'" (Ex. D paragraphs 5, 7.)

Exhibits 1 through 6 inclusive (deeds for Unit 990) all include the legal description for the "common area" of the Bayside Court development, attached as "Exhibit A" to each deed. "Parcel One" is "an undivided 1/33d interest in Parcel A" shown on the parcel maps recorded in 1997 and 2000 creating the project. However, the "Excepting Therefrom" paragraph that follows, under Part B, excludes from the common area "Exclusive easements for the use, occupancy and possession of … *Parking Exclusive to 990 28th St. … as shown on the Condominium Plan and Second Amendment referred to above and as such easements are provided in the [July 10, 2000 CC&Rs]."*

The meaning of the legal description in the recorded deeds, as well as Article 2.22 of the CC&Rs as they existed prior to June 22, 2015 (Ex. 8A), is a matter of law for the court to decide. The plain wording of the legal description shows that the "Parking Exclusive to 990 28th St." shown on the original plans and referred to in the CC&Rs is appurtenant to Unit 990 and is not common area as contended by respondents when claiming the parking area on October 13, 2014.

This conduct is an "act to obtain possession of property of the estate or … to exercise

control over property of the estate," prohibited under 362(a)(3). This conduct was more than two months before plan confirmation, thus all property was property of the estate. It is also harassing and coercive, violating 362(a)(6).

## C. THE SUPPOSED PROXY IS IRRELEVANT AND HAS NO EFFECT ON PARKER'S CLAIMS FOR STAY AND DISCHARGE VIOLATIONS.

### 1. The supposed proxy is not genuine.

Respondents could not prove the genuineness of the supposed proxy at trial. Under the highly suspicious circumstances present the court should give no weight to the document.

Most damning, respondents could not produce the original of this document on which they place so much importance. When asked at trial where the original is, Laurence Jennings said the original had been "thrown away with all the others" after the "election period passed," presumably a reference to the one-year period for challenging elections in Civil Code 5145(a). This means the document, if it ever existed, was in possession of respondents, and particularly Association Secretary-Treasurer Jennings, until at least a year after the June 6, 2015 election, which is June 6, 2016 at the earliest. That date is *eight months* after Parker's sanctions motion was filed. That respondents, represented by counsel Eric Nyberg, would have deliberately destroyed the original of a critically important document on which their defense rests, is simply not credible.

Jennings testified a "scanned" copy of the original was kept, but not the original itself. However, this supposed copy of the signed original was not presented to Parker at her April 5, 2017 deposition. (Ex. 38.) Instead, a *blank copy* was shown to her. (Ex. 38 pages 137 lines 18-25, pages 159-161.) If a copy of a "signed original" existed, it would have been presented to her and she would have been extensively questioned about it. That did not happen.

Neither was the supposed "scanned" copy of the "signed original" submitted as evidence in respondents' June 8, 2017 motion for summary judgment. The court took note of this odd absence of evidence in the court's ruling on the motion. (Doc. #170 page 6 lines 9-12.)

The "signed original" made its first appearance in early 2018 when respondents presented their list of trial exhibits, including proposed Exhibit 36. It is extremely unlikely that if a genuine copy, even a photocopy, existed it would not have appeared until more than two years into the

litigation of this matter and seven months after the summary judgment motion. Respondents at trial did not ask Jennings to explain why an "original" was destroyed but a "scanned" copy was kept, which is contrary to logic and common sense.

Jennings testified he is skilled at digital document manipulation and knows how to add digital "layers" to a document he is creating.

Civil Code 5110(a) requires an association to appoint "an independent third party" as inspector of elections. At trial when Laurence Jennings was asked who the inspector of elections was for the June 2015 vote Jennings said he "thinks" it was his wife, JoLee Jennings. However, Exhibit 35/M (tenth page) lists "Laurence Jennings" as the "BCOA Election Inspector" to whom the voting materials should be mailed. After three years of litigation, Laurence Jennings cannot innocently have forgotten it was him, not his wife, who had custody and control of the voting materials including the supposed proxy. His credibility on this point is nil.

