

The following constitutes the order of the Court.
Signed: January 29, 2019

Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

SARAH-JANE PARKER,

　　　　　Debtor.

Case No.  14-44083 CN
Chapter 13

**MEMORANDUM DECISION AFTER TRIAL**

On February 22, 2017, this court consolidated for trial debtor Sarah-Jane Parker's claims against respondents Bayside Court Owners Association, Inc. ("BCOA"), Laurence Jennings, Raj Patel, Justin Hu, Lawrence Drouin, and Andrew Cantor, Esq. (collectively, "respondents") for alleged violations of the automatic stay and discharge injunction.  After a contentious pre-trial period, the court conducted a multi-day trial on Parker's claims.  Parker asserts that respondents' collective settlement demands, HOA invoices and fines, and rental of her condominium unit violated the automatic stay and the discharge injunction.  She asks that this court award substantial damages under Bankruptcy Code §§ 105 and 362(k).  All appearances were made on the record.  Parker's claims are core proceedings under 28 U.S.C. § 157(b), and the following constitutes this court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052(a).

Parker filed her Chapter 13 bankruptcy on October 8, 2014 and received her Chapter 13 discharge on December 1, 2015.  BCOA received notice of her Chapter 13 bankruptcy and her

Chapter 13 discharge.[1]  When Parker filed her Chapter 13, she and BCOA were embroiled in contentious litigation in Alameda County Superior Court in which BCOA sought to collect unpaid HOA dues arising from Parker's ownership of Unit 990 at the BCOA run condominium complex in Oakland, California ("Unit 990").  Parker's pre-petition HOA obligations arose from BCOA's Declaration of Covenants, Conditions and Restrictions dated May 22, 2000, which were duly recorded with the Alameda County Recorder's Office (the "CC&Rs").[2]  Unit 990 is the largest unit in the BCOA complex, and its annual HOA dues represent 12% of BCOA's annual assessment revenue.

Parker's Chapter 13 plan treatment of her interest in Unit 990 was straightforward. Parker owned Unit 990 when she filed her Chapter 13, and she listed on her Bankruptcy Schedule D unpaid Alameda County real property taxes, first and second deeds of trust, and BCOA's disputed HOA liens.  Unit 990 was in foreclosure on the petition date, and her bankruptcy filing stayed the junior deed of trust holder's trustee sale.  Parker's amended Chapter 13 plan was confirmed on December 17, 2014 (the "Plan").  The Plan "surrendered" Unit 990 to her secured creditors - including BCOA - and provided stay relief (upon confirmation) to allow her secured creditors "to exercise [their] right[s] against [their] collateral."  The Plan also revested Unit 990's title in Parker.  While Parker retained title to Unit 990, she otherwise abandoned the property.  Parker moved to Frisco, Texas in October 2014 shortly after she filed her Chapter 13, and she did not rent Unit 990 in her absence.

Despite obtaining stay relief through the confirmation order, BCOA filed a motion for relief from the automatic stay on March 13, 2015, which Parker did not oppose.  BCOA described its stay relief motion as a request for a "comfort order."  BCOA's motion argued that Unit 990 was worth less than the secured debt against it, and that its negative equity (combined with Parker's failure to pay her pre and post-petition assessments) justified relief from the automatic stay.  BCOA's prayer for relief sought, in part, "That the automatic stay be terminated so that BCOA may exercise or cause

---

[1]  All of the respondents, save Cantor, were members of BCOA's board of directors and/or BCOA officers during all or part of the relevant time period.  Cantor was BCOA's outside counsel.

[2]  As discussed in greater detail below, BCOA amended its CC&Rs post-petition, which is the source of some of the alleged stay and discharge violations.

**MEMORANDUM AFTER TRIAL**

to be exercised any and all rights under the CC&R's and any and all rights after the foreclosure sales, including, but not limited to, the right to consummate foreclosure proceedings on the Property and the right to proceed in unlawful detainer."  This court's relief from stay order simply provided that the "Motion is granted."  Parker thereafter obtained her Chapter 13 discharge on December 1, 2015.

Parker's post-petition difficulties with BCOA arose from a series of intertwining facts:  1) Parker retained title to Unit 990 until the first deed of trust holder foreclosed on November 21, 2016; 2) in the interim, Parker did not pay Unit 990's HOA assessments and fines; and 3) Parker's unpaid HOA obligations created significant financial angst for BCOA.

BCOA filed a $163,249.18 proof of claim in Parker's Chapter 13 for unpaid pre-petition HOA dues and fines.[3]  While Parker's Chapter 13 bankruptcy filing stayed the parties' Alameda County Superior Court litigation, BCOA did not curtail its collection efforts.  Shortly after Parker filed her Chapter 13, BCOA sent Parker's counsel, Fong & Fong, an aggressive offer (by email) to settle the Superior Court litigation.  Even though BCOA was well aware of her bankruptcy filing, it demanded, among other things, that Parker pay it $25,000 "plus any additional legal costs incurred after 10/31/2014 right up until Settlement Agreement signing by Parker, and continue her efforts to sell Unit 990, from which BCOA will accept "60 cents on the dollar for its existing liens."  The settlement offer also stated that "If the offer is not accepted, we will be moving forward with our lawsuit with new counsel, and cross-complaining Unit 990's tenant and realtor among other things-inclusive of filing multiple adverse claims with the Bankruptcy Court.  This will occur if you manage to maintain the Chapter 13 filing (which is full of errors by the way) vis a vis the Trustee's current valid move to dismiss, or convert to a Chapter 7 as has always been expected. (The original Chapter 13 being a familiar stall tactic-just as it was for BCOA Unit C in 2006-2008)."[4]  In mid-

---

[3]  Parker objected to BCOA's proof of claim well after she received her Chapter 13 discharge, and this court overruled her objection as moot.  The merits of BCOA's proof of claim are not before this court.

[4]  The settlement offer was not signed, but instead was issued by "The BCOA Board of Directors."  In fact, the offer was authored by respondent Lawrence Jennings, BCOA's secretary and treasurer.  Jennings holds himself out as an HOA expert who is well versed in HOA bankruptcy issues, and BCOA's board of directors willingly accepted his advice on all matters Sarah Jane

Case: 14-44083    Doc# 299    Filed: 01/29/19    Entered: 01/29/19 09:28:15    Page 3 of 29

December 2014, BCOA's attorney, respondent Andrew Cantor, sent a virtually identical settlement offer under his own letterhead to Fong & Fong. Parker did not respond to these offers.

Parker's silence did not deter BCOA. In early December 2014, BCOA sent to Parker (by email and regular postal service) a "BCOA Late Payment & Notice of Delinquency" demanding payment of her entire pre-petition delinquency (there stated to be $169,669.88). She received a similar "Late Payment Demand & Notice of Delinquency" in early January 2015, which demanded payment of $196,256.71. Both of these invoices were accompanied by "cover" emails which requested immediate payment of these amounts. At trial, Jennings admitted that BCOA should not have issued these invoices, and that he had instructed BCOA's billing department to send invoices with a watermark stating "FOR INFORMATIONAL PURPOSES ONLY.[5]" Jennings did not explain, however, why Parker needed this reminder after two years of litigation and her decision to surrender Unit 990. BCOA also demanded that Parker pay Unit 990's post-petition annual assessments. In December 2014, BCOA invoiced Parker for her 2015 annual HOA assessment of more than $22,000.00, and similarly issued in January 2016 an invoice for her entire 2016 HOA assessment. In April 2016, BCOA issued an omnibus invoice to Parker, which included all unpaid post-petition assessments and fines, including the 2016 HOA assessment.