## 2. Respondents bypassed Parker's attorneys and improperly sent the ballot package direct to Parker.

Parker's attorneys notified respondents on April 3, 2015 to cease all direct communications with Parker and to send all communications to Fong & Fong. (Ex. 50.) Despite this notice, on May 21, 2015 respondents mailed the June 2015 vote package directly to Parker. Respondents did not send a copy of the ballot package to Fong & Fong. (Ex. 35/M, first page.) This fact shows respondents wanted to get Parker's consent by the June 20, 2015 voting date before Parker's attorneys realized the vote was even taking place and without knowing it would harm Parker. A "proxy" obtained by stealth and deceit should be given no weight in this court.

## 3. Parker did not sign the proxy.

Parker testified at trial she has never seen the "signed" copy before and does not recall signing it. She testified she had recently reviewed her contemporaneous emails with Fong & Fong from 2015 in which she had said giving a proxy to Bayside would be unwise. She testified it would have been "ridiculous" to give a proxy to Bayside. Parker testified "I did not give anything to them." Parker's April 2017 deposition testimony is ambiguous at best, at which time she had no specific recollection of this proxy. (Ex. 38 pages 159-161.)

**4. The "proxy" was for a vote on CC&R amendments adopted after 990 was already leased out and which were never invoked by respondents as a basis for seizing and leasing Parker's property.**

Even if real, the "proxy" is irrelevant to Parker's ability to maintain these claims for stay and discharge violations. The proxy would only in theory validate that Parker agreed to the provisions of the amendments. But, the amendments were **never invoked** to justify or authorize renting 990 and keeping the rent.

Part I B(1)(d) above discusses the fact that respondents never told Parker they were putting the amended CC&Rs into practice to seize and rent her property, never told Parker that 990 had been found to qualify for seizure and rental under amended 3.4.8, never gave notice to Parker that a hearing would be held to make a finding on whether 990 was "abandoned" and "delinquent" as required under 9.2.1, and never in fact held a hearing or made any such determination.

**5. The Association owed a fiduciary duty to Parker to act in good faith and not arbitrarily. Parker could rely on Association complying with its fiduciary duties.**

"The courts have recognized that such associations owe a fiduciary duty to their members." *Cohen v. Kite Hill Community Association* (1983) 142 Cal.App.3d 642, 651. "This special responsibility is manifested in the requirements of due process, equal protection, and fair dealing." (*Id*.) Thus even if Parker knowingly consented to use of a proxy to approve the proposed amendments, Parker could rely on the association's fiduciary duties of good faith and fair dealing to not abuse its power under the amended documents, such as by seizing and renting her property without notice, without a hearing, and without any findings. She did *not* implicitly consent, as respondents argue, to respondents ignoring the procedural and substantive protections in the CC&Rs and California law. Likewise, Corporations Code sections 7231 and 7233 require directors to act in good faith, and Parker was entitled to rely on this requirement even had she given a "proxy" to the board.

## II. DISCHARGE VIOLATIONS

In a motion for violation of the discharge injunction the debtor must show that the creditor (1) knew the discharge injunction was applicable, and (2) intended the actions which

violated the injunction. *In re Zilog*, 450 F.3d 996, 1007 (9th Cir. 2006); *In re Taggart*, No. DC 3:12-cv-00236 MO (April 23, 2018, 9th Cir.). Once the moving party proves the violation, the burden shifts to the creditor to demonstrate why it was unable to comply with the injunction. *In re Breul*, 533 B.R. 782, 791-792 (Bankr.C.D.Calif. 2015); *In re Zilog*, supra, 1006.

In each of the sections below respondents knew of the applicability of the discharge and intended the acts that violated the injunction.

**1. CONTINUED RENTAL OF 990 VIOLATED THE DISCHARGE INJUNCTION.**

Bayside continued to rent out Parker's Unit 990 following the discharge. From December 1, 2015 through the date the mortgage holder took title on December 6, 2016, 12 monthly rent installments were collected at $6,500 per month, or $78,000.