BCOA also sought to collect a "retro-assessment" from Parker that covered her pre-petition ownership of Unit 990. In May 2015, Fong & Fong[6] received a "BCOA Member Account Invoice" which demanded that Parker pay $9,856.25 as a "retro-assessment." In its accompanying letter, BCOA informed Parker that this amount arose from its 2015 "remapping project" of the entire

---

Parker. Jennings testified that the settlement offer represented the terms under which BCOA would accept a short sale and that its terms were an integral part of BCOA's 2015 budgetary planning. His explanation ignores the fact that BCOA was plainly demanding payment of a pre-petition debt. Jennings is anything but a bankruptcy expert, and the evidence demonstrates his significant disdain for the bankruptcy process.

[5]  BCOA's future invoices zeroed out Parker's pre-petition assessments.

[6]  Shortly after Parker's Chapter 13 filing Parker's bankruptcy counsel, Fong & Fong, instructed BCOA to send all communications to it and not to Parker directly. BCOA generally complied with this directive.

4

**MEMORANDUM AFTER TRIAL**

condominium development. BCOA asserted that the remapping indicated that "Unit 990 was previously assessed at 6088 sqft, but has been found through onsite verification and map examination to actually be 6672 sqft in assessable area. . . . These areas must be assessed in accordance with BCOA CC&R 6.2.3." Unit 990 was one of several units that received retro-assessments. Parker did not respond to or pay this retro-assessment.[7]

BCOA also rejected Parker's early effort to do more than just "surrender" Unit 990 to her secured creditors. In a letter dated October 29, 2014, Parker's bankruptcy counsel offered to transfer Unit 990 to Ocwen Loan Servicing (the senior secured lender), Vida Capital (the junior lender), and BCOA in satisfaction of the claims against the property. Parker proposed "to transfer legal and equitable title to [Ocwen], Vida Capital or [BCOA] in satisfaction of claims against the property. Please advise in writing if [you] desire[] to accept surrender of this property by November 6, 2014. Upon approval of the Bankruptcy Court, Debtor will execute either a quitclaim, deed in lieu of foreclosure or other transfer document in favor of the accepting creditor." Jennings testified that the November 6th response date did not provide BCOA's board of directors with enough time to consider the offer. Drouin also testified that he did not think that the offer was "serious" given the short deadline. BCOA did not ask Parker to extend the deadline, and Parker did not renew her offer.

Having failed to settle the Alameda County Superior Court litigation and unwilling to accept title to Unit 990[8], BCOA developed several strategies to turn Unit 990 into an assessment paying unit. Commencing in December 2014, BCOA began notifying Parker that Unit 990 was in substantial non-compliance with the CC&Rs. When Parker failed to respond to these notices, BCOA fined her and sent her collection invoices. For example, in February 2015, BCOA imposed

---

[7] BCOA sent a second retro-assessment in May 2015 for $1,151.52. This assessment was a "Corrected 2015 Annual Assessment For the Period of 5/01/15-12/31/15 For Actual BCOA Assessable Unit Area Found in 2015 To Have Been Unreported to Date By Your Member Account."

[8] BCOA may have had valid financial reasons to decline Parker's offer to convey title. BCOA did not know whether there was any equity in the property, and it preferred to populate Unit 990 with a financially solvent occupant. As discussed *infra*, BCOA amended its CC&Rs in June 2015 to allow it to lease Unit 990, which generated far more revenue than Parker's annual assessment.

5

**MEMORANDUM AFTER TRIAL**

fines for:

1. Failure to pay property taxes (a $500 fine);

2. Failure to pay assessments (a $500 fine);

3. Failure to pay City taxes (a $500 fine);

3. Failure to advise of tenant identity and lease arrangements (a $500 fine); and

4. Acting in a manner which generally reduces general building security (a $500 fine).

In late April 2015, BCOA imposed (after complying with its CC&R's notice requirements) additional fines for:

1. Five "counts" of Hanging An Item Weighing In Excess of Ten Pounds from the Ceiling of Your unit ($2500.00 in fines);

2. Storing Hazardous Materials Inside A Unit (a $500 fine);

3. Failure to Comply with Governmental Authorities (Wall Construction Without Permits) (a $500 fine);

4. Use of A Unit In A Manner Which Would Increase Insurance Premium (Wood Burning Stove Installation w/o Permit) (a $500 fine);

5. Use of a Unit In A Manner Which Would Increase Insurance Premiums (Obstructing Fire Suppression System Sprinkler Heads) (a $500 fine);

6. Unauthorized Alternation Of The Common Area (Satellite Dish Installation Into Parapet) (a $500 fine);

7. Unauthorized Alteration of the Common Area (Lighting Fixture Installation In Common Area) (a $500 fine);

8. Electrical Wiring Without a Permit (a $500 fine); and

9. Failure to Maintain Roof (a $500 fine).

BCOA gave Parker due notice of these CC&R violations and an opportunity to contest these allegations before it imposed its fines. Parker did not respond to these notices nor attend any of the related hearings. What BCOA did not sufficiently consider, however, is whether these CC&R violations pre-dated Parker's bankruptcy filing. Parker vacated Unit 990 soon after she filed her Chapter 13 and did not return. The court therefore concludes that, at the very least, the CC&R

6

violations for the unpermitted wiring, lighting fixture, satellite dish, wood stove, wall construction and sprinkler head obstruction pre-dated her bankruptcy. In addition, Parker testified that the excess hanging item may have been a model airplane attached to Unit 990's joists (which she said she removed before she vacated the premises). Furthermore, the court takes judicial notice under Federal Rule of Evidence 201(c) of the proof of claim filed by Alameda County in Parker's Chapter 13. This $50,270.63 claim was filed on December 3, 2014, and lists unpaid taxes for the 2012-13, 2013-14 and 2014-15 tax years. These taxes were assessed before Parker filed her Chapter 13 bankruptcy. By fining Parker for these real property tax defaults, BCOA was imposing additional costs for her failure to pay a pre-petition debt.

Finally, in May 2015, BCOA leased Unit 990 in anticipation of amended CC&Rs which would authorize it to (among other things) rent "abandoned" units. There is little question that BCOA implemented this strategy to address Parker's failure to pay Unit 990's HOA obligations.

The BCOA board's post-petition emails to its residents and its meeting minutes plainly reflected BCOA's need to generate income from Unit 990. The BCOA board emailed its residents on December 1, 2014 to discuss Unit 990's status. This email, drafted by Jennings, stated in part that "Unit 990 is now derelict (at least with it empty, we won't be paying for water and gas and gate electricity for its former residents to enjoy for 'free')" and that the board was "still hot on the heels of collecting . . . the Unit 990 highly delinquent account." BCOA's March 10, 2015 board minutes listed as an agenda item BCOA's interest in filing "Stay of Bankruptcy & Collections Lawsuit Against Unit 990 Owner." The minutes state "this action is a central component of the BCOA's extensive Unit 990 debt collection plan. The BCOA is undeterred in its collections efforts by a Member's decision to file bankruptcy, abandon their property, surrender their deed to secured creditors in order to maintain 5 yrs of Federal Bankruptcy protection, and flee the state in order to avoid payment of Member responsibilities to the association. Unit 990 represents 12% of the BCOA's revenue base. Unit 990 has not paid a regular assessment since October 2012. It is only through careful cost conscious management, a tremendous amount of volunteer time donated, the development of significant operating savings in programs . . . that has prevented this 12% loss of revenue from directly resulting in regular assessment increases in 2013, 2014, and 2015. Assessment

7

**MEMORANDUM AFTER TRIAL**

increases greatly reduce BCOA property value."