The personal obligation to pay homeowner association assessments is created when the unit owner takes title to the condominium unit. The future assessments are a "claim" within the meaning of 11 U.S.C. 101(5)(A) and are subject to the very broad 1328(a) discharge of "debt." *In re Goudelock*, supra. The factual situation in *Goudelock* is near-identical to the present case, where a condominium owner allegedly fell behind in assessments, moved out of her unit, surrendered the unit as part of her Chapter 13 Plan, paid no further assessments, and continued to own the unit until it was foreclosed on by the lender several years after the case was filed. The Ninth Circuit held that post-petition assessments are discharged under 1328(a): "Thus, the obligation to pay CA assessments is a debt since it creates a right to payment. See 11 U.S.C. 101(5)(A). The fact that the future assessments may be a contingent and unmatured form of the debt does not alter this analysis." (*Goudelock*, supra.)

Therefore, as a matter of law *all assessment claims* by Bayside against Parker were discharged on December 1, 2015 when Parker received her discharge, including future installments that had not yet been billed as well as all installments that were billed prior to the discharge and prior to case filing.

#### (1) Respondents knew the discharge injunction was applicable to rental of 990.

Bayside and its attorneys and agents knew its pre-petition assessment claim was within the scope of the discharge injunction. Bayside had been represented by bankruptcy counsel Scott Jordan since March 13, 2015 when he filed a motion for relief from stay on behalf of Bayside.

The subject of Jordan's motion was Bayside's pre-petition assessment claim for $163,249.15. (Doc. #53.) Parker's motion for sanctions for violation of the automatic stay was filed November 3, 2015. The certificate of service filed on November 4, 2015 shows service of paper copies of the motion and supporting papers on Bayside Court at its business address, service on the individual respondents at their residence or business addresses, and electronic service on attorney Jordan. (Doc. #75.) Respondents filed opposition on November 16, 2015 by counsel Jordan, and a further opposition on January 4, 2016 by new bankruptcy counsel Eric Nyberg. (Doc. #85, 86; Ex. BL item 8.0)

The central theme of Parker's motion for stay violations is that respondents are attempting to collect, outside the bankruptcy process and in violation of 362(a), the same pre-petition assessment claim that is the subject of Bayside's Proof of Claim.

Respondents knew the pre-petition assessments would be "lost forever," i.e. discharged in the bankruptcy. Exhibit 35/M "June Ballot Initiative Explanation Summary Ballot Item [05] recites "When Unit 990's ownership changes hands, all of the proper assessments for it will be lost forever. This amendment assures that the other 32 members of the association will not have to pay for this loss in the future." Exhibit AM (October 21, 2014) recites "Unit 990's bankruptcy may strip the >$90,000 in liens we now hold." Exhibit AA (June 5, 2015) says 990 will be leased to "recoup" past claims that would otherwise be lost due to the bankruptcy. Exhibit BZ item 41 (June 2, 2015) claims the Parker bankruptcy has been "defeated" and the past debt can now be collected from Parker.

The cardinal rule is, "If there is any question about the applicability or scope of the stay, creditors are required to come to the bankruptcy court to obtain clarification or relief from the stay." *In re Henry*, 266 B.R. 457, 469 (Bankr.C.D.Cal. 2001). Respondents could easily have come to court for a ruling on continuing to rent 990 post-discharge, but did not.

Respondents made no attempt at trial to prove they had any "good faith belief" that the rental of 990 was not within the scope of the discharge. No such affirmative defense is mentioned in the Joint Pretrial Order (Doc. #259), either in the "Respondents' facts" nor in the "issues of law" that remain to be litigated. Respondents offered no documents to support such theory. Respondents' trial witnesses offered no testimony that any of them had any "belief" regarding whether the continued rental of 990 violated the discharge or was within the scope of the discharge. Respondents failed to carry their burden of showing they could not comply with

the injunction due to any "good faith belief" the injunction did not apply to their conduct.