BCOA's efforts to recoup its Unit 990 losses culminated in its June 2015 ballot initiatives, in which it sought, among other things, the authority to lease "abandoned units." As described by BCOA's outside counsel, this "potent plan" would "help the BCOA recover from the long-term economic damage inflicted by 990's delinquent owner. [¶] In regards to 990, this has resulted in the BCOA plan to lease the property to allow BCOA to recoup reserves funding necessary for your Board to take care of its fiduciary duty of properly running your association. Revising your CC&Rs to authorize the leasing of delinquent and abandoned units in order to protect the membership from severe economic hardship, is nothing short of brilliant."

BCOA's "June [2015] Ballot Initiative Explanation Summary" contained the terms of the proposed amendment. It stated that BCOA sought authority from the membership "to lease any Unit which is at least 60 days or more delinquent in its Member Account obligations, if the respective Unit has, for the same period of delinquency, also been abandoned for at least 60 calendar days. The lease proceeds shall be used to fund the BCOA's Operating & Reserve Accounts as the Board may determine appropriate. The lease proceeds shall not be used to reduce the delinquent Member Account balance in any manner whatsoever. The lease proceeds are the permanent property of the BCOA, and no other entity shall have the right thereto, for any reason whatsoever."[9]

While the BCOA membership approved the ballot initiatives in June 2015, BCOA retained a leasing agent in May and preemptively executed a lease for Unit 990 on May 26, 2015 (Jennings testified that BCOA jumped the gun after it received enough ballots to guarantee the passage of the ballot initiatives). The lease (drafted by Jennings and Cantor) contained a "Special Advisory Regarding This Lease Property" which stated that "BCOA Unit 990 comprises 12% of the BCOA's annual assessment revenue. The BCOA is dependent upon its assessment revenue scheme in order to provide legally required services to its Members. The owner of Unit 990 has filed for, and been granted, Federal Chapter 13 bankruptcy protection. She has left the state of California and

---

[9] No evidence was introduced indicating that there were any other abandoned units. The June 2015 ballot initiative also proposed to reduce the parking spaces assigned to several units, including Unit 990.

8

**MEMORANDUM AFTER TRIAL**

surrendered her property deed to the property's secured creditors . . . . The BCOA cares for the property and must now Lease it in order to continue to properly care for it.  In 2015 the BCOA was granted the right to foreclose on the property.  The BCOA was also granted the right to attempt to recover the revenue and operating costs it is legally entitled to, pursuant to its CC&Rs which are provided along with this Lease.  These powers were formally granted by a Federal Bankruptcy Judge in Federal Bankruptcy Court.  As a direct result, the BCOA is now leasing the surrendered property to a third party through this Lease Agreement."  BCOA leased Unit 990 for $6500.00 per month, which on an annual basis significantly exceeded Unit 990's yearly assessment.  The lease term commenced in June 2015, and BCOA collected $78,000.00 in rent before the senior lienholder foreclosed on Unit 990.[10]  Jennings and respondent Raj Patel, a board director, signed the lease and related disclosures on BCOA's behalf.

In June 2015 Jennings sent an email to all BCOA members summarizing BCOA's achievements in the past 12 months.  Among them was BCOA's lease of Unit 990.  Jennings hailed this accomplishment as enabling the "recapture of all costs & delinquent amounts from Unit 990's unfortunate 2005-2015 member resident history."  Jennings' testimony did not dispute the plain import of his statement.

Throughout all of BCOA's collection efforts, Parker and her attorneys remained mute.  Parker did not respond to or challenge any of the invoices, notices or fines issued and/or imposed by BCOA, and she never demanded that BCOA refrain from issuing any more notices or assessments.  Instead, Parker commenced this consolidated contested matter to recover damages and attorneys' fees.[11]

---

[10]  Interestingly, BCOA's emails to its leasing agent state that Unit 990 was in good shape and that BCOA needed a "solid tenant in there to provide a revenue source so that we have an active funding source to pay for the care."  Despite this representation, BCOA sent an August 8, 2015 email to Parker informing her that Unit 990 required "interior sprinkler modifications" to meet current standards, and that the estimated $6307.00 cost would be billed to her membership account.

[11]  Parker filed her § 362(k) motion on November 3, 2015.  On December 10, 2015, Cantor emailed Fong & Fong to discuss BCOA's offer (conveyed the week before) to (now) accept a quit-claim deed for Unit 990.  Parker did not respond to this offer.

9

MEMORANDUM AFTER TRIAL

Parker's evidence regarding the distress caused by BCOA's conduct, while genuine and credible, was limited. Parker did not offer any third party or expert medical testimony to buttress her own statements. Parker was and is a software engineer employed by Oracle. She testified that she was at times frustrated, depressed and sometimes in a state of disbelief regarding BCOA's failure to adhere to the automatic stay and cease its collection activities. While Parker credibly testified that she had a painful response to BCOA's conduct, she also testified that she now has little recollection of receiving some of the offending documents. Although she stated that she received medical treatment for the stress, no medical professional testified on her behalf. She also did not demand that BCOA stop its collection efforts, and it appears that she signed a June 2015 proxy which BCOA may have cast in favor of the proposed CC&R amendments.[12]

**Parker's Automatic Stay Claims**

Bankruptcy Code § 362(k) authorizes damages for willful violations of the automatic stay. Section 362(k) provides in pertinent part that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Willful conduct requires that 1) the creditor know of the automatic stay and 2) the actions that violate the stay be intentional. No specific intent is required, and a creditor's good faith belief that its conduct did not violate the automatic stay carries no weight in determining whether the act was willful. *In re Peralta*, 317 B.R. 381, 389 (B.A.P. 9th Cir. 2004). Parker asserts that BCOA's post-petition conduct violated, at the very least, § 362(a)(6), which prohibits all entities from taking "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." This court also must examine BCOA's conduct under the Ninth Circuit's recent holding in *Goudelock v. Sixty-01 Ass'n of Apt. Owners*, 895 F.3d 633, 638 (9th Cir. 2018). There, the Ninth Circuit disagreed with Ninth Circuit BAP case law that HOA-like assessments arising from recorded documents "run

---

[12]  Parker testified that she did not vote in favor of the June 2015 ballot initiatives, and that while the proxy contained her signature, she was uncertain how her signature was placed on that document. The proxy was general in nature, and authorized its holder to vote in her stead for any BCOA measures during the next 36 months. It did not mention the June 2015 ballot initiatives (*see* Exh. 36).