## (2) Respondents intended the actions that violated the injunction.

These actions by respondents were deliberate and not accidental or inadvertent. Respondents have not argued the acts were not intentional and the facts establish the "intentional" nature of the acts for purposes of 524(a)(2). The burden shifted to respondents to prove why they could not comply with the injunction. *In re Breul*, supra, 791-792. Respondents failed to do so.

## 2. ACCELERATION OF THE 2016 ANNUAL ASSESSMENT VIOLATED THE DISCHARGE INJUNCTION.

On December 15, 2015 Bayside accelerated the entire fiscal 2016 assessment on Unit 990, for $24,285.48, and added a late charge of $2,428.59 in January 2016. (Ex. AT, April 2, 2016 invoice.) This was an act to collect discharged pre-petition claims.

Under *Goudelock* the entire invoice is a discharge violation. *All* post-petition assessments are discharged under 1328(a) along with the installments that accrued pre-filing.

Even without the application of *Goudelock* the evidence shows the acceleration of the entire fiscal 2016 assessment in December 2015 was an act to "collect, recover or offset" the pre-filing claims which would be "lost forever" due to the bankruptcy. (Ex. 35/M discussed above.)

A violation of 524(a)(2) exists where the creditor acted in such a way as to coerce or harass the debtor improperly, to "collect, recover or offset" a discharged debt, even if the act is otherwise permitted. The inquiry is objective; the question is whether the creditor's conduct had the practical, concrete effect of coercing payment of a discharged debt, and bad faith is not required. *In re Paul*, 534 F.3d 1303, 1308-1309 (10th Cir. 2008). The *Goudelock* decision establishes as a matter of law that the invoice is an attempt to collect a discharged debt.

Respondents made no attempt at trial to prove they had any "good faith belief" that the 2016 assessment claim was not within the scope of the discharge. As discussed above this affirmative defense is not contained in the Joint Pretrial Order and respondents presented no evidence on the issue. These actions by respondents were deliberate and not accidental or inadvertent.

**3. THE APRIL 2, 2016 PAYMENT DEMAND INCLUDING "RETRO ASSESSMENTS" VIOLATED THE DISCHARGE INJUNCTION.**

The April 2, 2016 "BCOA Late Payment Demand" includes a line item for $9,856.25 (Ex. AT, Page 1, 05/01/15 entry) for "Retro" assessments for the years 2010 – 2014.

Under *Goudelock* the entire invoice is a discharge violation. *All* post-petition assessments are discharged under 1328(a) along with the installments that accrued pre-filing. Even without the application of *Goudelock* the evidence shows an attempt to "collect, recover or offset" a discharged pre-filing claim, for assessments that could have been billed in the years 2010 – 2014. The *Goudelock* analysis makes clear that this is a "claim" as defined in 101(5)(A), "encompassing all of a debtor's obligations 'no matter how remote or contingent.'" (*Goudelock*, supra.) As such the claim was discharged under 1328(a) on December 1, 2015.

Respondents made no attempt at trial to prove they had any "good faith belief" that the retro assessment claim was not within the scope of the discharge. As discussed above this affirmative defense is not contained in the Joint Pretrial Order and respondents presented no evidence on the issue. These actions by respondents were deliberate and not accidental.

**4. FAILURE TO DISMISS BAYSIDE'S CIVIL ACTION AGAINST PARKER FOR MORE THAN A YEAR AFTER THE DISCHARGE VIOLATED THE DISCHARGE INJUNCTION.**

Bayside did not dismiss its state court suit against Parker for 2013 and earlier assessments until January 27, 2017, more than a year after the discharge. (Joint Pretrial Order page 3 line 15.) No purpose was served by maintaining the action on record except as a threat against Parker to revive its suit. Bayside made exactly this threat in its October and December 2014 "settlement" proposals (Exs. E, BX.) Keeping the action on file was harassing and coercive, in violation of 524(a)(2).