10

**MEMORANDUM AFTER TRIAL**

with the land" and that post-petition assessments of such obligations in a Chapter 13 case are not dischargeable as a pre-petition claim. Rather, the Ninth Circuit held that unpaid, post-petition condominium assessments arising from a recorded declaration of covenants and restrictions are dischargeable in a Chapter 13 case. *Goudelock*, *supra*, at 638. It determined that Chapter 13 debtor Goudelock's obligation to pay monthly assessments arose from her pre-petition purchase of her condominium, and that the condominium association's contention that she was obligated to pay post-petition dues ran afoul of the Ninth Circuit's "fair contemplation" test. "In the Ninth Circuit, courts use the "fair contemplation" test to determine when a claim arises. This test provides that "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law." . . . Here, at the time of the purchase of the condominium unit, Sixty-01 fairly could have contemplated that the monthly assessments would continue to accrue based upon Goudelock's continued ownership of the condominium unit. Thus, Goudelock's *in personam* obligation to pay assessments arose pre-petition when she purchased the condominium unit." *Id*. at 638. If a claim such as Goudelock's is a dischargeable *pre-petition* claim, it is also subject to the automatic stay.

This court's summary judgment order determined that respondents knew of Parker's automatic stay at all relevant times.[13] With this backdrop, this court now must determine whether respondents willfully violated the automatic stay, and if so, what damages to award to Parker.

Parker has demonstrated by a preponderance of the evidence that BCOA (and some of the individual respondents) repeatedly and willfully violated the automatic stay.

**1. The Settlement Demands:** Few cases directly address whether a post-petition offer to resolve prepetition debt violates the automatic stay. For example, in *In re Jamo,* 283 F.3d 392 (1st Cir. 2002), the First Circuit held that "while the automatic stay is in effect, a creditor may engage in post-petition negotiations pertaining to a bankruptcy-related reaffirmation agreement so long as the creditor does not engage in coercive or harassing tactics." *Jamo, supra* at 399. *See also In re*

---

[13] This court's August 24, 2017 summary judgment order was issued before *Goudelock*, and noted that Parker could not discharge her annual, post-petition HOA assessments. This statement is no longer accurate.

**MEMORANDUM AFTER TRIAL**

*Diamond*, 346 F.3d 224 (1st Cir. 2003). Reaffirmation agreements, however, are authorized by the Bankruptcy Code; stay violations are not. What makes settlement negotiations problematic are their tone, context and content, and the inclusion of any threat of continued legal action outside of the Bankruptcy Court should the debtor reject the offer. Such coercive language may violate the automatic stay. *See*, *e.g.*, *Morgan Guar. Tr. Co. of N.Y. v.Am. Sav. & Loan Ass'n*, 804 F.2d 1487, 1491 (9th Cir. 1986): "the automatic stay does not bar mere requests for payment unless some element of coercion or harassment is involved;" *Zotow v. Johnson (In re Zotow)*, 432 B.R. 252, 259 (9th Cir. BAP 2010). While this court readily acknowledges that the automatic stay does not prevent all communication between debtor and creditor, coercive and harassing demands for payment of pre-petition debt generally violate the automatic stay. Whether a communication is permissible or prohibited under Bankruptcy Code § 362(a) is a fact-driven inquiry, and it is not susceptible to any bright line test. *In re Zotow*, 432 B.R. 252, 258.

BCOA's early settlement letters were coercive, harassing attempts to collect a pre-petition debt and thus violated the automatic stay. BCOA's October 2014 email to Fong & Fong demanded, among other things, that a) Parker pay it $25,000 (plus any additional legal costs that it incurred through the execution of the settlement agreement), b) sell Unit 990 (for which BCOA would accept "60 cents on the dollar for its existing liens") and "never own property in the BCOA again," and c) replace her present realtor with a "competent" real estate agent. BCOA stated further that "If the offer is not accepted, we will be moving forward with our lawsuit with new counsel, and cross complaining Unit 990's tenant and realtor among other things – inclusive of filing multiple adverse claims with the Bankruptcy Court." The only pending litigation between the parties was, of course, BCOA's stayed Alameda County collection action, and its threats against an unnamed (and to this court's knowledge, non-existent) tenant, and her real estate agent were simply an attempt to make Parker's life miserable (*see* Exh. E). Cantor's December 15, 2014 settlement offer contained verbatim demands and threats (*see* Exh. BX).[14]

These settlement demands were thus improper, willful attempts to collect pre-petition debt.

---

[14] Both documents were penned by Jennings.

12

**MEMORANDUM AFTER TRIAL**

They were harassing and coercive in nature, and were emblematic of BCOA's general disdain for the bankruptcy process.

**2. The Invoices To Collect Pre-Petition HOA Debt**

BCOA's "late payment demand" dated December 2, 2014 and its January 2, 2015 "member account invoice" (Exhs. F and H) violated the automatic stay. Both documents requested payment of BCOA's pre-petition assessments, and the December 2nd demand was accompanied by an email (sent directly to Parker) demanding immediate payment. While Jennings testified that BCOA intended to mark these invoices with a "for informational purposes only" overlay - and BCOA did, thereafter, send such de-fanged invoices - his testimony is unavailing. These invoices, in any form, were meant to harass Parker.[15] After two years of litigation, BCOA knew that Parker was acutely aware of BCOA's claim, and indeed, Parker listed BCOA's claim (albeit as "disputed") in her Schedule D at $161,000. She filed her bankruptcy schedules along with her petition on October 8, 2014.

Moreover, the Plan provided for the surrender of Unit 990 to her secured creditors, including BCOA. BCOA (and, more specifically, Jennings) knew how its claim was being treated before it sent these invoices (*see* Exh. X). There was simply no reason to send these invoices to Parker and her counsel, as there was no "information" that BCOA needed to convey. Instead, these invoices are just more palpable evidence of BCOA's intent to pressure and harass Parker. Accordingly, these demands violated the automatic stay.

**3. The BCOA Disciplinary Fines**

BCOA's imposition of numerous disciplinary fines in February and May 2015 violated the automatic stay. As stated above, BCOA imposed fines for the following violations:

---

[15] Even if this court accepted Jennings' testimony at face value, a creditor's "internal disorder does not excuse it from violating the automatic stay." *In re Campion*, 294 B.R. 313, 317 (Bankr. 9th Cir. 2003). In addition, BCOA's overlay did not create a safe harbor or bulwark against the automatic stay. An informational disclaimer is of little value if the invoices are sent with the intent to harass or coerce. "One distinguishing factor between permissible and prohibited communications is evidence indicating harassment or coercion. When such evidence is present, a disclaimer on the communication that it was being sent for "informational purposes only" is ineffective. *In re Zotow*, *supra*, at 259. If this court has not already made clear, other than filing a redundant motion for relief from stay to foreclose on its lien (which it never did), BCOA did not hold the automatic stay in high regard, and it sent these invoices with the intent to harass Parker.

13

1. Failure to pay property taxes (a $500 fine);

2. Failure to pay assessments (a $500 fine);

3. Failure to pay City taxes (a $500 fine);

3. Failure to advise of tenant identity and lease arrangements (a $500 fine); and

4. Acting in a manner which generally reduces general building security (a $500 fine).

5. Five "counts" of Hanging An Item Weighing In Excess of Ten Pounds from the Ceiling of Your unit ($2500.00 in fines);

6. Storing Hazardous Materials Inside A Unit (a $500 fine);

7. Failure to Comply with Governmental Authorities (Wall Construction Without Permits) (a $500 fine);

8. Use of A Unit In A Manner Which Would Increase Insurance Premium (Wood Burning Stove Installation w/o Permit) (a $500 fine);

9. Use of a Unit In A Manner Which Would Increase Insurance Premiums (Obstructing Fire Suppression System Sprinkler Heads) (a $500 fine);

10  Unauthorized Alternation Of The Common Area (Satellite Dish Installation Into Parapet) (a $500 fine);

11.  Unauthorized Alteration of the Common Area (Lighting Fixture Installation In Common Area) (a $500 fine);

12.  Electrical Wiring Without a Permit (a $500 fine); and

13.  Failure to Maintain Roof (a $500 fine).

BCOA's right to impose such fines is rooted in its CC&Rs and Bylaws.[16]  Given that Parker promptly vacated Unit 990 after she filed her Chapter 13 and never rented it, and that the taxes in question were assessed pre-petition, virtually all of these violations arose before Parker filed her Chapter 13 bankruptcy.[17]  The post-petition imposition of fines for pre-petition CC&R violations therefore violated the automatic stay.  Bankruptcy Code § 101(5)(A) defines a claim as a "right to

---

[16]  The court refers the parties to the trial testimony of respondent Raj Patel.