Respondents made no attempt at trial to prove they had any "good faith belief" that the pending suit was not within the scope of the discharge. As discussed above this affirmative defense is not contained in the Joint Pretrial Order and respondents presented no evidence on the issue. These actions by respondents were deliberate and not accidental or inadvertent.

**III. MITIGATION OF DAMAGES**

Respondents contend that Parker could have "mitigated" her losses and damages somehow, but at trial presented no evidence of where and how she might have done so or what portion of her damages could supposedly have been avoided. Respondents rely on *In re Roman*, 283 B.R. 1 (9th Cir. BAP 2002). In *Roman* the creditor claimed debtor could have "mitigated" her expenses by negotiation rather than filing the stay motion.

The *Roman* court pointed out that "Appellant's argument attempts to deflect the blame for the damages for its willful stay violation. The first factor, determining reasonableness [of damages], is to ascertain whether the creditor or the debtor created the injury. The creditor has the burden both to establish administrative safeguards to prevent stay violations and to restore the status quo by undoing them." *Roman,* supra, 12. The *Roman* court also observed that "mitigation" is normally an issue where debtor has no damages other than attorney's fees in litigating the stay motion and where there is no basis for punitive damages. *Id.* 12.

Applying these principles to this case, respondents plainly have not proved that Parker needed to do anything other than what she did to "avoid" damages nor that anything she could have done would have changed respondents' conduct. In practice that would have meant getting respondents to admit they were wrong and stop doing everything they were doing. Clearly from the evidence any such attempt would have been futile.

First, there is no question that respondents created the many injuries addressed in the stay violation motion. Respondents are also the ones who continued the same conduct after the discharge, after being put on notice that all their conduct was unlawful when the stay motion was filed on November 3, 2015. Parker did not need to further warn respondents to stop what they were doing.

Second, debtor has sustained substantial damages due to respondents' conduct, including severe and sustained emotional distress, loss of the rental income from her property, and other damages apart from the fees in litigating the motion.

Third, this is a case where punitive damages due to respondents' reprehensible conduct are highly appropriate and have been requested.

It was up to respondents at trial to present evidence that Parker could have done something within reason that would have stopped respondents from continuing to violate the stay, and then the discharge injunction. *Roman*, supra, 12-13. "As the offending creditor, Appellant can neither dictate nor second-guess how debtor should have protected her rights when

she was forced to defend herself against its wrongful conduct." *(Id.*, 10.)

The evidence however shows the utter futility of trying to negotiate or deal reasonably with respondents, particularly the extreme language in Exhibit 35/M decrying the terrible injustice done to BCOA by Parker and the need to recover from the "loss" of the assessment claims. Exhibit BZ items 41 and 44 show that BCOA was determined to collect all the assessments it wrongly contended were owed to it from 2005 through 2015 and intended to collect them. Exhibit AA shows that BCOA intended to collect the pre-petition claims and had a "potent plan" to do so. These acts were all in June 2015, shortly before the stay motion was filed.

Respondents' testified that Parker did not directly "respond" to notice of hearings on proposed fines, but presented no evidence that an appearance by Parker would have changed any outcome. Bayside's "hearing" notices advise that Bayside will have present "BCOA Directors, Officers, Management Agent, & invited guest professionals," while Parker "may not be represented by an attorney or have an attorney present." (Ex. I/45 page 5.) Under those circumstances Parker could not have a fair hearing. The trial testimony showed the lack of procedural and substantive due process inherent in Bayside "hearings."

In any case the stay violation was the imposition of the fines as a subterfuge to collect or offset pre-petition claims, and to harass and coerce Parker into paying them, which is unaffected by whether Parker contested the claims or not. Likewise Parker could not reasonably be expected to travel from her temporary home in Texas every time respondents called a disciplinary hearing.