[17]  *See* pages 6-7, *infra*.

14

payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." This definition is purposefully very broad and encompasses all of a debtor's pre-petition obligations, "no matter how remote or contingent." *Goudelock*, *supra*, at 637-38, citing *In re SNTL Corp*., 571 F.3d 826, 838 (9th Cir. 2009). Parker's obligation to comply with the CC&Rs and Bylaws arose when she purchased Unit 990. "For claims sounding in contract, '[i]t is within the fair contemplation of parties entering into a contract that the other party may breach it, or have made misrepresentations to induce the making of the contract." *In re Hassanally*, 208 B.R. 46, 53 (Bankr. 9th Cir. 1997) quoting *In re Russell*, 193 B.R. 568, 571 (Bankr.S.D.Cal.1996)). The court in *Russell* reasoned that this inclusive interpretation of claims best serves the Bankruptcy Code's policies, contemplated in 11 U.S.C. § 101(5)." *Mt. View Hosp., L.L.C. v. Sahara, Inc.*, 2011 U.S.Dist .LEXIS 120023, *34. Given the "contract-like" nature of its CC&Rs and Bylaws, BCOA's attempts to collect the disciplinary fines violated the automatic stay. Its conduct also underscores its need to maximize revenue from Unit 990 and desire to punish Parker for filing a bankruptcy and discharging her HOA liability.[18] Accordingly, BCOA willfully violated the automatic stay when it imposed these fines and attempted to collect them.

**4. The Retro-Assessment**

BCOA's retro-assessment of Unit 990 presents a more difficult analysis. Jennings testified that the original maps of the BCOA development were incorrect, and that BCOA needed for recordation purposes to prepare new maps. This required BCOA to measure the assessable living space of each unit. When BCOA measured Unit 990, it determined that its actual square footage was 6672 square feet, almost 600 square feet more than its original assessable living area. BCOA generally attributed this increase to a "significant unreported loft area built illegally without building permits in clear violation" of its CC&Rs and local laws...." Since each unit's annual assessment was based on its square footage, Jennings sent a "Unit 990 Retro Assessment Advisory" email to Fong & Fong on May 1, 2015 which informed Parker and her attorneys of the new assessment. Jennings'

---

[18] Parker was particularly upset by the fine relating to the model airplane that she hung from Unit 990's ceiling joists.

**MEMORANDUM AFTER TRIAL**

email explained how BCOA calculated the amount of the retro-assessment ($9,856.25) and further informed Parker that Unit 990's annual assessment would be increased to reflect its actual size. BCOA simultaneously issued a invoice to Parker demanding payment of the retro-assessment in full.

BCOA's physical assessment and Jennings' explanatory email did not violate the automatic stay. BCOA was entitled to accurate maps, and while it knew that Parker had surrendered Unit 990 and was not occupying it, she was still fee owner of Unit 990 and entitled to receive the revelatory information contained in the May 1st email. The email was explanatory and did not contain an explicit payment demand. BCOA's accompanying May 1, 2015 invoice, did, however, demand payment of the retro-assessment (which included both pre and post-petition shortfalls). While BCOA may have thought that Parker remained liable for Unit 990's post-petition assessments, it knew that she was seeking to discharge her pre-petition HOA obligations. BCOA should have amended its proof of claim to include the pre-petition assessments. Accordingly, while the actual assessment and explanatory email did not violate the stay, the invoice did.

**5. BCOA's Rental of Unit 990**

BCOA's rental of Unit 990 constituted a willful violation of the automatic stay. The evidence at trial established that a) Unit 990 represented a significant percentage of BCOA's assessable space, and that Parker's pre and post-petition failure to pay assessments was causing BCOA financial distress; b) BCOA chose not to foreclose on its lien against Unit 990; and c) Jennings (and thus BCOA) had little regard for tenants who filed for bankruptcy seeking to discharge BCOA assessments and for the bankruptcy process itself. Jennings instead schemed to recoup these losses, and the June 2015 ballot initiative and BCOA's leasing of Unit 990 were the culmination of his efforts. The June 2015 ballot initiative's proposal to lease "abandoned units" was a direct response to Parker's Chapter 13 bankruptcy, and its objective was to allow BCOA to recover part of Parker's unpaid assessments and fines. Under the initiative, any rent was BCOA's property, and it was not required to credit the rent to any member (read: Parker)'s account. This language presumably was inserted to dispel any suggestion that its rental of Unit 990 would violate Parker's automatic stay. When stripped of its legal jargon, however, the ballot initiative "authorized" BCOA to appropriate Parker's property, and BCOA under its imprimatur generated significant revenue. In a

16

June 2, 2015 email to BCOA's members, Jennings crowed about the Unit 990 lease, which allowed BCOA to "recapture . . . costs & delinquent amounts from Unit 990's unfortunate 2005-2015 member resident history."

BCOA cannot rely on Parker's execution and return of her proxy to avoid this finding. While a debtor may consent to relief from stay, an order granting such relief is required.[19] In addition, while the Bankruptcy Code authorizes a debtor to voluntarily make payments to a creditor under certain circumstances (*see, e.g.* Bankruptcy Code § 524(f)), there is insufficient evidence that Parker's proxy demonstrates that she knowingly authorized BCOA to rent Unit 990 and retain the proceeds. Indeed, Parker never acknowledged that she contemporaneously read the ballot initiative.

**6. The Post-Petition HOA Assessments**

BCOA sent Parker several invoices seeking payment of her post-petition HOA assessments before she received her Chapter 13 discharge. These invoices willfully violated the automatic stay under § 362(a)(6), since BCOA was seeking to collect a pre-petition debt under *Goudelock.*

**Parker's Damages Under Bankruptcy Code § 362(k)**

Bankruptcy Code § 362(k) authorizes this court to award actual damages for willful violations of the automatic stay, including costs and attorneys' fees, and, "in appropriate circumstances . . . punitive damages." Parker requests damages for the emotional distress caused by BCOA's stay violations.[20] Such damages are available "if the individual provides clear evidence to

---

[19] BCOA's relief from stay order was nothing more than a "comfort" order authorizing it to foreclose on its liens. BCOA violated the stay by attempting to collect a debt against Parker individually. It never attempted to foreclose on its liens.