Parker offered on October 29, 2014 to convey title to BCOA for the asking. (Ex. X.) The offer was never withdrawn during the course of the case. Parker did not oppose BCOA's (unnecessary) motion for relief from stay, expecting BCOA would take title soon afterwards. Respondents took no action after their stay relief motion was granted on April 20, 2015. Instead, Bayside completely changed tactics and decided turn Unit 990 into a cash cow, signing the lease less than one month later on May 19, 2015.

The December 10, 2015 email from attorney Cantor (Ex. 18), after Parker had completed her plan and received her discharge, is not a settlement proposal but just a suggestion that the parties talk about a quitclaim as a step towards "the resolution of all our concerns." It shows that respondents believed the October 29, 2014 offer was still open. It does not address the accrued post-petition assessments, nor the fines and other charges claimed, over $80,000.00 by that point (Ex. AT), nor account for the rent received from 990, nor the attorney's fees incurred by Parker

or those claimed by BCOA (Ex. AV, Bylaws, Amendment G-12 [members billed for all fees BCOA incurs "as a result of their actions"]), or anything else. BCOA never followed up with a real settlement proposal. Respondents presented no evidence at trial as to the meaning of Cantor's suggestion or why Parker should have done anything in response to it, after having already filed a motion to address all these issues and receiving a discharge.

## IV. LIABILITY OF INDIVIDUAL RESPONDENTS

The automatic stay of 362(a) applies to "all entities," which includes "person" under 101(15). This court has already observed in this case that agents or attorneys of a creditor may be held liable under 362(k) if they are the individuals or entities which tried to collect, assess or recover a claim against a debtor. (Memorandum Decision Re: Jordan Summary Judgment Motion, January 30, 2018, Doc. #223, page 5 lines 108, page 6 lines 14-16, page 8 line 7.)

The conduct by individual respondents Laurence Jennings, Andrew Cantor, Raj Patel, Lawrence Drouin, and Justin Hu was specific and was intended to collect, assess or recover stayed and discharged claims against Parker. Jennings was the author of virtually every document and was the instigator of virtually every act taken against Parker. Patel was president of the Board at all times and approved all acts by the Board. Drouin testified he was on the board during the critical time from July 2014 through at least July 2015 and the meeting minutes reflect this fact. Hu was on the Board and approved all acts. (Exhibits W, BJ, BK, BL, BM.) Cantor did more than just act as legal counsel, as he also developed the "potent plan" to collect pre-petition assessments and helped implement that plan by approving the lease and adding his own text to be sure the lease was enforceable. (Exs. AA, AZ.)

The invoices, notices, and other documents that violated the stay and discharge are all issued by "The Board." (Exhibits D, E, F, G, H, I, J, K, 35/M, O, V, Y, Z, AM, AT, AZ, BN, BW.) The meeting minutes show these individual respondents present and voting in favor of the acts violating the stay and discharge. (Exhibits W, BJ, BK, BL, BM.) Direct and active involvement by the individual respondents is shown in all these exhibits. Exhibit BZ is from "the Board" though authored by Jennings. Cantor authored Exhibit BX, the settlement proposal.

Respondents produced no evidence of any dissent by any respondent to any of the acts by "the Board." To the contrary, respondents testified that the Board acted together on all decisions.

The "business judgment rule" mentioned at trial is irrelevant to stay and discharge

violations. (Cal. Corp. Code 7231(a)-(c), Civil Code 5800(a).) First, that doctrine limits civil tort claims against directors and has no application to Federal bankruptcy law. Second, the doctrine requires the director to "act in good faith" and to make reasonable inquiry when needed. The evidence shows respondents failed to act in good faith and failed to make reasonable inquiry when it was plainly needed.

## V. DAMAGES

### A. Compensatory damages under 362(k) and 105(a).

### (1) Parker has suffered severe emotional distress as a direct result of the stay and discharge violations.

Section 362(k) permits an award of emotional distress damages if the debtor (1) suffers significant harm, (2) clearly establishes the significant harm, and (3) demonstrates a causal connection between that significant harm and the violation of the automatic stay. *In re Snowden*, 769 F.3d 651, 656-657 (9th Cir. 2014) citing *In re Dawson*, 390 F.3d 1139, 1149 (9th Cir. 2004.)