[20] This court overruled BCOA's objection to Parker's introduction of evidence regarding her emotional distress. BCOA argued that Parker had failed to disclose her emotional distress allegations in the parties' pre-trial order. "A pretrial order generally supersedes the pleadings, and the parties are bound by its contents." *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993). The joint pretrial order states that the parties will litigate whether "Debtor had a duty to mitigate her alleged damages and failed to do so." Such a statement naturally infers that BCOA intended to object to Parker's damages demand. In the Ninth Circuit, emotional distress damages are one component of a Debtor's actual damages under §362(k). *See In re Dawson*, 390 F.3d 1139, 1148 (9th Cir. 2004). The joint pretrial order therefore contemplates the need for this court to determine Parker's entitlement to "actual damages."

17

**MEMORANDUM AFTER TRIAL**

establish that significant harm occurred as a result of the violation. . . . To be entitled to damages for emotional distress under [§ 362(k)], an individual must (1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process)." *Dawson v. Wash.Mut.Bank (In re Dawson)*, 390 F.3d 1139, 1148-49 (9th Cir. 2004). Fleeting or trivial anxiety or distress do not justify an award of damages. *Ibid*.

A debtor may establish emotional distress damages by introducing 1) corroborating medical evidence; 2) the testimony of non-experts, such as family members, friends, or coworkers who testify to a debtor's manifestations of mental anguish and clearly establish that significant emotional harm occurred; 3) evidence that establishes that the debtor's significant emotional distress is readily apparent even without corroborative evidence, such as in instances of egregious conduct; or 4) evidence (even if the stay violation was not egregious) that the circumstances make it obvious that a reasonable person would suffer significant emotional harm." *Id*. at 1149-1150.

Parker did not offer any expert medical testimony, and no third party testified regarding the distress she experienced. Instead, Parker relies solely on her own testimony to prove her entitlement to emotional distress damages. Parker's testimony was credible, and it sufficiently and obviously demonstrated that she experienced significant emotional harm, and that any reasonable person would have similarly suffered under the circumstances. To summarize: after several years of litigation with BCOA, Parker filed a Chapter 13, surrendered Unit 990, and moved more than a thousand miles away to Frisco, Texas with the expectation that this would terminate the dispute over her pre-petition HOA obligations. Rather than accept this outcome and work productively to find a more suitable owner for Unit 990, BCOA and its agents repeatedly harassed Parker regarding her pre-petition HOA assessments, instituted disciplinary action and issued fines over pre-petition CC&R violations, and in the end, appropriated her property (for which she was still legally liable) to generate rent which BCOA claimed as its own. One could reasonably conclude that BCOA was taking Parker to task for filing her Chapter 13, and used her as a cautionary tale should any other BCOA member seek to discharge their HOA obligations. Parker testified that BCOA's conduct left her in a state of

disbelief, with a sense of hopelessness that she would never come to terms with BCOA. She testified that BCOA's conduct made her angry, anxious and depressed and caused her to struggle in her work and personal life, all of which she internalized. Her testimony was credible, and given the duration of BCOA's violations, her distress was not fleeting.

The court notes that Parker and her counsel did little to dissuade BCOA and never informed BCOA that its invoices, fines, and ballot initiative (if implemented) would violate the automatic stay. Their inaction does not justify the harm caused by BCOA, but it does require this court to at least contemplate whether Parker could have mitigated her damages. The duty to mitigate damages in the context of § 362(k) recognizes that a debtor may not exploit a stay violation for profit. Instead, a debtor must act reasonably under the circumstances. The court determines what is reasonable as a matter of discretion. *Eskanos & Adler, P.C. v. Roman (In re Roman)*, 283 B.R. 1, 12 (Bankr. 9th Cir. 2002).

BCOA never established, however, what course of conduct Parker should have pursued, and failed to demonstrate that it would have been amenable to her ameliatory offers. While Parker stated on cross-examination that she did not want to quit-claim Unit 990, this is exactly what her counsel offered (presumably with her consent) in its October 29, 2014 letter. BCOA did not express any profound interest in accepting a quit-claim deed in the early stages of Parker's Chapter 13, and it waited until December 2015 to make its own quit-claim request. By then, the damage had been done. The court does acknowledge, however, that many of BCOA's offending documents were not sent directly to Parker. Given all of the circumstances, the court awards Parker $5,000 in emotional distress damages.

Parker also seeks as damages the rent BCOA received from leasing Unit 990. The Unit 990 lease had a one year term, and the evidence indicates that BCOA collected the rent due. "Actual" damages under § 362(k) include physical, emotional, economic or other damages for injury or loss caused by the stay violation. "In using the term "actual damages" in § 362(h), Congress obviously intended to give debtors substantial latitude in seeking damages for willful violation of the automatic stay. There is nothing in the statute nor the legislative history that indicates that courts should restrictively apply § 362(h). Additionally, a willful violation of the stay is analogous to intentional

torts that cause actual damages from the impact on legally protected rights." [citation omitted.] *Stinson v. Bi-Rite Rest. Supply Inc. (In re Stinson)*, 295 B.R. 109, 121 (Bankr. 9th Cir. 2003), *affirmed in part and reversed in part by Stinson v. Cook Perkiss & Lew (In re Stinson)*, 128 Fed.Appx. 30 (9th Cir.2005). Parker surrendered Unit 990 and promptly vacated the premises after she filed her Chapter 13. She did not lease nor express any interest in leasing Unit 990 during (or after) her Chapter 13 case. She remained the fee owner of Unit 990 until its December 2016 foreclosure, and as such was entitled to have some control over who, if anyone, occupied the premises. BCOA's appropriation and leasing of Unit 990 violated the stay and interfered with her property rights to Unit 990. Its lease was void as a matter of law, and BCOA's conduct fostered a trespass on Parker's property. Under California Civil Code § 3334(a), the detriment caused by the wrongful occupation of real property is generally "deemed to include the value of the use of the property for the time of that wrongful occupation . . . ." The property's value under this code section shall be " the greater of the reasonable rental value of that property or the benefits obtained by the person wrongfully occupying the property by reason of that wrongful occupation." Cal.Civ.Code § 3334(b). Section 3334 provides an appropriate method by which to gauge Parker's damages for this stay violation, and BCOA's lease reflects Unit 990's reasonable rental value[21]. Accordingly, Parker is awarded $39,000.00 in damages arising from the interference with her property rights in Unit 990. This amount reflects the monthly rent collected by BCOA from when it executed the lease to the issuance of Parker's Chapter 13 discharge.

Which respondents are liable for these damages? Certainly, BCOA is fully liable for the emotional distress and property right damages, since it was the creditor which sought to collect, assess or recover pre-petition claims against Parker. Corporate entities can only act through their agents, and a corporate principal is generally liable for its agent's tortious conduct. Moreover, § 362 is a stay against all entities, and § 362(k) applies with equal force to the agents and attorneys who commit the offending acts. *See, e.g., Sternberg v. Johnston*, 595 F.3d 937 (9th Cir. 2010), *overruled in part*, 803 F.3d 1095 (9th Cir. 2015); *In re Davis*, 177 B.R. 907, 911 (Bankr. 9th Cir. 1995); *In re*

---

[21] BCOA used a leasing agent to rent Unit 990, and this court reasonably presumes that the $6,500 monthly rent reflected the market.