Corroborating medical evidence is not needed to establish the severity of the emotional distress, particularly where the violator engaged in egregious conduct. Further, "the circumstances may make it obvious that a reasonable person would suffer significant emotional harm" even without egregious conduct. *Snowden*, supra, 657; *Dawson*, 1149, 1151.

Parker testified she moved from Bayside to Texas to get out from under being besieged with intimidation. The October 2014 settlement proposal (Ex. E) caused frustration and disbelief, due to the unreasonable tenor of the document, that the liens would stay in place, there would be no relief even if she paid the $25,000 demand. The second settlement proposal (Ex. BX) was received just before Christmas 2014. Parker was hoping to have time off during the holidays, but this affected her emotional state, left her with a feeling of "hopelessness," a feeling "that I could not come to terms with these people." This was "depressing," knowing it would continue, that it was not going to be resolved.

Almost immediately after this case was filed Parker got Bayside's October 14, 2014 email contesting Parker's right to exclusive parking area (Ex. D). This was "a spanner in the works" that she believed was "to interfere in the process of the short sale."

Shortly after that, Parker got a copy of Bayside's October 21, 2014 message to members concerning her. (Ex. AM.) The allegations, including that she was "fleecing the association," were "very hurtful, very upsetting."

Parker's reaction on receiving the December 2, 2014 payment demand for $169,669.88 from Bayside was "disbelief." The invoice was "incredibly stressful," knowing that she can't deal with such a huge claim, and knowing that the bankruptcy "made no difference." She felt "fear" due to the claim. Parker's decision to go into bankruptcy was "a big deal, it was shameful for me to go bankrupt." Parker was very anxious, knowing the dispute would continue.

Parker's reaction on receiving the notice of acceleration of the 2015 assessment (Ex. G) was again "disbelief," at being given 30 days to pay the entire year's assessment. She then received the January 2, 2015 payment demand for $196,256.71, which caused her "fear" due to "things piling up."

Receiving Bayside's notices of intended fines in March 2015 was "very upsetting." The threatened $1,500 fine for "rental" violations was "confusing" and "so very wrong" because she had no tenant. (Ex. I.) The other fines were upsetting, and look like someone is trying to dream up violations "until you crack." These were "part of the barrage" and "became a bit of a blow."

Parker received Bayside's May 1, 2015 "retro assessment" demand for $9,856.25 during a leave of absence from work. (Ex. V.) It made her "sick" to see that Bayside was making new claims, going back to 2010. This caused "frustration" and "made matters worse."

Parker saw Cantor's "potent plan" letter in June 2015. (Ex. AA.) Her reaction was "total disbelief." The contents of the letter making her out as a bad person, inflicting great damage on the Association, made her angry. The plan to lease her unit 990 made her angry. Parker was upset and discussed Cantor's letter with friends.

Parker received the "June Ballot Proposal" (Ex. M/35) from Bayside in late May 2015. She then received a further email from Bayside on May 31, 2015 (Ex. 35) asking her to return a ballot. These communications made her "annoyed" due to the "unreasonable" provisions and due to the fact her attorneys had told Bayside not to contact her. The contents of the proposed amendments were "very worrying."

Parker got Bayside's April 2, 2016 invoice for $81,855.79 in claims Bayside was making against her (Ex. AT) supposedly just since the case was filed in October 2014, including the accelerated 2016 assessment and the $9,856.25 "retro assessment" for 2010-2014. This caused

her an "emotional reaction," due to there being so many charges, including the "retro assessment," and being such a huge figure.

Appropriate compensation for three years of severe emotional distress, not just for one wrongful act but for dozens, needs to be substantial. The circumstances surrounding the violations make it obvious that a reasonable person would suffer significant emotional harm. (*Snowden*, supra, 657.) The court can also award emotional distress damages under 105(a) for the discharge violations that continue to this day.