**MEMORANDUM AFTER TRIAL**

*Crawford*, 388 B.R. 506, 522-23 (Bankr. S.D.N.Y. 2008), *partially reversed on other grounds*, 476 B.R. 83 (S.D.N.Y. 2012). The court's determination with regard to the individual respondents is as follows:

**Emotional Distress Damages:** Some of the individual respondents did violate the stay, and their acts contributed to Parker's emotional distress. This court finds that Andrew Cantor, BCOA's outside counsel, violated the stay when he sent his settlement letter to Fong & Fong. Cantor provided more than just legal advice to BCOA when he sent out the December 2014 settlement offer on his own letterhead, as this document was a blatant attempt to collect a debt. This court cannot, however, attribute a specific percentage of Parker's emotional distress damages award to this discreet act, and therefore declines to hold Cantor personally liable for any damages. Parker's emotional distress resulted from the multiple stay violations committed on BCOA's behalf, and the damages award reflects the cumulative impact of these bad acts. This court lacks sufficiently precise evidence to assign a specific percentage of her emotional distress damages to any individual stay violation. "Once a party has proven that he has been damaged, he or she needs to show the amount of damages with reasonable certainty." *Auyeung v. Christensen (In re Auyeung)*, 2012 Bankr.LEXIS 6126, *30 (Bankr.E.D.Cal. 2012).

Holding the respondent board members (Patel, Hu, and Drouin) and Jennings individually liable for her emotional distress damages is also problematic. Patel, Hu and Drouin served as board members, and there is almost no evidence that they were the "actors" who violated the stay. Parker has not provided this court with any cogent legal theory under which this court can hold board members (who favorably voted on board resolutions which led to stay violations) liable for Parker's emotional distress. If such is the result, where along the corporate chain (other than the individual who physically committed the offending act) would such liability start and stop? While this court may hold a principal and its agent jointly and severally liable for § 362(k) damages caused by the agent,[22] the agent's individual liability rests on evidence demonstrating that he or she directly committed the act which violated the automatic stay. Patel, Hu and Drouin served as board members

---

[22] *See In re Crawford*, *supra* at 523 and citations therein.

21

who reviewed and presumably approved various resolutions which may have led to stay violations which caused Parker's emotional distress. This conduct, standing alone, did not violate Bankruptcy Code § 362(a)(6). In contrast, Jennings was the primary actor related to several stay violations which caused Parker's emotional distress. He, among other things, authored the demand letters and sent one of them by email, signed the lease's lead-based paint and asbestos disclosures, and directly oversaw the issuance of some of the offending invoices. This conduct rises to the level of "acts" which violate § 362(a)(6). However, as stated above, this court reached the damages award by analyzing the cumulative effect of the stay violations on Parker, and not just those directly committed by Jennings. This court declines to arbitrarily award specific damages to discreet acts when Parker has failed to provide this court with the evidence to do so. Accordingly, Jennings is not personally liable for the emotional distress damages. Patel also served as a board member, and he, on BCOA's behalf, signed the Unit 990 lease. The lease's execution was an affirmative, direct attempt to collect a debt, and Patel therefore violated the automatic stay by signing it. Parker (as stated above) did not, however, provide this court with sufficient evidence to attribute a specific amount of damages to this act. Accordingly, the court declines to hold Patel, Hu, Drouin and Jennings liable for the $5,000.00 damages award.

**Property Interference Damages:** Jennings and Patel executed the Unit 990 lease on BCOA's behalf. The execution of the lease violated § 362(a)(6), and as a result, Patel, Jennings and BCOA are jointly and severally liable for the $39,000 property right damages award.

None of respondents' affirmative defenses provide any respite. This court rejects their argument that California Corporations Code § 7231.5 shields them from liability. California Corporations Code § 7231 provides that directors of non-profit entities such as BCOA owe a duty of due care to the non-profit. Section 7231.5, however, limits a volunteer officer or director's liability for any breach of his/her fiduciary duty. This code section states in pertinent part that "there is no monetary liability on the part of, and no cause of action for damages shall arise against, any volunteer director or volunteer executive officer of a nonprofit corporation . . . based upon any alleged failure to discharge the person's duties as a director or officer if the duties are performed in a manner that meets all of the following criteria: (1) The duties are performed in good faith; (2) The

22

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

duties are performed in a manner such director or officer believes to be in the best interests of the corporation; and (3) The duties are performed with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

This code section is constitutionally preempted by Bankruptcy Code § 362(k). "In the absence of express preemption, Congressional intent can be inferred [...] where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Thorpe Insulation Co.*, 677 F.3d 869, 889 (9th Cir. 2012). As noted by the Ninth Circuit, "[T]he automatic stay plays a vital role in bankruptcy. It is designed to protect debtors from all collection efforts while they attempt to regain their financial footing. As Congress stated 'The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.'" *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992). Section 362(k) safeguards the automatic stay by providing a claim for relief for willful violations. Section 7231.5 in this instance would undermine this laudatory goal, and it is accordingly preempted.

Respondents' equitable estoppel argument is also not convincing. BCOA failed to introduce any evidence establishing that it would not have rented Unit 990 if Parker had voted against the 2015 ballot initiatives. Indeed, this argument runs exactly contrary to BCOA's successful scheme to persuade the BCOA home owners to approve the June 2015 ballot initiatives. Parker's vote by proxy was, presumably, one of many votes cast, and there was no evidence that it was the decisive vote. Accordingly, BCOA did not rely on Parker's proxy when it leased Unit 990.

The court also disagrees that Parker's claims are barred by the doctrine of "unclean hands." There was nothing untoward concerning Parker's performance of her Plan. While BCOA correctly states that Parker "surrendered" Unit 990, it misstates the legal impact of that surrender. A surrender under a Chapter 13 plan does not transfer title or any other property right to the secured creditor. Instead, it signals to the secured creditor that the Chapter 13 debtor does not intend to cure arrears or otherwise satisfy the secured debt through the Chapter 13 plan. As such, the form Chapter 13 plan in

23

use in the Northern District of California in 2014 expressly granted secured creditors stay relief upon confirmation to exercise their lien rights against their collateral. Parker's Plan did not, in theory, preclude her from "negotiating" with her secured creditors. Of course, other than her early offer to transfer title to her secured creditors, there were no negotiations between the parties.

Finally, Parker's claims are not barred by laches. Laches is an equitable time limitation on a party's right to bring suit. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). The doctrine "may apply where there is an unreasonable or unexcused delay by the party asserting the claim and the defending party is prejudiced by the lack of diligence." *In re Shook*, 278 B.R. 815 (Bankr. 9th Cir. 2002). *See also In re Beaty*, 306 F.3d 914, 926 (9th Cir. 2002). Parker filed her initial motion seeking damages under § 362(k) on November 3, 2015, only several months after BCOA executed its Unit 990 lease and well within a year of virtually all of the other stay violations. This time line is not unreasonable. In addition, the respondents have not demonstrated how this "delay" prejudiced them.