**(2) Parker has suffered financial losses as a direct result of the stay and discharge violations.**

Bayside obtained over $128,000.00 in rent from Parker's property in violation of the stay and then in violation of the discharge injunction. The rent collected was $6,500.00 per month from June 2015 through December 2016. (Ex. AZ; testimony rent was paid.)

A creditor has a duty to return money obtained from a debtor in violation of the stay. *In re Henry*, 260 B.R. 457, 480 (Bankr.C.D.Cal. 2001); *Snowden*, supra, 659-660; *In re Abrams*, 127 B.R. 239, 242-43 (9th Cir. BAP 1994). The court can make whatever orders are necessary to carry out the purposes of the Bankruptcy Act under 105(a) and has wide discretion to do so. *In re Avon Townhomes Venture*, 433 B.R. 269, 303-304 (Bankr.N.D.Cal. 2010).

There is no question this $128,000.00 is property belonging to Parker taken by Bayside in violation of the stay and discharge. As such it must be refunded to Parker, with interest at the legal rate on each wrongfully-taken installment. (*Henry*, supra, 480.) Acts done in violation of the stay are void ab initio. *In re Peralta*, supra, 389, citing *In re Schwartz*, 954 F.2d 569, 572-74 (9th Cir. 1992); *In re Wardrobe*, 559 F.3d 932, 934; *In re Perl*, 513 B.R. 566, 572 (9th Cir. BAP 2014). During the time the stay was in effect the rent taken was approximately $50,000.00. The money taken in violation of the discharge injunction was approximately $78,000.00 for the period from December 1, 2015 through December 6, 2016 when title changed to Deutsche Bank.

**(3) Attorney's fees.**

Because respondents willfully violated the automatic stay, an award of attorney's fees and costs is mandatory under 362(k). Fees are discretionary for the discharge violations, under 105(a). Debtor will make an appropriate post-judgment motion under Civil Local Rule 54-5,

applicable under Bankruptcy Local Rule 1001-2(a).

**B. Punitive damages are available under 362(k)(1) and 105(a) and are highly appropriate under the egregious facts of this case.**

Punitive damages are available under 362(k)(1) in "appropriate circumstances." This case presents such "circumstances" in abundance. The same factors discussed above regarding emotional distress show the "reckless or callous disregard for the law or the rights of others" that warrants punitive damages. *Snowden*, supra, 657.

Punitive damages are especially appropriate to deter a pattern of behavior that ignores the automatic stay. *In re Klotz*, 239 B.R. 706, 713 (Bankr.N.D.Ohio 2002). "Under the facts of this case punitive damages in a large amount are essential. This Court finds that the facts in this case show such egregious and troubling behavior on the part of [the creditor], such contempt for the bankruptcy process, and such harassment of the debtors that significant punitive damages are in order. [The creditor] did everything in its power to trample on the rights of the Debtors and other creditors by attempting to collect on its claim outside the bankruptcy process." (*Id.* 713.)

*In re Kaufman*, 315 B.R. 858 (Bankr.N.D.Calif. 2004) is instructive. In that case, on facts much less egregious than this case, Judge Jellen of this court imposed $755,000.00 in punitive damages against a creditor and persons working with it. Likewise, in *In re Henry*, supra, a lender collected post-petition mortgage payments outside the bankruptcy. The court ordered the creditor to reimburse $6,570.00 taken in violation of the stay, and then imposed $65,700.00 in punitive damages for "massive violation of the automatic stay and discharge injunction." (*Henry,* 266 B.R. at 466, 481-483.)

The court should award punitive damages of at least twice the amount of the rent taken in violation of the stay with interest, $300,000.00. Bayside Court Owners Association has cash reserves, and has the power to assess its members over time to pay judgments. The individual respondents should be sanctioned in an amount according to their participation in the wrongful conduct.

Dated: October 12, 2018                    FONG & FONG, APC

                                           By: <u>Marc Alan Fong</u>

                                           Attorneys for Debtor