Parker also seeks punitive damages against respondents. "An award of punitive damages requires some showing of reckless or callous disregard for the law or rights of others." [citations omitted.] *Snowden v. Check into Cash of Wash., Inc. (In re Snowden)*, 769 F.3d 651, 657 (9th Cir. 2014). "Generally speaking, there are two underlying purposes for punitive damages awards: to punish outrageous conduct and to deter future similar conduct." [citations omitted.] *Orian v. Asaf (In re Orian)*, 2018 Bankr.LEXIS 3734, *37 (November 27, 2018). A punitive damages award must reasonably relate to compensatory damages. While there is no fixed ratio or formula for determining the proper proportion, a court should generally consider 1) the nature of the respondents's acts; 2) the amount of compensatory damages awarded; and 3) the wealth of the respondents. *Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exh. Council, Inc.*, 727 F.2d 1470, 1473 (9th Cir. 1984). The court awards $10,000.00 in punitive damages against respondent BCOA. Parker has established by a preponderance of the evidence that BCOA callously and repeatedly disregarded Parker's rights under the automatic stay. This award will deter BCOA from violating the automatic stay in similar fashion in any future bankruptcy filed by one of its unit owners. The court also believes that the punitive damages award is commensurate with Parker's actual damages. While Parker did not present direct

evidence of BCOA's financial condition, this court can infer - based on the amount of Unit 990's annual assessment and the percentage that this amount represents of BCOA's total annual assessments- that a $10,000.00 punitive damages award is reasonable. Patel's conduct does not warrant the imposition of punitive damages against him, and no evidence was presented, among other things, regarding Jennings' financial condition.  The court therefore declines to award punitive damages against them.

**Parker's Contempt Claims**

Parker argues that respondents should be held in contempt under Bankruptcy Code § 105 for its repeated stay violations (as established above) and violation of the discharge injunction under Bankruptcy Code § 524(a)(2).  The court turns first to Parker's discharge injunction claims.

Bankruptcy Code § 105(a) authorizes this court to hold parties in contempt and award damages for a knowing violation of a court order, such as the discharge injunction.  Bankruptcy Code § 524(a)(2) provides that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ." Section 524(a)(2) does not provide a private right of action. *See Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502 (9th Cir. 2002).  Instead, a debtor may only seek redress through a contempt finding under Bankruptcy Code § 105(a). "Compensatory civil contempt allows an aggrieved debtor to obtain compensatory damages, attorneys fees, and the offending creditor's compliance with the discharge injunction.  Therefore, contempt is the appropriate remedy and no further remedy is necessary." *Walls, supra,* 276 F.3d at 507.  To prevail, Parker must establish by clear and convincing evidence that BCOA (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction.  The burden then shifts to the contemnors to demonstrate why they were unable to comply." *Lorenzen v. Taggart (In re Taggart)*, 888 F.3d 438, 443 (9th Cir. 2018).  The Ninth Circuit recently made clear that a "creditor's good faith belief that the discharge injunction does not apply to the creditor's claim precludes a finding of contempt, even if the creditor's belief is unreasonable." *Lorenzen v. Taggart, supra* at 444.

The clear and convincing standard creates an exacting evidentiary burden for Parker.  Parker

25

1  must "[p]lace in the ultimate fact finder an abiding conviction that the truth of [her] factual

2  contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81

3  L.Ed. 2d 247 (1984).  Factual contentions are highly probable if the evidence offered in their support

4  "instantly tilt[s] the evidentiary scales in the affirmance when weighed against the evidence [the non-

5  moving] party offered in opposition."  *e-smart Techs., Inc. v. Drizin*, 2011 U.S.Dist. LEXIS 53129

6  (N.D.Cal. 2011).

7      Parker's Chapter 13 discharge was entered on December 1, 2015, and she raised two possible

8  injunction violations at trial: 1) BCOA's April 2, 2016 "Late Payment Demand and Notice of

9  Delinquency (Ex. AT) which requested payment of $81,855.79 in post-petition HOA assessments,

10  disciplinary fines, retro-assessments, and related finance charges, and 2) BCOA's collection of post-

11  discharge Unit 990 rent.[23]

12  **The April 2, 2016 Invoice**:    The court will not hold BCOA (or any of the individual respondents)

13  in contempt for issuing the April 2, 2016 invoice.  This invoice appears to be BCOA's standard form

14  invoice that it uses to bill its members.  The invoice lists a zero pre-petition 'balance,' which

15  indicates BCOA's acknowledgment that the pre-petition balance (as reflected in its proof of claim)

16  was discharged.  Instead, this invoice demanded payment of the individual invoices that BCOA

17  issued post-petition, including the regular HOA assessment for the 2015 calendar year.  While this

18  court believes that Parker discharged the 2015 and 2016 annual HOA assessments, this clarity is a

19  product of *Goudelock*, a Ninth Circuit decision issued only a few months before trial.  Moreover,

20  respondents testified that they did not believe that the 2015 HOA assessment was subject to the stay.

21  Such testimony demonstrates that they had a good faith belief that the 2015 HOA assessment (in the

22  amount of $22,558.20) was not discharged.

23      Parker also did not solicit any evidence regarding how the April 2nd invoice was prepared.

24  BCOA had both bankruptcy and general outside counsel during its entire bankruptcy debacle with

25  Parker, and it relied to some degree on their advice.  This court finds that Parker did not introduce

26  clear and convincing evidence establishing that respondents knew the true scope of the discharge and

27  ─────────────────

28      [23]  While Parker's summary judgment motion raised several other discharge injunction
violations, she limited her trial evidence to the above two alleged violations.

26

**MEMORANDUM AFTER TRIAL**

understood that it applied to all of the amounts listed in the April 2nd invoice.

**The Unit 990 Rent**

BCOA apparently collected rent after Parker received her Chapter 13 discharge. The court will not, however, hold BCOA (or the individual respondents) in contempt for this conduct. First, Parker did not introduce clear and convincing evidence establishing how BCOA applied these funds. As stated above, respondents had a good faith belief that Parker was liable for the post-petition HOA assessments. Absent clear and convincing evidence regarding how BCOA used these funds, the court is unwilling to hold it in contempt.[24]

**The Automatic Stay Violations**

The court will not hold respondents in contempt for their automatic stay violations. Parker's counsel made no effort in his post-trial brief to address each stay violation and explain why each is contempt worthy. This court declines to represent Parker in this regard. Second, Parker did not present clear and convincing evidence to establish contempt.[25] For example, BCOA believed that the automatic stay did not apply to its 2015 HOA assessment, and its belief, while incorrect under *Goudelock*, was held in good faith. In addition, Parker did not present clear and convincing evidence that BCOA *knew* that its disciplinary fines were rooted in pre-petition conduct, and that they therefore violated the stay. The same is true regarding BCOA's leasing of Unit 990. Respondents believed that Parker was still personally liable for the 2015 assessment, and Parker did not present clear and convincing evidence which explained how BCOA used the rent proceeds.

**Conclusion**

For all of the reasons stated above, Parker is awarded $5,000.00 in emotional distress damages, $39,000.00 in property right interference damages, and $10,000 in punitive damages. BCOA is liable for all of these damages. Respondents BCOA, Patel and Jennings are jointly and

---

[24]  For example, was the rent used to pay expenses that her 2015 HOA assessment would have helped cover?

[25]  The same evidentiary standard applies to discharge injunction and automatic stay contempt claims. *See Taggart*, *supra* at 888 F.3d at 444, ft. 4. The court notes that the United States Supreme Court granted a writ of certiorari to review *Taggart* on January 4, 2019. *Taggart v. Lorenzen*, 2019 U.S. LEXIS 1. Neither Parker not respondents have sought a stay in light of the writ of certiorari.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

severally liable for the $39,000.00 property right interference damages.  Parker is entitled to reasonable attorneys and costs under § 362(k), and she shall promptly file an application for these fees and costs and set it for a hearing.

**\* \* \* END OF ORDER \* \* \***

MEMORANDUM AFTER TRIAL

Case No. 14-44083 CN

## COURT SERVICE LIST

Recipients are ECF participants

**MEMORANDUM AFTER TRIAL**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California